**CASE NO. 20-1001 (L)**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; and PATRICIA BROWN, as Guardian of K.B., a minor child,

*Plaintiffs - Appellees, Cross-Appellants*

v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER; CHAD ADAMS; SUZANNE WEST; COLLEEN COMBS; TED BODENSCHATZ; and MELISSA GOTT in their capacities as members of the Board of Trustees of Charter Day School, Inc.,

*Defendants - Appellants, Cross-Appellees*

and

THE ROGER BACON ACADEMY, INC.,

*Defendant - Cross-Appellee*

---

On Appeal from the United States District Court
Eastern District of North Carolina, Southern Division
Case No. 7:16-cv-00030-H-KS

---

**APPELLANTS' OPENING BRIEF**

---

Aaron M. Streett
J. Mark Little
Travis L. Gray
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

*Counsel for Appellants, Cross-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __20-1001__     Caption: __Peltier et al. v. Charter Day School, Inc. et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Charter Day School, Inc. and Robert P. Spencer, Chad Adams, Suzanne West, Colleen Combs,__
(name of party/amicus)

__Ted Bodenschatz, and Melissa Gott, in their official capacities__

who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                            ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☐YES ☑NO
     If yes, identify all such owners:


- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                      ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Aaron M. Streett                        Date: _____01/16/2020_____

Counsel for: Charter Day School, Inc., et al.

[Print to PDF for Filing]        [Reset Form]

## TABLE OF CONTENTS

**Page**

Table of Contents ........................................................................................ i

Table of Authorities .................................................................................. iii

Jurisdictional Statement ............................................................................1

Issues Presented ........................................................................................2

Introduction ...............................................................................................3

Statement of the Case................................................................................6

    I.     North Carolina contracts with non-profit corporations to operate charter schools, aiming to diversify public education and provide a meaningful alternative to state-run public schools............................6

    II.    CDS, Inc. obtains a charter from the State to begin operating Charter Day School. .....................................................................8

    III.   As part of its overall pedagogical strategy, CDS, Inc. includes a Uniform Policy designed to encourage discipline and respect between male and female students. ....................................................10

    IV.   Three students and their parents sue to change the Uniform Policy, and the district court grants summary judgment to Plaintiffs, holding that the Uniform Policy violates the Equal Protection Clause even as it complies with Title IX. ..........................12

Summary of the Argument........................................................................16

Standard of Review ..................................................................................17

Argument...................................................................................................18

    I.     CDS, Inc. and its Board are not amenable to suit under § 1983 because they did not act under color of state law in promulgating the Uniform Policy. ...........................................................................18

i

A.  A government contractor acts under color of state law only when it performs a "traditional and exclusive state function" or its specific challenged conduct is "compelled" by "extensive regulation." ...................................18

B.  CDS, Inc. did not perform a traditional and exclusive state function by operating a charter school.....................................22

C.  Defendants' design and implementation of the Uniform Policy was not "compelled" by "extensive regulation."...........29

II.  The Uniform Policy does not violate the Equal Protection Clause. ............................................................................................37

A.  Sex-specific dress codes that impose requirements on both sexes are constitutional unless they disproportionately burden one sex. ........................................................................38

B.  Defendants are entitled to summary judgment because Plaintiffs failed to adduce evidence that the Uniform Policy—considered as a whole—imposes a disproportionate burden on female students. ...........................44

C.  In no event should the district court have granted summary judgment to Plaintiffs................................................................51

Conclusion ...........................................................................................58

Request for Oral Argument...................................................................59

Certificate of Compliance ....................................................................60

Certificate of Service ...........................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999)...................................... 18, 21, 30, 31, 32, 33, 35

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................54

*Bauer v. Lynch*,
  812 F.3d 340 (4th Cir. 2016)................................................44

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ..................................... 18, 20, 21, 30, 32, 33, 36

*Brooks v. Johnson*,
  924 F.3d 104 (4th Cir. 2019).............................................17

*Carroll v. Talman Fed. Sav. & Loan Ass'n of Chicago*,
  604 F.2d 1028 (7th Cir. 1979)......................................41, 43

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
  590 F.3d 806 (9th Cir. 2010)........................ 18, 24, 25-31, 33, 35, 36

*Earwood v. Cont'l Se. Lines, Inc.*,
  539 F.2d 1349 (4th Cir. 1976)...........................................40

*Fountain v. Safeway Stores, Inc.*,
  555 F.2d 753 (9th Cir. 1977)............................................39

*Furnco Constr. Corp. v. Waters*,
  438 U.S. 567 (1978) ......................................................40

*Gerdom v. Cont'l Airlines, Inc.*,
  692 F.2d 602 (9th Cir. 1982) ......................................41, 43

*Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*,
  743 F.3d 569 (7th Cir. 2014)..........................................42-44

*Jackson v. Metro. Edison Co.*,
  419 U.S. 345 (1974) ................................. 19, 20, 21, 24, 25, 26, 35

*Jespersen v. Harrah's Operating Co.*,
    444 F.3d 1104 (9th Cir. 2006)............................................. 40, 42, 44-49

*Johnson v. Pinkerton Acad.*,
    861 F.2d 335 (1st Cir. 1988)................................................25

*Lanigan v. Bartlett & Co. Grain*,
    466 F. Supp. 1388 (W.D. Mo. 1979)......................................39

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ...........................................................19

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019).................................................20, 21, 30, 35

*Mentavlos v. Anderson*,
    249 F.3d 301 (4th Cir. 2001)........................ 19, 21, 25, 28, 30, 32, 35

*Milburn by Milburn v. Anne Arundel Cty. Dept. of Soc. Servs.*,
    871 F.2d 474 (4th Cir. 1989)...............................................20

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) ............................................................40

*Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*,
    579 F.3d 502 (5th Cir. 2009)...........................................52, 58

*Philips v. Pitt Cty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009)...............................................19

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982)............................. 14, 18, 19, 21, 22, 24-31, 35

*Santiago v. P.R.*,
    655 F.3d 61 (1st Cir. 2011).................................................25

*Schleifer ex rel. Schleifer v. City of Charlottesville*,
    159 F.3d 843 (4th Cir. 1998)...............................................41

*State v. Kinston Charter Acad.*,
    836 S.E.2d 330 (N.C. Ct. App. 2019)................................36, 37

*Sugar Creek Charter Sch., Inc. v. State*,
    712 S.E.2d 730 (N.C. Ct. App. 2011) ................................................. 33

*United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*,
    43 F.3d 902 (4th Cir. 1995) ....................................................... 20, 25, 26

*United States v. Espinoza*,
    641 F.2d 153 (4th Cir. 1981) ............................................................. 56

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
    888 F.3d 651 (4th Cir. 2018) ............................................................. 55

*Vernonia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995) ......................................................................... 41

**STATUTES AND RULES**

20 U.S.C. § 1681 ....................................................................... 1, 13

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

42 U.S.C. § 1983 ................... 1, 4, 13, 14, 16, 18-20, 23, 25, 26, 36, 58

N.C. Gen. Stat. § 115C-218 ................................................... 6, 7, 32, 33

N.C. Gen. Stat. § 115C-218.1 ............................................................ 7

N.C. Gen. Stat. § 115C-218.6 ............................................................ 8

N.C. Gen. Stat. § 115C-218.10 ..................................................... 7, 32

N.C. Gen. Stat. § 115C-218.15 ................................................... 7, 8, 32

N.C. Gen. Stat. § 115C-218.95 ........................................................... 8

N.C. Gen. Stat. § 115C-390.2 ................................... 8, 9, 10, 14, 34, 35

Fed. R. Civ. P. 54(b) ................................................................... 1, 16

**OTHER AUTHORITIES**

EEOC Compliance Manual, 2006 WL 4672751, § 619.4(d) (June 2006) ........ 39, 49

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs brought claims under 42 U.S.C § 1983 and Title IX, 20 U.S.C. § 1681. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered partial final judgment under Federal Rule of Civil Procedure 54(b) as to Plaintiffs' § 1983 and Title IX claims on November 26, 2019. JA 2755. Defendants timely noticed their appeal on December 26, 2019. JA 2757.

**ISSUES PRESENTED**

1. Whether a private nonprofit corporation that operates a charter school under a contract with the State acted "under color of state law" when it independently designed and implemented a uniform policy for that charter school.

2. Whether the district court erred in denying Defendants summary judgment on Plaintiffs' equal-protection claim where Plaintiffs failed to adduce any evidence showing that the uniform policy disproportionately burdens female students.

3. Whether the district court erred in granting Plaintiffs summary judgment on their equal-protection claim where there were at least material fact issues on whether the uniform policy disproportionately burdens female students.

## INTRODUCTION

North Carolina enacted a charter-school program to promote educational innovation. Charter schools aim to improve education in creative ways, employing different teaching techniques, curricular choices, and discipline policies than traditional, state-run public schools. Charters offer parents—often low-income or rural ones—an alternative to their local public school. By design, they are meant to be distinct from state-run public schools.

To ensure maximum innovation, each charter school is run by an independent nonprofit corporation. The nonprofit's board devises policies for the school. The nonprofit corporation holds a "charter agreement" with the State, which broadly defines the nonprofit's duties, including compliance with state and federal constitutions. If the corporation violates the charter agreement, the State may revoke the charter or otherwise discipline the corporation. Beyond the charter agreement, the State takes a largely hands-off approach, imposing few statutory mandates.

This case involves a successful North Carolina charter school, Charter Day School. The School is operated by Defendant-Appellant Charter Day School, Inc., the nonprofit corporation that holds charters for four schools in rural and inner-city North Carolina. Founded in 1999 by a retired entrepreneur with a heart for serving low-income and special-needs children, the School employs a distinctive educational method focused on a classical curriculum with strict classroom discipline.

Plaintiffs, three students and their parents, chose the School over the local public schools. While expressing overall satisfaction with the School, Plaintiffs disagreed with one aspect of the School's traditional approach to education—a dress-code requirement that female students must wear "jumpers, skirts, or skorts." Plaintiffs could have transferred to the local public school with a laxer dress code or to another charter school with a different educational philosophy. They could have petitioned the state Board of Education and argued that CDS, Inc. was violating its charter. But instead Plaintiffs filed a federal lawsuit against CDS, Inc. and its Board under the Equal Protection Clause (via 42 U.S.C. § 1983) and Title IX to force a change in CDS, Inc.'s Uniform Policy.

Despite accepting that CDS, Inc. designed its Uniform Policy without any input from the State, the district court held CDS, Inc. and its Board liable as state actors under § 1983. That holding is gravely wrong as a matter of law. CDS, Inc. is a private government contractor that provides a service—primary and secondary education—that has long been provided by both governmental and private entities alike. And the State neither compelled nor influenced the content of the School's dress code through statute or the charter agreement.

By treating nonprofit corporations that operate charter schools as state actors, the district court departed from Supreme Court case law, contravened the only court of appeals that has addressed this issue, and eliminated the distinctions between

charters and state-run schools codified in North Carolina law. And by declaring open season for constitutional, fee-shifting litigation against charter nonprofits and their boards, the district court's approach threatens to destroy the flexibility and innovation that characterize North Carolina charter schools.

The district court erred again when it granted summary judgment to Plaintiffs on their Equal Protection claim. Comprehensive, sex-specific dress codes—which impose requirements on both sexes—have long been endorsed by the EEOC and consistently permitted under Title VII and Title IX—the federal statutes that directly address sex discrimination. Yet while the district court correctly held that the Uniform Policy does *not* violate Title IX, it nonetheless held that the same policy runs afoul of the Equal Protection Clause. No court of appeals has ever invalidated a comprehensive, sex-specific dress code under the Equal Protection Clause, and this Court should not be the first.

The district court reached that result only by relieving Plaintiffs of the evidentiary duty they faced in challenging a comprehensive, sex-specific dress code. While the district court purported to apply the right legal test—whether the dress code, viewed as a whole, imposes comparable burdens on male and female students—it in fact evaluated parts of the dress code in isolation, shifted the burden to Defendants, and applied aspects of heightened scrutiny. Indeed, Plaintiffs utterly failed to produce any evidence that the Uniform Policy *disproportionately* burdens

female students; they showed merely that the Uniform Policy treats girls *differently* than male students, but that it is true of *every* sex-specific dress code. By granting summary judgment without considering—much less comparing—the burdens the Uniform Policy imposed on boys, the district court granted summary judgment for the wrong party. At a bare minimum, Plaintiffs were not entitled to summary judgment because a reasonable jury could have concluded—from substantial record evidence—that the Uniform Policy, viewed holistically, did not disproportionately burden female students.

## STATEMENT OF THE CASE

**I.    North Carolina contracts with non-profit corporations to operate charter schools, aiming to diversify public education and provide a meaningful alternative to state-run public schools.**

In the mid-1990s, the North Carolina General Assembly passed the Charter School Act, which "authorize[d] a system of charter schools to provide opportunities for teachers, parents, pupils, and community members to establish and maintain schools that operate independently of existing schools." N.C. Gen. Stat. § 115C-218(a). These independent charter schools were designed to "[i]mprove student learning," with a "special emphasis" on "at risk" and "academically gifted" students, and to "[e]ncourage the use of different and innovative teaching methods." *Id.* § 218(a)(1)-(3). The ultimate goal was to "[p]rovide parents and students with

expanded choices in the types of educational opportunities that are available within the public school system." *Id.* § 218(a)(5).

Although the statute deems charter schools to be "public school[s] within the local school administrative unit in which [they are] located," *id.* § 218.15(a), they "operate independently of" and differ dramatically from traditional public schools run by state entities. "Any child who is qualified . . . for admission to a public school" may choose to attend any charter school, but no child may be required to attend one. *Id.* § 218.45(a)-(b). Charter schools are operated not by a local public-school board, but "by a private nonprofit corporation." *Id.* § 218.15(b); *see id.* §§ 218.1(a), 218.15(a). The nonprofit's board of directors—which the State has no role in selecting, JA 2497—has authority to "decide matters related to the operation of the school, including budgeting, curriculum, and operating procedures." N.C. Gen. Stat. § 115C-218.15(d).

North Carolina gives charter schools wide freedom to experiment. "[A] charter school is exempt from statutes and rules applicable to a local board of education." *Id.* § 218.10. Instead of those generally applicable laws, charter schools are governed by their charter—a contract between the private nonprofit corporation and the State. *Id.* § 218.15(c). Among other things, the charter incorporates "any terms and conditions imposed on the charter school by the State Board of Education," such as compliance with state and federal constitutions. *Id.*

Through the charters, the State Board of Education is able to hold the nonprofit operating corporations accountable. If a nonprofit corporation violates its contract obligations, the State can revoke the charter or bring a breach-of-contract action. *Id.* § 218.95. Similarly, if the nonprofit's charter school underperforms, the State can either revoke the charter, decline to renew it, or renegotiate the contract to add additional performance metrics. *Id.* § 218.6(a).

Outside of the charter agreements, the State takes a largely hands-off approach regarding charter schools' "budgeting, curriculum, and operating procedures," leaving those decisions to the nonprofit that runs the school. *Id.* § 218.15(d). For example, while charter schools, like state-run public schools, must "adopt policies to govern the conduct of students and establish procedures to be followed by school officials in disciplining students," the State does not approve or supervise the content of charter schools' discipline policies. *Id.* § 390.2(a). Particularly relevant here, no state law or charter provision requires charter schools to impose a dress code as part of their student-conduct codes. Rather, the nonprofit corporation's board has complete discretion to mandate and design school uniforms as it sees fit.

## II. CDS, Inc. obtains a charter from the State to begin operating Charter Day School.

Charter Day School, Inc ("CDS, Inc.") is a nonprofit corporation that holds a charter from the State. JA 2250-60. Baker Mitchell incorporated CDS, Inc. in 1999. JA 1744. Mr. Mitchell sought to open a charter school instead of a private school

8

because he saw a "need . . . in public schools and among the low income and minority [and] . . . the special needs students" in the local area. JA 1774. CDS, Inc. filed its initial application for State approval to open Charter Day School ("the School") in Leland, a small town in rural Brunswick County.[1] JA 2497. When the School first opened, it had 53 students. JA 1750. Since then, it has grown to over 900 on both elementary- and middle-school campuses. *Id.* CDS, Inc. has since opened three additional charter schools in southeastern North Carolina. *Id.*

CDS, Inc.'s Board establishes policy for the School. JA 1528, 1765-66, 1768-69, 1839, 1842, 2236. The Board's members are uncompensated volunteers. JA 1836, 2251. While the Board sets policy for the School, CDS, Inc. entered into an "educational management contract" with The Roger Bacon Academy, Inc. ("RBA") to manage the day-to-day operations of the four CDS, Inc. charter schools. JA 2160, 2229-47. RBA is a for-profit corporation, with separate shareholders, finances, and management from CDS, Inc. JA 2497. No one associated with RBA has a voting seat on CDS, Inc.'s Board. *Id.*

---

[1] The School is not a juridical entity and thus not a defendant here.

### III. As part of its overall pedagogical strategy, CDS, Inc. includes a Uniform Policy designed to encourage discipline and respect between male and female students.

The Board has chosen to operate "a traditional school with a traditional curriculum, traditional manners and traditional respect." JA 1719. The School's pledge sums up these values, with students promising, for example, "to keep myself healthy in body, mind, and spirit," "to be truthful in all my works," and "to be virtuous in all my deeds." JA 1958. Students must use polite forms of address, including "Ma'am" and "Sir." JA 1967.

One cornerstone of the School's traditional model is the "direct instruction" method, which features "constant vocal responses" in order to increase active student participation in the lessons. JA 1588-90, 2079-80. Another is its "classical curriculum," which includes classical literature and history, Latin, and sentence diagramming. JA 1752. These subjects serve the goals of liberal education—to learn "to communicate one's ideas clearly and understand the communications of others." JA 2064.

CDS, Inc.'s Uniform Policy is a key part of its traditional approach. Before opening the School, Mr. Mitchell and its other founders hosted meetings with parents of prospective students to obtain their input on formulating school policies. JA 1756-57. Those parents expressed a desire for dress and grooming requirements that closely resemble the specific requirements of the current Uniform Policy. *Id.*

10

As a result, from the time of the School's initial charter application, it has "require[d] all students to wear a simple uniform" to "help to instill discipline and keep order" in the classroom. JA 2079. The below chart summarizes the specific requirements:

| Regardless of Sex | Males Only | Females Only |
|---|---|---|
| • White or navy blue tops<br>• Khaki or blue bottoms<br>• Shirts tucked in<br>• Closed-toed, closed-heel shoes<br>• Bottoms must be knee-length or longer<br>• May wear watches<br>• No "[e]xcessive or radical haircuts and colors"<br>• PE uniform required on PE days | • Unisex polo or oxford collar shirt<br>• May wear pants or shorts<br>• Must wear belt at all times<br>• Must wear white, black, or navy blue socks<br>• No jewelry<br>• Must keep hair "neatly trimmed and off the collar, above the eyebrows, and not below the top of the ears or eyebrows"<br>• Must not have any facial hair | • Unisex polo, oxford, or "Peter Pan" collar shirt<br>• May wear jumpers, skirts, or skorts[2]<br>• May wear socks, stockings, or leggings, but not required; if worn, must be plain and white, black, or navy blue<br>• May wear small earrings, and "non-eccentric necklaces and bracelets"<br>• Middle school girls may wear makeup |

JA 1985.

If a student fails to comply with the Uniform Policy, then a standardized, written notification is sent home to that student's parents. JA 1866-67. The School

---

[2] A "skort" is a skirt with shorts attached underneath. JA 324.

uses these letters as "a communication tool for parents, not disciplinary actions," and takes steps to ensure compliance without punishing students. JA 2266.

The School's unique pedagogical approach has borne fruit. In the words of one Plaintiff's guardian, the School's education model has resulted in "fantastic test scores." JA 1793-94. The School's students are demographically similar to students in the surrounding area, JA 1547, 2350-68, but, as the district court put it, "there is no dispute among the parties that the test scores of the School are high compared to traditional public schools in the area." JA 2721.

That is especially true for the School's female students. On standardized math tests, "the girls' achievement has been somewhat greater than that of the boys." JA 1545, 2786. Compared to female students at state-run public schools across the state, the School's female students pass standardized tests at higher rates. JA 2367-68. Compared to female students in Brunswick County Public Schools, the School's female students perform on par or better. JA 1545, 2424. Regarding extracurriculars, girls at the School have excelled at both co-ed archery (eight consecutive state championships) and cheerleading (nine national titles). JA 1548. Over the last five years, female enrollment has trended upwards, eclipsing male enrollment. JA 2341.

## IV. Three students and their parents sue to change the Uniform Policy, and the district court grants summary judgment to Plaintiffs, holding that the

12

**Uniform Policy violates the Equal Protection Clause even as it complies with Title IX.**

Three Plaintiffs—students at the School—and their parents filed a federal lawsuit challenging the Uniform Policy as unlawful under Title IX, 20 U.S.C § 1681, the Equal Protection Clause of the Fourteenth Amendment (via 42 U.S.C. § 1983), and North Carolina law. JA 34-63. The lawsuit named CDS, Inc., its Board members, and RBA as defendants. JA 37-39.

The parties filed cross-motions for summary judgment, and the district court delivered a mixed ruling. JA 2712-13, 2746. It first agreed with CDS, Inc. that "Title IX does not regulate the uniform policy at issue here." JA 2727. The court deferred to the Department of Education's longstanding regulatory view that Title IX does not prohibit sex-specific dress codes, "permitting issues involving codes of personal appearance [to] be resolved at the local level." JA 2726 (quoting Nondiscrimination on the Basis of Sex, 47 Fed. Reg. 32,526, 32,527 (July 28, 1982)). This interpretation has been endorsed by 20 federal agencies and never overridden by Congress. JA 2726-27. On that basis, the district court granted Defendants summary judgment on the Title IX claim. JA 2727.[3]

The district court next turned to Plaintiffs' equal-protection claim. *Id.* The threshold question was whether Defendants acted "under color of state law," such

---

[3] The Title IX issue is the subject of Plaintiffs' cross-appeal.

that they could be considered state actors subject to § 1983 liability.  JA 2727-28.

Defendants argued that they did not qualify as state actors under the governing test

because (1) *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), and other precedent

establish that providing educational services has not been "traditionally the exclusive

prerogative of the State" and (2) no "extensive [State] regulation" "compelled" their

actions in designing and implementing the Uniform Policy.

The district court disagreed.  The district court purported to distinguish

*Rendell-Baker*'s holding that "education is not the 'exclusive prerogative of the

State'" by narrowing its analysis to "free, public education."  JA 2732.  Applying

that formulation, the district court concluded that "[i]n North Carolina, free, public

education has long been historically governmental."  *Id.*  The district court also held

that "CDS, Inc. has brought the uniform policy under extensive regulation of the

State by making violations of the uniform policy a disciplinary violation."  JA 2735.

As evidence of the State's "extensive" regulation, the court cited a single statutory

provision, N.C. Gen. Stat. § 115C-390.2, which requires schools to create a

discipline code—though not a dress code—and instructs schools to "minimize" the

use of long-term suspension for minor violations of the discipline code, such as

"dress code violations."  JA 2734-35.  For those reasons, the district court held that

"CDS, Inc. and its board members acted under color of state law when they

incorporated into the disciplinary code of the School a uniform policy the violation of which could subject students to discipline." JA 2736.[4]

Having found state action by CDS, Inc. and its Board, the district court continued to the merits. Plaintiffs argued that the Uniform Policy's requirement that female students wear "skirts, skorts, or jumpers" treated female students unequally and impeded their ability to participate at school. JA 2713, 2739. Defendants presented objective evidence regarding female students' success at the School and testimony from teachers and administrators that the Uniform Policy did not harm female students. JA 2350-68, 2721. They also showed that the Uniform Policy imposed comparable sex-specific burdens on boys and thus was lawful under longstanding precedent permitting comprehensive, sex-specific dress codes. Focusing largely on Plaintiffs' own testimony that they sometimes felt uncomfortable or inhibited wearing skirts, the court concluded that "the skirts requirement causes the girls to suffer a burden the boys do not, simply because they are female." JA 2743. The district court therefore granted summary judgment for Plaintiffs on their equal-protection claim. JA 2743-44.

---

[4] By contrast, the district court concluded that RBA was not a state actor. Because CDS, Inc.—not RBA—"is the entity with final authority over the uniform policy," "the court [determined] the state action doctrine does not extend so far as to cover RBA in this particular instance." *Id.* at 595.

The district court did not reach Plaintiffs' claims under North Carolina law. JA 2744-45. It instead facilitated an immediate appeal of its equal-protection and Title IX holdings by entering a partial final judgment under Federal Rule of Civil Procedure 54(b). JA 2755. After Defendants timely filed their notice of appeal and Plaintiffs cross-appealed, the district court stayed further proceedings on the outstanding state-law issues pending this appeal. JA 2757, 2759, 2762-63.

SUMMARY OF THE ARGUMENT

The district court granted summary judgment to Plaintiffs only by contravening Supreme Court precedent and diverging from the vast body of case law on state actors and comprehensive sex-specific dress and grooming codes. Plaintiffs' § 1983 claim never should have gotten off the ground. Under the Supreme Court's test, a government contractor is a state actor only when it performs a "traditional and exclusive state function" or its specific challenged conduct is "compelled" by "extensive regulation." The Supreme Court, this Court, and common sense all confirm that providing educational services is not a "traditional and exclusive state function." It is equally clear that the State did not regulate the School's Uniform Policy, much less "compel" the inclusion of the challenged provisions. Only by fundamentally misunderstanding the state-action framework did the district court reach the opposite conclusion and thereby threaten North Carolina's project of independent charter schools.

16

The district court further erred in granting Plaintiffs summary judgment on the merits. Courts consistently hold that sex-specific dress codes that impose requirements on both sexes are lawful so long as the burdens on each sex are comparable. Yet Plaintiffs failed to adduce any evidence on that key comparable-burdens element. They focused entirely on the burdens that a single provision of the Uniform Policy imposed on female students, ignoring the burdens that other provisions place on male students. That failure should have resulted in summary judgment in favor of Defendants, but the district court granted *Plaintiffs* summary judgment that the Uniform Policy violates the Equal Protection Clause as a matter of law. That holding is profoundly wrong. At the very least, a jury should have considered both sides' evidence regarding the burdens on male and female students, resolved the conflicting evidence, and then decided whether the burdens on the sexes were comparable. The district court usurped the role of the jury when it granted summary judgment despite the presence of material factual disputes.

### STANDARD OF REVIEW

"Whether a party is entitled to summary judgment is a question of law [courts] review *de novo* using the same standard applied by the district court." *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019). "[A] court should grant summary judgment only if, taking the facts in the best light for the nonmoving party, no

material facts are disputed and the moving party is entitled to judgment as a matter of law." *Id.*

**ARGUMENT**

I.  **CDS, Inc. and its Board are not amenable to suit under § 1983 because they did not act under color of state law in promulgating the Uniform Policy.**

Plaintiffs' § 1983 claim cannot proceed without first showing that CDS, Inc. and its Board are state actors. Under Supreme Court precedent, Defendants could not have acted under color of state law in issuing the Uniform Policy because they do not perform a "traditional and exclusive" state function and the challenged policy was not "compelled" by the State. In reaching the opposite conclusion, the district court ignored both the Supreme Court's dispositive holdings and the only federal court of appeals decision to have considered state action with respect to charter schools, which held that nonprofit charter-school corporations are not state actors for precisely those reasons. *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010).

A.  **A government contractor acts under color of state law only when it performs a "traditional and exclusive state function" or its specific challenged conduct is "compelled" by "extensive regulation."**

Liability under § 1983 attaches only when a defendant acts "under color of [state law]." 42 U.S.C. § 1983. Section 1983 does not reach private conduct, "no matter how discriminatory or wrongful.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). "[T]he

18

ultimate issue in determining whether a person is subject to suit under § 1983 is . . . [whether] the alleged infringement of federal rights [is] 'fairly attributable to the State?'" *Rendell-Baker*, 457 U.S. at 838 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Section 1983 therefore requires a "close nexus between the State and the challenged action." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This important limitation on § 1983 liability ensures that the Constitution remains "a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 181 (4th Cir. 2009).

As the district court recognized, when it comes to government contractors and school operators, two factors dominate the inquiry into whether the defendant's challenged conduct "is fairly attributable to the State": (1) whether the function performed has been "traditionally the exclusive prerogative of the State," and (2) whether "extensive regulation" "compelled" the challenged conduct. *Rendell-Baker*, 457 U.S. at 840-42; *see also Mentavlos v. Anderson*, 249 F.3d 301, 314-23 (4th Cir. 2001) (focusing state-action analysis of public military college on whether educating students was "exclusive state function" and whether challenged action was "coerced, compelled, or encouraged by any law").

On the first factor, "the relevant question is not simply whether a private group is serving a 'public function.'" *Rendell-Baker*, 457 U.S. at 841; *Jackson*, 419 U.S.

at 353 (rejecting "broad principle that all businesses 'affected with the public interest' are state actors in all their actions"). Rather, the only acts that fall within the State's exclusive prerogative are those "traditionally associated with sovereignty, such as eminent domain" or holding elections. *Jackson*, 419 U.S. at 353; *see also United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 906 (4th Cir. 1995) ("[A] private party becomes subject to section 1983 . . . through the government's conferral upon that party of what is, at core, sovereign power.").

Importantly, the State's authority in a field must be "exclusive" for it to qualify, and thus the historic presence of private actors in the same space precludes a finding of state action. *See, e.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929-30 (2019) (holding that because "early Manhattan public access channels were operated in large part by private cable operators, with some help from private nonprofit organizations," "operating public access channels on a cable system is not a traditional, exclusive public function within the meaning of this Court's cases"). Given that high standard, "[t]he [Supreme] Court has stressed that 'very few' functions fall into that category" of "exclusive" state functions. *Id.* at 1929; *see, e.g.*, *Blum*, 457 U.S. at 1011-12 (provision of healthcare pursuant to state and federal statutes does not fall within "the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public"); *Milburn by Milburn v. Anne Arundel Cty. Dept. of Soc. Servs.*, 871 F.2d 474, 479

(4th Cir. 1989) ("The care of foster children is not traditionally the exclusive prerogative of the State.").

The second factor—"extensive regulation" that "compels" the challenged conduct, *Rendell-Baker*, 457 U.S. at 841-42—requires a similarly strong showing. "The mere fact that a business is subject to state regulation does not by itself convert its conduct into that of the State for purposes of the Fourteenth Amendment." *Jackson*, 419 U.S. at 350. Nor is "mere approval or acquiescence of the State" in the defendant's challenged actions sufficient. *Am. Mfrs.*, 526 U.S. at 52. Instead, the State must have "exercised coercive power or ha[ve] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* (quoting *Blum*, 457 U.S. at 1004). Thus, this factor is satisfied only "when the government compels the private entity to take a particular action." *Halleck*, 139 S. Ct. at 1928.

Critically, this analysis focuses on the specific challenged conduct. "[S]tate regulation unrelated to the alleged constitutional violation, even if extensive, is not sufficient, in itself, to transform private action into state action." *Mentavlos*, 249 F.3d at 320 (quotation marks omitted). Rather, "the specific conduct of which the plaintiff complains" must have been effectively compelled by the State. *Blum*, 457 U.S. at 1004.

**B.    CDS, Inc. did not perform a traditional and exclusive state function by operating a charter school.**

Defendants do not qualify as state actors under the first factor because both the Supreme Court and this Court have held that operating a school is not "traditionally the exclusive prerogative of the State." *Rendell-Baker*, 457 U.S. at 842. Common sense dictates as much, for as the district court admitted, "[m]any students" have long been "educated in private and home school settings." JA 2732. The district court concluded otherwise only by impermissibly narrowing the analysis to whether providing "free, public education" is a traditional and exclusive state function. *Id.* But binding authority cannot be circumvented so easily. The Supreme Court and this Court have already decided this issue, and the district court erred by contravening those precedents.

**1.    Operating a school is not a traditional and exclusive state function.**

The Supreme Court, this Court, and numerous other courts have held that operating a school is not "traditionally the exclusive prerogative of the State." *Rendell-Baker*, 457 U.S. at 842. Under that uniform body of precedents, Defendants likewise did not act under the color of state law by operating a charter school under a contract with the State.

The Supreme Court settled this question in *Rendell-Baker*. That case involved a school for "maladjusted high school students" that functioned much like a charter

school. *Id.* at 842. The school was a "nonprofit institution located on privately owned property" that was "operated by a board of directors, none of whom [were] public officials or [were] chosen by public officials." *Id.* at 831-32. Through its "contract with the Boston School Committee [an arm of the Boston municipal government]," the school received students via referral from the traditional public schools. *Id.* at 833. Every year, public funding "accounted for at least 90%, and in one year 99%, of [the school's] operating budget." *Id.* at 832.

A former teacher brought a § 1983 action against the school, claiming that the nonprofit's board of directors violated her constitutional rights when it terminated her employment. *Id.* at 835. Although the Court recognized that "[t]here can be no doubt that the education of maladjusted high school students is a public function" and that "the State intends to provide services for such students at public expense," it nevertheless held that the State's "legislative policy choice [to bear that expense] in no way makes these services the exclusive province of the State." *Id.* at 842.

The Court instead explained that private entities providing educational services at public expense are no different than any other government contractor:

> The school . . . is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.

23

*Id.* at 840-41. The Court thus concluded that providing educational services is not "a function [that] has been 'traditionally the exclusive prerogative of the State.'" *Id.* at 842 (quoting *Jackson*, 419 U.S. at 353).

Numerous courts of appeals have applied *Rendell-Baker* to hold that various kinds of educational contractors, including charter-school corporations, are not state actors. The most on-point example is *Caviness*, in which the Ninth Circuit held that a nonprofit charter-school operator was not a state actor. The plaintiff, one of the school's former teachers, attempted to distinguish *Rendell-Baker* in the same manner the district court did here. She argued that "that since charter schools are 'public schools' under Arizona law, they therefore engage in the provision of '*public* educational services,' [as opposed to the] the 'educational services' that the Supreme Court held is not the exclusive and traditional province of the state." *Caviness*, 590 F.3d at 814-15 (emphasis added). The Ninth Circuit properly rejected that argument as "foreclosed by *Rendell-Baker*." *Id.* at 815. "Like the private organization running the school in *Rendell-Baker*, [the charter school's nonprofit corporation] is a private entity that contracted with the state to provide students with educational services that are funded by the state." *Id. Rendell-Baker* therefore applied on all fours and compelled the court's conclusion that "[the nonprofit corporation's] provision of educational services is not a function that is traditionally and exclusively the prerogative of the state." *Id.* at 816; *see also id.* at 815 ("The

Arizona legislature chose to provide alternative learning environments at public expense, but, as in *Rendell-Baker*, that 'legislative policy choice in no way makes these services the exclusive province of the State.'").

Other federal courts of appeals—including this Court—have echoed *Rendell-Baker*'s holding that providing educational services is not a traditional and exclusive state function:

- "[T]he mission of The Citadel is to educate civilian students and produce community leaders, which has never been held to be the exclusive prerogative of a State." *Mentavlos*, 249 F.3d at 314 (male cadets at a "public," "military-style" college were not state actors for a § 1983 gender-discrimination claim).

- "[E]ven though 'it is difficult to imagine a regulated activity more essential or more clothed with the public interest than the maintenance of schools,'" it is clear "that the provision of education" is not "traditionally within the exclusive prerogative of the state." *United Auto. Workers*, 43 F.3d at 907 (quoting *Jackson*, 419 U.S. at 354 n.9).

- "Education in general is not an exclusive public function because it has long been undertaken by private institutions." *Santiago v. P.R.*, 655 F.3d 61, 69 (1st Cir. 2011) (private party providing free transportation for public schools via contract was not state actor).

- "Granted that the state requires that its children, to a certain age, be educated, even to the extent of assuming full tuition cost of all who do not voluntarily pay their own way, it does not follow that the mechanics of furnishing the education is exclusively a state function." *Johnson v. Pinkerton Acad.*, 861 F.2d 335, 338 (1st Cir. 1988) (grooming code for teachers at publicly funded private school operating under state contract not state action).

This is an open-and-shut case under these precedents. As in *Rendell-Baker* and *Caviness*, CDS, Inc. "is a private entity that contracted with the state to provide

25

students with educational services that are funded by the state." *Caviness*, 590 F.3d at 815; *Rendell-Baker*, 457 U.S. at 842. The State's "cho[ice] to provide alternative learning environments at public expense . . . 'in no way makes these services the exclusive province of the State.'" *Caviness*, 590 F.3d at 815 (quoting *Rendell-Baker*, 457 U.S. at 842). Thus, the conclusion follows that because "the provision of education" is not "'traditionally within the exclusive prerogative of the state,'" *United Auto. Workers*, 43 F.3d at 907 (quoting *Jackson*, 419 U.S. at 354 n.9), CDS, Inc. does not operate the School "under color of [state law]," 42 U.S.C. § 1983.

> **2.    The district court artificially restricted its analysis to "free, public education" and thereby erroneously concluded that operation of a charter school is a traditional and exclusive state function.**

The district court acknowledged that *Rendell-Baker* established that "education is not 'the exclusive prerogative of the State.'" JA 2732 (quoting *Rendell-Baker*, 457 U.S. at 842). But it then circumvented that holding by redefining the question as whether "*free, public* education" is a traditional and exclusive state function. *Id.* (emphasis added). That put the district court on course to hold that because "free, public education has long been historically governmental," "CDS, Inc. is performing an historical, exclusive and traditional state function." JA 2732-33. Neither that analysis nor its result can be squared with the governing precedents.

26

The Ninth Circuit correctly rejected the district court's approach in *Caviness*, and its reasoning explains why that analytical framework is incompatible with *Rendell-Baker*. The plaintiff in *Caviness* advanced the same argument that the district court adopted here: "Caviness reasons that 'education in general' can be provided by anyone, while 'public educational services' are traditionally and exclusively the province of the state." 590 F.3d at 815. As the Ninth Circuit recognized, "[t]his argument is foreclosed by *Rendell-Baker*." *Id.*

That is because the school at issue in *Rendell-Baker* was also providing "free, public education." "The tuition of state-referred students was publicly funded, and public funds accounted for 90 to 99 percent of the school's operating budget." *Id.* (quoting *Rendell-Baker*, 457 U.S. at 832). Yet the *Rendell-Baker* Court held that "[a]lthough the school provided a public function by educating 'students who could not be served by traditional public schools,' . . . the 'legislative policy choice' to provide those services at public expense 'in no way' made their provision 'the exclusive province of the State.'" *Id.* (quoting *Rendell-Baker*, 457 U.S. at 842). Thus, contrary to the district court's rationale, whether the public bears the expense of educational services is irrelevant to the state-action analysis. Nor can the mere statutory label "public" be determinative, as the district court correctly recognized at an earlier point in its opinion. JA 2731 (citing *Caviness*, 590 F.3d at 813).

This Court's analysis in *Mentavlos* further demonstrates the district court's frame-of-reference error. There, this Court considered whether male students at The Citadel—a "public," "military-style" college—were state actors for purposes of a gender-discrimination claim. *Mentavlos*, 249 F.3d at 314-15. The plaintiff contended that the proper analogy would be to the "rigorous military environment . . . [of] the United States service academies," whose cadets are considered state actors for some purposes. *Id.* at 314. This Court rightly rejected that invitation to narrow its exclusive-state-function analysis to only "military-style" public universities. *Id.* Instead, it relied on the general rule announced in *Rendell-Baker*, holding that "educat[ing] civilian students . . . has never been held to be the exclusive prerogative of a State." *Id.* (citing *Rendell-Baker*, 457 U.S. at 842). *Mentavlos* thus confirms that courts must use a functional lens in assessing whether a service has "traditionally [been] the exclusive prerogative of the State." *Rendell-Baker*, 457 U.S. at 842.

Had it not violated that principle, the district court would have reached the right result. Indeed, the school at issue in *Rendell-Baker* and the non-profit in *Caviness* are functionally identical in structure to CDS, Inc. All three are non-profit entities run by a private board of directors that provide publicly funded educational services free-of-charge to their students under a governmental contract. *Rendell-Baker*, 457 U.S. at 833; *Caviness*, 590 F.3d at 808-09; JA 2250. There are simply

28

no grounds for distinguishing these three cases. Because the educational "function[s] performed [by the schools in *Rendell-Baker* and *Caviness*] . . . [were not the] 'traditionally the exclusive prerogative of the State,'" the same necessarily holds for Defendants. *Rendell-Baker*, 457 U.S. at 842. The district court erred in holding otherwise.

### C.    Defendants' design and implementation of the Uniform Policy was not "compelled" by "extensive regulation."

The second factor in the state-action analysis—whether "extensive regulation" "compelled" the challenged conduct—further confirms that Defendants did not act under color of state law. *Rendell-Baker*, 457 U.S. at 841-42. North Carolina law gives charter schools autonomy to design unique educational settings. That autonomy extends to dress codes. Charter schools need not even have a dress code. If they choose to implement one, North Carolina law imposes no restrictions or oversight on its requirements. Despite the fact that North Carolina law does not regulate the Uniform Policy's requirements or compel the inclusion of any specific provisions, the district court nevertheless held that this factor renders Defendants state actors. It reached that flawed conclusion by reasoning that North Carolina's regulation of one aspect of school discipline-code enforcement—though not the requirements of charter-school dress codes—was sufficient. That analysis cannot be squared with *Rendell-Baker* or the other governing precedents. Under a proper

understanding of this factor, Defendants did not act under color of state law when they independently designed and implemented the Uniform Policy.

### 1. North Carolina law does not "extensively regulate" charter schools' dress codes, much less "compel" CDS, Inc. to enact the challenged Uniform Policy.

The question under this factor is whether the State has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Mentavlos*, 249 F.3d at 318 (quoting *Am. Mfrs.*, 526 U.S. at 52). The focus is on "the specific conduct of which the plaintiff complains," *Blum*, 457 U.S. at 1004, and whether "the government compels the private entity to take [that] particular action," *Halleck*, 139 S. Ct. at 1928. "Mere [government] approval of or acquiescence" in the conduct is not enough. *Id.* at 1004-05. Indeed, "[e]ven extensive government regulation of a private business is insufficient to make that business a state actor if the challenged conduct was 'not compelled or even influenced by any state regulation.'" *Caviness*, 590 F.3d at 816 (quoting *Rendell-Baker*, 457 U.S. at 841-42).

Once again, *Rendell-Baker* and *Caviness* illuminate how to apply this factor to a publicly funded school operated by a private entity. In *Rendell-Baker*, the challenged conduct was the school's firing of a teacher. 457 U.S. at 834. The Court acknowledged the existence of "detailed regulations concerning matters ranging from [the school's] recordkeeping to student-teacher ratios." *Id.* at 833. Critically,

however, "[c]oncerning personnel policies, the . . . regulations require the school to maintain written job descriptions and written statements describing personnel standards and procedures, but they impose few specific requirements." *Id.* The Court noted this incongruence: "[I]n contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters." *Id.* at 841. That minimal regulation of the school's personnel policies was "not sufficient to make a decision to discharge, made by private management, state action." *Id.*

The Ninth Circuit applied the rule from *Rendell-Baker* in *Caviness*. The plaintiff—a teacher who had been terminated from a charter school—cited the regulations governing charter schools' employment decisions and benefits as proof of "extensive government regulation" of the school's personnel policies. 590 F.3d at 816. The Ninth Circuit rejected that argument because "[n]one of the regulations cited by Caviness contains substantive standards or procedural guidelines that could have compelled or influenced [the charter school's] actions" in terminating the plaintiff. *Id.* at 818. Nor did the plaintiff otherwise demonstrate "that the state was involved in the contested employment actions." *Id.* Rather, "[the charter school's] actions and personnel decisions were 'made by concededly private parties, and turn[ed] on judgments made by private parties without standards established by the State.'" *Id.* (quoting *Am. Mfrs.*, 526 U.S. at 53).

31

That analysis leads to the same result here. "[T]he specific conduct of which the plaintiff complains" is CDS, Inc.'s inclusion in the Uniform Policy of the provision concerning the lower-body clothing requirements for female students. *Blum*, 457 U.S. at 1004. Indeed, Plaintiffs emphasized that they "do not contest Defendants' authority to impose a school uniform policy in general" and instead challenge "only the specific provision of the policy requiring girls to wear skirts." DE 150 at 1. Accordingly, the relevant question is whether the State "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice [to include that provision in the Uniform Policy] must in law be deemed to be that of the State." *Mentavlos*, 249 F.3d at 318 (quoting *Am. Mfrs.*, 526 U.S. at 52).

The answer is no. North Carolina law imposes certain discrete requirements on charter schools, but its overall policy reflects a hands-off approach to charter schools' operations and policies. North Carolina's charter schools are generally "exempt from statutes and rules applicable to" state-run public schools. N.C. Gen. Stat. § 115C-218.10. And the charter school's board, not the State, "decide[s] matters related to the operation of the school, including budgeting, curriculum, and operating procedures." *Id.* § 218.15(d).

Indeed, the State has expressly disclaimed any endorsement of "any method of instruction, philosophy, practices, curriculum, or pedagogy used by the School or

its agents." JA 2259. This light regulatory touch makes sense given the Legislature's desire for charter schools to use "different and innovative teaching methods" and to offer "expanded choices in the types of educational opportunities." N.C. Gen. Stat. § 115C-218(a)(3), (5); *see Sugar Creek Charter Sch., Inc. v. State*, 712 S.E.2d 730, 742 (N.C. Ct. App. 2011) (remarking on charter schools' "greater freedom to devise their own educational programs" than traditional public schools).

Dispositive here is that the State imposes no regulation concerning the "specific conduct of which [Plaintiffs] complain[]." *Blum*, 457 U.S. at 1004. North Carolina law leaves the decision whether to create a dress code entirely in the hands of the charter school. And if it chooses to implement one, the nonprofit's board uses its own judgment in deciding its requirements. The record confirms that it happened precisely that way in this case. CDS, Inc. and its Board created the Uniform Policy after consultation with the School's parents. JA 1756-57. There is no evidence that the State had any input into the Uniform Policy, much less compelled the inclusion of any specific provision. *See id.*

Because Defendants' "actions and [Uniform Policy] decisions were 'made by concededly private parties, and turn[ed] on judgments made by private parties without standards established by the State,'" they did not act "under color of state law" when they designed and implemented the Uniform Policy. *Caviness*, 590 F.3d at 818 (quoting *Am. Mfrs.*, 526 U.S. at 53).

**2.    The district court erred in concluding that North Carolina's regulation of one aspect of school-discipline enforcement transformed CDS, Inc.'s design and implementation of the Uniform Policy into state action.**

The district court applied a quite different analysis to reach the opposite conclusion.  Rather than asking whether State regulation compelled CDS, Inc. to promulgate the challenged policy, the district court instead constructed an attenuated connection between the Uniform Policy and State regulation of one aspect of discipline policies.  But that gossamer thread does not constitute "extensive regulation" of charter-school dress codes, much less state compulsion to adopt the challenged provision.

The district court's evidence of "extensive regulation" consists of a single statutory provision, N.C. Gen. Stat. § 115C-390.2, that "requires public schools, including charter schools, to establish a student code of conduct and discipline." JA 2734.   In enforcing those discipline codes, § 390.2(f) directs schools to "minimize the use of long-term suspension and expulsion" for minor conduct violations.   N.C. Gen. Stat. § 115C-390.2(f).   The statute then lists several "[e]xamples of conduct that would not be deemed to be a serious violation[,] includ[ing] . . . dress code violations."   *Id.*   In the district court's view, that lone reference to "dress code violations" and the fact that Defendants "ma[de] violations of the [U]niform [P]olicy a disciplinary violation," "brought the uniform policy under the extensive regulation of the State."  JA 2735.

34

That analysis is mistaken. To begin with, state action requires more than "extensive regulation by the State." *Id.* at 594. As *Caviness* explained, "[e]ven extensive government regulation of a private business is insufficient to make that business a state actor if the challenged conduct was 'not compelled or even influenced by any state regulation.'" 590 F.3d at 816 (quoting *Rendell-Baker*, 457 U.S. at 841-42); *Jackson*, 419 U.S. at 353; *Mentavlos*, 249 F.3d at 323. Thus, the district court never even confronted the dispositive question—whether the State has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Mentavlos*, 249 F.3d at 318 (quoting *Am. Mfrs.*, 526 U.S. at 52); *accord Halleck*, 139 S. Ct. at 1928 (relevant question is whether "the government compels the private entity to take a particular action"). Had it answered that question, it would have concluded that nothing in § 390.2 "compelled or even influenced," *Rendell-Baker*, 457 U.S. at 841, Defendants' design and implementation of the Uniform Policy—including its requirement that female students wear "skirts, skorts, or jumpers." JA 1985.

Section 390.2(f) merely directs CDS, Inc. to "minimize the use of long-term suspension and expulsion" for violations of any dress code it may adopt. N.C. Gen. Stat. § 115C-390.2(f). It neither requires a dress code nor imposes any restrictions on a dress code's requirements, but merely curtails one particular enforcement

option for all dress codes—namely, long-term suspension or expulsion. As a result, that statutory provision does not remotely implicate the "specific conduct of which [Plaintiffs] complain[]," *Blum*, 457 U.S. at 1004, for their equal-protection claim does not allege discriminatory *enforcement* of the Uniform Policy, but rather that the policy discriminates on its face.

The evidence is undisputed that no state regulation governs whether charter schools may adopt sex-specific dress code requirements, and neither the district court nor Plaintiffs claim that state officials had any input into the School's Uniform Policy. Thus, as in *Caviness*, "[n]one of the regulations cited by [the district court] contains substantive standards or procedural guidelines that 'could have compelled or influenced' [Defendants'] actions" in including the "skirts requirement" in the Uniform Policy. 590 F.3d at 818.

In sum, the district court asked the wrong question and then answered it incorrectly. The combination of both of those errors led to its erroneous conclusion that "CDS, Inc. and its board members acted under color of state law." JA 2736. Defendants are entitled to summary judgment because they are not amenable to suit under § 1983.[5]

---

[5] In *State v. Kinston Charter Academy*, 836 S.E.2d 330 (N.C. Ct. App. 2019), the North Carolina Court of Appeals held that nonprofit corporations that operate charter schools enjoy immunity under state law from suits under the North Carolina False Claims Act. *Id.* at 336-41. This holding has no bearing on the far different federal-law question of whether Defendants acted under color of state law when they

## II.    The Uniform Policy does not violate the Equal Protection Clause.

A second, independent reason for reversal is that the Uniform Policy would not violate the Equal Protection Clause even if the Defendants *were* state actors. Comprehensive sex-specific dress codes like the School's have been consistently upheld under Title VII and Title IX, and no court of appeals has invalidated one under the Equal Protection Clause. To prevail, Plaintiffs must carry the heavy load of showing that the Uniform Policy, viewed as a whole, imposes disproportionate burdens on one sex. Yet Plaintiffs and the district court made no effort to compare the Uniform Policy's overall burdens on male and female students. Instead, they artificially narrowed the analysis to one provision of the Uniform Policy and assessed the burdens that particular provision imposes on female students. Worse, while claiming to apply the comparable-burden test, the district court in fact applied aspects of heightened scrutiny, forcing *Defendants* to justify their policy. Under the proper legal test, Plaintiffs' failure to produce evidence of the dress code's comparative overall burdens mandates summary judgment in Defendants' favor.

---

implemented the Uniform Policy, which is governed by the two factors discussed above. The *Kinston* court's immunity holding turned largely on the charter school's "public" label. As the district court correctly noted, that label carries little weight in state-actor analysis given that "defendants are two private corporations and six individuals" and "a private entity may be designated a state actor for some purposes but still function as a private actor in other respects." JA 2731.

At the very least, whether the Uniform Policy disproportionately burdens female students is a fact issue for a jury to decide. The district court ignored that a jury could have found that the Uniform Policy imposes comparable burdens on boys, and it disregarded substantial material evidence—which a reasonable jury could have believed—showing that the Uniform Policy did not burden girls in the way Plaintiffs alleged. Thus, in no event should the district court have granted summary judgment for Plaintiffs.

**A.    Sex-specific dress codes that impose requirements on both sexes are constitutional unless they disproportionately burden one sex.**

**1.    Comprehensive, sex-specific dress codes that merely apply different requirements to both sexes do not constitute sex discrimination.**

Plaintiffs contend that the Uniform Policy violates the Equal Protection Clause because it discriminates against them on the basis of sex.  Few litigants have attempted this novel approach, as the district court acknowledged.  *See* JA 2740 ("Most recent uniform and dress code cases are claims based on the First Amendment, not the Equal Protection Clause.").  That is likely because challenges to dress codes that impose requirements on both sexes have almost uniformly failed under Title VII and Title IX—the civil-rights statutes that expressly outlaw discrimination because of sex.

Title IX—the statute specifically addressing sex discrimination in education—permits sex-specific dress codes, as the district court recognized in

granting summary judgment to Defendants on that claim. Title IX simply "does not regulate the uniform policy at issue here." JA 2727. For nearly 40 years—spanning the last six presidential administrations—the Department of Education has authoritatively interpreted Title IX to "permit[] issues involving codes of personal appearance [to] be resolved at the local level." JA 2726 (quoting Nondiscrimination on the Basis of Sex, 47 Fed. Reg. 32,526, 32,527 (July 28, 1982)).

Title VII likewise permits comprehensive, sex-specific dress codes. The EEOC's Compliance Manual—unchanged since 2006—expressly endorses a policy analogous to the one here. A workplace "dress code may require male employees to wear neckties at all times and female employees to wear skirts or dresses at all times." EEOC Compliance Manual, 2006 WL 4672751, § 619.4(d) (June 2006)). Federal courts have likewise upheld similar comprehensive policies. *See, e.g.*, *Fountain v. Safeway Stores, Inc.*, 555 F.2d 753, 755 (9th Cir. 1977) (upholding "regulations requiring men [and only men] to wear a tie as a condition of employment"); *Lanigan v. Bartlett & Co. Grain*, 466 F. Supp. 1388, 1389-91 (W.D. Mo. 1979) (holding that policy "prohibit[ing] women from wearing pants in the executive office[s]" was not sex discrimination "when compared to the treatment of men in the executive offices"). In the seminal recent case on the matter, the en banc Ninth Circuit expressly reaffirmed this longstanding case law and granted summary judgment under Title VII to an employer who imposed comprehensive

dress and grooming requirements on both sexes, including requiring, *inter alia*, that women wear makeup. *Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1109-10 (9th Cir. 2006) (en banc).

The teaching of this consistent case law is that employers and schools "may differentiate between men and women in appearance and grooming policies." *Id.* at 1110 (surveying federal case law upholding such policies under Title VII); *Earwood v. Cont'l Se. Lines, Inc.*, 539 F.2d 1349, 1350 (4th Cir. 1976) ("[S]ex-differentiated grooming standards do not, without more, constitute discrimination under Title VII"). "The material issue . . . is not whether the policies are different, but whether the policy imposed on the plaintiff creates an 'unequal burden' for the plaintiff's gender." *Jespersen*, 444 F.3d at 1110.

In other words, dress codes that apply different but comparable burdens on both sexes do not unlawfully discriminate because they do not *disadvantage* one sex over another. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 569, 577 (1978) ("The central focus of the [Title VII] inquiry" is whether the employer has treated "some people less favorably than others because of their . . . sex."); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."). Thus, courts have invalidated dress codes only when plaintiffs can show that a policy imposes

categorically disproportionate burdens on one sex. *See Carroll v. Talman Fed. Sav. & Loan Ass'n of Chicago*, 604 F.2d 1028, 1029-30 (7th Cir. 1979) (holding that workplace dress code which required women to wear uniforms while men could wear business-casual clothing violated Title VII); *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 608-10 (9th Cir. 1982) (invalidating employer's policy that contained a weight requirement for women, but not for men).

It would be strange if a different test applied to dress codes under the Constitution; after all, Title VII and Title IX enforce the same anti-sex-discrimination principle as the Equal Protection Clause. Applying a heightened standard here would make no sense given Title IX's hands-off approach to dress codes in the educational context and the related principle that constitutional protections typically apply in diluted form in the school setting. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (explaining that schools are "permit[ted] a degree of supervision and control that could not be exercised over free adults"); *Schleifer ex rel. Schleifer v. City of Charlottesville*, 159 F.3d 843, 847 (4th Cir. 1998) ("[C]hildren do not possess the same rights as adults."). Indeed, applying stricter standards to dress codes under the Equal Protection Clause would compel the anomalous conclusion that Title VII and Title IX, as long understood, permit government employers and schools to engage in unconstitutional practices.

In short, for all sex-discrimination claims, the plaintiff must first establish that the policy discriminates because of sex—which in the dress-code context requires a showing that the policy disproportionately burdens one sex. The district court seemingly recognized as much, purporting to apply the comparable-burden standard from civil-rights statutes. JA 2740 ("[U]nder a 'comparable burden' analysis, the court finds the skirts requirement does not pass muster."). To the extent it applied aspects of stricter scrutiny, as discussed below, it legally erred.

> **2.    An Equal Protection Clause plaintiff must establish that a dress code—viewed as a whole—imposes a disproportionate burden on one sex.**

Under the Constitution as well as civil-rights statutes, then, a plaintiff must establish that a dress code imposes "unequal burden[s] for the plaintiff's gender." *Jespersen*, 444 F.3d at 1110; *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 580-82 (7th Cir. 2014) (question under both Equal Protection and Title IX is whether the dress code imposes "comparable burdens on both males and females alike"). Although the district court claimed to be applying the comparable-burden test, it fundamentally departed from it.

Importantly, the frame of reference for the unequal-burden analysis is the dress code *as a whole*. In *Jespersen*, for example, the Ninth Circuit considered a casino's uniform policy that "applie[d] to all of the bartenders, male and female." 444 F.3d at 1111. In addition to various unisex requirements, men were required to

wear bow ties, certain shirts and pants, and no makeup, while women had some distinctive hair and grooming requirements of their own. *Id.* at 1107. The plaintiff challenged one specific characteristic of that comprehensive dress code—the requirement that female bartenders wear makeup. *Id.* at 1111-12. But the Ninth Circuit rejected this "parsing," explaining that "[t]he requirements [of a comprehensive uniform policy] must be viewed in the context of the *overall policy*." *Id.* at 1112 (emphasis added). Thus, "[u]nder established equal burdens analysis, when an employer's grooming and appearance policy does not unreasonably burden one gender more than the other, that policy will not violate" the law. *Id.* at 1110.

Similarly, in *Hayden*, the Seventh Circuit explained that so long as the challenged provision "is just one component of a comprehensive grooming code that imposes comparable although not identical demands on both male and female [students]," then the dress code is valid. 743 F.3d at 580. The court struck down a hair-length policy for males only because the defendant "litigated the hair-length policy in isolation rather than as an aspect of any broader grooming standards applied to boys and girls basketball teams." *Id.* at 578.

Applying this holistic analysis, it is unsurprising that courts strike down only sex-differentiated personal-appearance codes that impose one-sided, categorically disproportionate uniform policies on men or women. *See Carroll*, 604 F.2d at 1029-30; *Gerdom*, 692 F.2d at 608-10; *supra* Part II.A.1. But merely identifying

43

different uniform requirements for the sexes—while ignoring whether the policy as a whole *disfavors* one sex—falls short, as a matter of law, of demonstrating unlawful sex discrimination. *Jespersen*, 444 F.3d at 1110; *cf. Bauer v. Lynch*, 812 F.3d 340, 351 (4th Cir. 2016) ("Put succinctly, an employer does not contravene Title VII when it utilizes physical fitness standards that distinguish between the sexes on the basis of their physiological differences but impose an equal burden of compliance on both men and women . . . .").

### B. Defendants are entitled to summary judgment because Plaintiffs failed to adduce evidence that the Uniform Policy—considered as a whole—imposes a disproportionate burden on female students.

The district court should have granted summary judgment to Defendants because Plaintiffs made no effort to demonstrate that the Uniform Policy—viewed as a whole—imposes a disproportionate burden on female students. The lack of evidence or even analysis supporting that essential element of Plaintiffs' equal-protection claim requires reversal and judgment as a matter of law for Defendants.

1.    As a threshold matter, the Uniform Policy is consistent with those long upheld by the courts because it imposes comprehensive sex-specific requirements on both sexes. JA 1538-41, 1985; *see supra* Part II.A.1. Unlike in *Hayden*, therefore, the record contains evidence of a dress code that applies to both sexes. And there are no categorical deviations between the respective sexes' requirements of the sort that has led courts to invalidate disproportionately burdensome dress

codes in the past.  *See supra* Part II.A.2 (citing cases); *Jespersen*, 444 F.3d at 1109 (noting that employer's policy did not "on its face place[] a greater burden on one gender than the other").  Consequently, to avoid summary judgment, Plaintiffs had to create a fact issue on whether "the [Uniform Policy] creates an 'unequal burden' for [Plaintiffs'] gender." *Jespersen*, 444 F.3d at 1110, 1112.

2.     Plaintiffs failed even to acknowledge, much less attempt to carry, that burden.  Their alternative analysis was crippled by two fatal errors.  Plaintiffs began by repeating the mistake of the plaintiff in *Jespersen*, seeking to artificially narrow the inquiry to the Uniform Policy's provision regarding lower-body clothing for female students.  *See* DE 150 at 1.  "This parsing, however, conflicts with established grooming standards analysis," which makes clear that the "overall policy" is the appropriate frame of reference for the unequal-burden analysis.  *Jespersen*, 444 F.3d at 1112.  Indeed, if it were otherwise, then every sex-specific dress-code provision would be unconstitutional, for when viewed in isolation it would necessarily impose a disproportionate burden on one sex.

Plaintiffs compounded that error by focusing solely on the burdens that this single provision imposed *on female students*.  JA 2739.  But whatever the burden on female students, that does not answer the "material [question] under . . . settled law . . . [of] whether the policy imposed on the plaintiff creates an '*unequal* burden' for the plaintiff's gender." *Jespersen*, 444 F.3d at 1110 (emphasis added).  Such a

comparison necessitates an analysis of the Uniform Policy's burden on male students. The Uniform Policy imposes numerous unique burdens on boys, who, unlike girls, must maintain short hair, avoid wearing jewelry, and wear belts and socks. JA 1985, 2718. Yet, like the plaintiff in *Jespersen*, Plaintiffs ignored that side of the equation entirely, making no attempt to evaluate male students' burdens, much less offering evidence on how those substantial burdens compared to the burdens imposed on female students. 444 F.3d at 1110 ("Jespersen did not submit any documentation or any evidence of the relative cost and time required to comply with the grooming requirements by men and women.").

Those two errors prevented Plaintiffs from making the necessary showing that the overall Uniform Policy imposed a disproportionate burden on female students. The absence of any evidence on that critical component of their claim means that, just as in *Jespersen*, Defendants are entitled to summary judgment.

3.   The district court held otherwise only because it repeated Plaintiffs' analytical errors and added a few of its own. It endorsed Plaintiffs' frame-of-reference error by focusing not on the Uniform Policy as a whole, but instead on the fact that "CDS, Inc. has promulgated and is enforcing a uniform policy at the School that requires girls to wear skirts, and, on its face, treats girls differently than boys by not allowing them to wear pants." JA 2739. Under the district court's approach,

*Jespersen* (and countless other cases) would have come out the other way, with its makeup requirement for female employees only.

The district court further erred by conclusively crediting Plaintiffs' subjective testimony as establishing the Uniform Policy's burdens on female students. JA 2720, 2743.[6] As the Ninth Circuit explained in *Jespersen*, however, if Plaintiffs' "own subjective reaction" to a dress code is sufficient to demonstrate a burden, then that "would come perilously close to holding that every grooming, apparel, or appearance requirement that an individual finds personally offensive, or in conflict with his or her own self-image, can create a triable issue of sex discrimination." 444 F.3d at 1112. Surely more is required to trigger protections of a constitutional dimension. But in any event, Plaintiffs' testimony certainly does not constitute *comparative* evidence of how the Uniform Policy burdened girls *vis a vis* boys.

After uncritically accepting Plaintiffs' framing of the Uniform Policy's burden on female students, the district court declared that "Defendants have offered no evidence of any comparable burden on boys." JA 2743. In its truncated analysis,

---

[6] The district court characterized Plaintiffs' testimony as showing "that the girls are subject to a specific clothing requirement that renders them unable to play as freely during recess, requires them to sit in an uncomfortable manner in the classroom, causes them to be overly focused on how they are sitting, distracts them from learning, and subjects them to cold temperatures on their legs and/or uncomfortable layers of leggings under their knee-length skirts in order to stay warm, especially moving outside between classrooms at the School." JA 2743.

the district court acknowledged that the Uniform Policy imposes some unique requirements on male students only, although it mentioned only belts. *Id.* But it then quickly dismissed that fact, claiming that "there is no evidence that wearing a belt inhibits the boys' ability to fully participate in the programs or activities of the School." *Id.*

The district court's approach improperly assigns the burden of proof and artificially constrains the relevant balancing of "burdens" to alleged obstacles to full participation in school activities. But neither precedent nor common sense supports that framework. Indeed, even if balancing were limited to burdens that allegedly inhibited full school participation, *Jespersen* illustrates that Plaintiffs—not Defendants—would bear the responsibility in the first instance to show that boys do not suffer similar burdens. *Jespersen*, 444 F.3d at 1110. For example, a boy who desires to wear longer hair or jewelry may well feel constrained in a similar way that Plaintiffs do. Plaintiffs ignored the burden on male students entirely.

As fundamentally, even if girls suffer a *different type* of burden, that hardly means that the dress code disproportionately burdens female students. In addition to the added cost of belts and more frequent haircuts, boys suffer substantial restrictions on their appearance that girls do not. Girls may choose long or short hair; boys must wear short hair. Girls may choose to wear or not wear jewelry; boys have no choice in the matter. Plaintiffs made no effort to evaluate and weigh the

economic costs and infringements on boys' freedom and self-expression against the burdens girls allegedly suffered. These are not matters that can be assumed away. *See Jespersen*, 444 F.3d at 1110 (faulting plaintiff for failing to show that it "costs more money and takes more time for a woman to comply with the makeup requirement than it takes for a man to comply with the requirement that he keep his hair short"). By relieving plaintiffs of their proper burden of proof to compare male and female burdens, the district court erroneously failed to grant summary judgment to Defendants.

4.    Although it purported to apply the comparable-burden framework, JA 2740, the district court's erroneous conclusion was driven in part by analysis more suitable for a claim subject to heightened scrutiny.

Indeed, the district court began its Equal Protection analysis by declaring that "the skirts requirement in this case is not consistent with community norms" and faulting Defendants for allegedly failing to produce evidence on this score. JA 2741. It is unclear why Defendants should bear any burden regarding community norms in a case involving a comprehensive, sex-specific dress code, which have long been accepted as consistent with civil-rights law. Indeed, such policies are routinely upheld without any inquiry into community norms. *See, e.g.*, *Jesperson*, 444 F.3d at 1111. And the EEOC's current Compliance Manual confirms that "skirts requirements" remain lawful as part of a comprehensive dress code. To state a sex-

discrimination claim, Plaintiffs must prove that the policy disproportionately burdens one sex; Defendants bear no affirmative duty to show that the policy is consistent with community norms.

The district court similarly criticized Defendants for failing to "show[] how the skirts requirement actually furthers [its] stated goals." JA 2742. This is unmistakably the language of heightened scrutiny. But unless the Plaintiffs first adduce evidence on the threshold element of discriminatory treatment—which cannot be satisfied by a mere showing of different dress codes—there is no occasion for a heightened-scrutiny analysis into whether Defendants can justify their policy. The district court's heightened-scrutiny approach cannot be reconciled with Title IX's allowance of sex-based school dress codes, the lessened role of constitutional protections in schools, and the longstanding acceptance of comprehensive, sex-specific dress codes in American law.[7]

Under the unequal-burden test that governs sex-specific dress and grooming codes, Plaintiffs failed to create a fact issue on a key element of their equal-protection claim. Therefore, Defendants are entitled to summary judgment.

---

[7] Regardless, as discussed *infra* Part II.C.2, Defendants produced ample evidence that the Uniform Policy mirrors the norms of the relevant community and advances educational goals.

### C.    In no event should the district court have granted summary judgment to Plaintiffs.

At the very least, the district court should not have granted summary judgment in favor of Plaintiffs.  Whether the Uniform Policy unequally burdens girls is, at best for Plaintiffs, a disputed fact issue that the district court glossed over by (1) ignoring material evidence showing that the policy did not meaningfully burden female students and (2) failing to draw reasonable inferences that a jury could draw about the burdens on male students *vis a vis* female students.

### 1.    The unequal-burden question is at least a fact issue.

a.    If Plaintiffs avoid summary judgment against them, it should be up to a jury to evaluate Plaintiffs' testimony that the lower-body clothing restrictions on female students "renders them unable to play as freely during recess, requires them to sit in an uncomfortable manner in the classroom, causes them to be overly focused on how they are sitting, distracts them from learning, and subjects them to cold temperatures on their legs and/or uncomfortable layers of leggings under their knee-length skirts in order to stay warm, especially moving outside between classrooms at the School."  JA 2743.  The district court's opinion reads as if this evidence of Plaintiffs' burdens was uncontested.  Far from it.  The record contains ample evidence that a reasonable jury could credit showing that female students suffer minimal, if any, burdens from the Uniform Policy.

In contrast to Plaintiffs' largely subjective testimony, a jury could choose to believe the detailed testimony of school administrators who observe all students on a day-to-day basis for years on end. *See Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 511 (5th Cir. 2009) (crediting "the sworn testimony of teachers or administrators" because "they are in a better position than are we to determine the benefits of the dress code"). These witnesses testified that "the School's female students are not, as a general matter, less physically active during recess than female students at the other schools" and that "the School's female students who want to participate in physical activities during recess do in fact participate." JA 2537. In sum, these administrators had "seen nothing to suggest that the Uniform Policy inhibits the ability or the willingness of the School's female students to participate in physical activity during recess." JA 2538.

A jury could also reasonably conclude that expert testimony and objective evidence regarding female academic and extracurricular achievement undercuts the Plaintiffs' portrayal of a student body hobbled by the Uniform Policy. Academically, girls at the School equal or outperform their male counterparts in both math and science. JA 2786. As one expert summarized, girls "do not appear to be educationally impaired, in comparison to the boys, by having to wear dresses." JA 2787. Female students at the School outperform their peers nationally and

around the state.  JA 2784-87.  And they perform on par with or better than their peers in Brunswick County Public Schools.  JA 2424.

Beyond academics, female students excel in extracurricular activities.  The cheerleading squad associated with the School has won nine national titles, and the co-ed archery team has won the state championship in eight consecutive years. JA 1548. What is more, females now outnumber males in the student body after years of steady enrollment growth. JA 2341.  A jury could reasonably conclude that all of this objective evidence regarding hundreds of female students speaks louder than three Plaintiffs' assertions that the Uniform Policy hampers females' ability to "play . . . freely" during recess and "distracts them from learning."  JA 2743.

Finally, in repeatedly invoking "the skirts requirement," the district court overlooked that a jury could consider whether the availability of skorts and leggings as part of the Uniform Policy diminishes or eliminates any burdens on female students.  Skorts—a skirt with shorts attached underneath, JA 324—mitigate the complaints that Plaintiffs raised about how they sit in class or play at recess.  And the availability of leggings alleviates the burden of skirts during cold weather.  A jury could conclude that these alternatives are little different than the shorts or pants that boys must wear.

b.    Material fact issues also exist regarding the relative magnitude of the burdens that the Uniform Policy imposes on male students.  Although female

students face no sex-specific hair restrictions, male students must keep their hair "neatly trimmed and off the collar, above the eyebrows, and not below the top of the ears or eyebrows." JA 1978. Similarly, unlike female students, male students are prohibited from wearing makeup or jewelry and must wear a belt and socks. *Id.* Nor can male students wear jumpers, skirts, or skorts, but must instead stick to pants or shorts. *Id.* The hair requirements come with the financial cost of more frequent haircuts. Male students must also bear the cost of belts and socks. And the Uniform Policy severely burdens male students who intensely desire, for any number of reasons, to wear longer hair, jewelry, or other forbidden items.

The district court's truncated analysis failed to acknowledge that a jury could reasonably conclude that these sex-specific restrictions impose substantial burdens on male students—at least comparable to those that the Uniform Policy imposes uniquely on female students. That is especially so given that a jury could credit Defendants' evidence discussed above regarding the lesser magnitude of the burdens on female students.

The district court's analysis of the comparable-burden issue reflects no application of the well-known summary-judgment standard to this factual record. Consequently, the district court invaded the exclusive province of the jury because, at minimum, "the evidence . . . [was not] so one-sided that [Plaintiffs] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If

this Court concludes that Plaintiffs produced sufficient evidence of comparative burdens to avoid summary judgment—which it should not, *see supra* Part II.B—the Court should remand so that a jury can assess whether the Uniform Policy unequally burdens female students.

> ### 2.     To the extent other factors the district court considered are relevant, those create more fact issues.

As discussed above, the district court mistakenly invoked aspects of heightened scrutiny to conclude that Defendants failed to produce evidence regarding community norms and whether the Uniform Policy advances its stated goals. If the Court decides that Defendants bear a burden of proof on these questions under the Equal Protection Clause, the Court should hold that the district court usurped the role of the factfinder and remand for further proceedings. On both points, Defendants produced sufficient evidence such that "a reasonable jury could resolve this issue in either party's favor." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 664 (4th Cir. 2018).

a.     In declaring that "the skirts requirement in this case is not consistent with community norms," the district court (1) cited Plaintiffs' expert, a fashion historian, who opined that "most public school dress codes across the country allowed girls to wear pants or shorts by the mid-1980s" and pointed out that West Point's female cadets and female Senators are allowed to wear trousers, JA 2741, and (2) perceived "no evidence that requiring girls to wear skirts on a daily basis is

consistent with community standards of dress in Brunswick County or in North Carolina generally," JA 2742.

Even accepting that evidence, however, a jury could reasonably conclude that the relevant community for the Uniform Policy is not the population at large or state-run schools, but rather *the School's* community—*i.e.*, the students and their parents who voluntarily choose to join the School. Just as free choices about where and how to live generate community norms that differ widely between West Virginia and California, *United States v. Espinoza*, 641 F.2d 153, 161 (4th Cir. 1981) (distinguishing, in obscenity context, between California community norms and "local contemporary standards obtaining in the Southern District of West Virginia"), so may parents' free choices about schooling shape the relevant community norms that apply here. In the School's community, a supermajority of the parents remain "satisfied" or "very satisfied" with the Uniform Policy. JA 2011. That is unsurprising since local parents designed the Uniform Policy in consultation with the Board and choose to send their children to the School instead of the local state-run school that lacks a similar dress code. JA 1756-57.

Thus, to the extent community norms matter, a reasonable jury could decide that they support the Uniform Policy, not count against it. And even if the relevant community is broader than the School, who better to assess the norms of the local

community than a jury composed of its members?  But in no event, could the community-norms question be decided, as a matter of law, in favor of Plaintiffs.

b.    In holding that "[D]efendants have not shown how the skirts requirement actually furthers [its] stated goals," JA 2742, the district court similarly overlooked disputed material facts.  The district court's conclusion seemingly rests on two subsidiary assertions:

- "There has been no evidence presented that the boys treat the girls differently or vice versa on those days" "where girls are not required to wear skirts." *Id.*

- "[Defendants] do not bring forth any facts showing specifically how the skirts requirement furthers [female students' educational] success." JA 2721.

To the contrary, Defendants in fact produced evidence that a jury could credit. Defendants presented undisputed testimony from administrators showing that, on days when the Uniform Policy is suspended, "the classroom level usually is not as orderly[;] the kids are excited."  JA 1869-71.  On those days, students are "more rowdy," "more excited," and "distracted."  *Id.*  They "tend to be less focused" and are "sillier and excited." JA 1889-90.  A jury could infer from this evidence that the Uniform Policy fosters the School's goals of respect, discipline, and good behavior. Even under heightened scrutiny, "statistical or scientific evidence [is not required] to uphold a dress code; improvements in discipline or morale cannot always be

quantified.  The sworn testimony of teachers or administrators would also suffice."
*Palmer*, 579 F.3d at 511 (upholding dress code against First Amendment challenge).

Moreover, a jury could conclude that the undisputed evidence about the academic and athletic achievements of female students shows that the Uniform Policy advances female students'—and indeed all students'—success.  While it may be impossible to isolate the effects of each aspect of the Uniform Policy—as the district court improperly demanded—a jury could reasonably infer that the entire Uniform Policy, as part of the School's traditional approach to education, meaningfully contributes to the unique environment that has birthed such remarkable accomplishments by the Schools' students over the past two decades.

If such matters are relevant to the equal-protection analysis, then they are fact issues for a jury to decide.

## CONCLUSION

For these reasons, Appellants request that the Court reverse the district court's grant of summary judgment to Plaintiffs on their § 1983 claim and render judgment in favor of Appellants on that claim, or, alternatively, remand the case for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fourth Circuit Rule 34(a)(2) and Federal Rule of Appellate Procedure 34(a)(1), Appellants submit that oral argument would be helpful in this case given the important constitutional questions at issue.


May 4, 2020                                    Respectfully submitted,


                                   By:  */s/ Aaron M. Streett*
                                        BAKER BOTTS L.L.P.
                                        Aaron M. Streett
                                        J. Mark Little
                                        Travis L. Gray
                                        910 Louisiana St.
                                        Houston, Texas 77002
                                        Tel: (713) 229-1234
                                        Fax: (713) 229-1522

                                        *Counsel for Appellants, Cross-Appellees*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman font, size 14.

*/s/ Aaron M. Streett*
Aaron M. Streett

CERTIFICATE OF SERVICE

On this 4th day of May, 2020 a true and correct copy of the foregoing was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Fourth Circuit, which currently provides electronic service to the following counsel of record:

Galen Sherwin
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 519-7819
gsherwin@aclu.org

Irena Como
ACLU of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
icomo@acluofnc.org

Johnathan A. Sasser
Ellis & Winters LLP
P.O. Box 33550
Raleigh, NC 27636
(919) 865-7000
jon.sasser@elliswinters.com

*/s/ Aaron M. Streett*
Aaron M. Streett