Nos. 20-1001, 20-1023 (XAP)

# United States Court of Appeals
## for the
# Fourth Circuit

◆❙◆

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; KEELY BURKS,

*Plaintiffs-Appellees,*

– v. –

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; CHAD ADAMS, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; SUZANNE WEST, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; COLLEEN COMBS, in her capacity as member of the Board of Trustees of Charter Day School, Inc.; TED BODENSCHATZ, in his capacity as member of the Board of Trustees of Charter Day School, Inc.; MELISSA GOTT, in her capacity as member of the Board of Trustees of Charter Day School, Inc.,

*Defendants-Appellants,*

– and –

THE ROGER BACON ACADEMY, INC.,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA (WILMINGTON)
DISTRICT COURT CASE NO. 7:16-cv-00030-H-KS
(MALCOLM J. HOWARD, U.S. DISTRICT COURT JUDGE)

## BRIEF OF NATIONAL WOMEN'S LAW CENTER AND COALITION OF CIVIL RIGHTS AND PUBLIC INTEREST ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

EMILY MARTIN
NEENA CHAUDHRY
SUNU CHANDY
ADAKU ONYEKA-CRAWFORD
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, NW
Washington, D.C. 20036
(202) 588-5180

COURTNEY M. DANKWORTH
*Counsel of Record*
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10003
(212) 909-6000

*Counsel for the National Women's
Law Center, et al., as Amici Curiae*

# ADDITIONAL *AMICI CURIAE*

A Better Balance
American Association of University Women (AAUW)
American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME)
American Federation of Teachers, AFL-CIO
Anti-Defamation League
Autistic Self Advocacy Network
Bold Futures
California Women Lawyers
Clearinghouse on Women's Issues
Coalition of Labor Union Women
Desiree Alliance
Disability Rights Advocates
Disability Rights Education & Defense Fund (DREDF)
End Rape on Campus
Equality California
Feminist Majority Foundation
FORGE, Inc.
Gender Justice
Girls for Gender Equity
Girls Inc.
GLBTQ Legal Advocates & Defenders (GLAD)
Human Rights Campaign
Kentucky Association of Sexual Assault Programs
KWH Law Center for Social Justice and Change
Legal Aid at Work
Legal Momentum
Legal Voice
National Association of Social Workers (NASW)
National Association of Women Lawyers
National Center for Transgender Equality
National Council of Jewish Women
National Crittenton
National Network to End Domestic Violence
National Organization for Women Foundation
National Partnership for Women & Families
National Women's Political Caucus

## ADDITIONAL *AMICI CURIAE*

Oklahoma Call for Reproductive Justice
Partnership for Working Families
Religious Coalition for Reproductive Choice
Shriver Center on Poverty Law
SisterReach
Southern Poverty Law Center
Stop Sexual Assault in Schools (SSAIS.org)
The Afiya Center
The Women's Law Center of Maryland
Transgender Law Center
Washington Lawyers' Committee for Civil Rights & Urban Affairs
Women Lawyers On Guard Inc.
Women With A Vision, Inc.
Women's Bar Association of the District of Columbia
Women's Bar Association of the State of New York
Women's Institute for Freedom of the Press
Women's Law Project
Women's Media Center
Women's Rights and Empowerment Network
Women's All Points Bulletin, WAPB

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, 29, and Local Rule 26.1, the undersigned counsel of record certifies that none of the amici curiae is a nongovernmental entity with a parent corporation or a publicly held corporation that owns 10 percent or more of its stock. This representation is made in order that the judges of this Court may evaluate possible disqualification or recusal.

Dated:       July 13, 2020

/s/ Courtney M. Dankworth
COURTNEY M. DANKWORTH

*Counsel for the National Women's Law Center, et al., as Amici Curiae*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...................................................... i

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ...........................................................................................................6

    I.    Title IX Prohibits the Kind of Sex Discrimination Promoted by the Skirts Requirement. ........................................................................6

        A.    Congress Intended Title IX to Have a Broad Remedial Reach. ......................................................................................6

        B.    Revocation of the Appearance Regulation Does Not Impact the Scope of Title IX. ..................................................10

    II.    The Skirts Requirement Promotes Sex Stereotypes and Denies Female Students Equal Educational Opportunities and Benefits. ......15

        A.    The Skirts Requirement Promotes Sex Stereotypes in Violation of Title IX. ...............................................................15

        B.    The Skirts Requirement and Related Sex Stereotypes Create More Pronounced Harms for Girls of Color, Girls with Disabilities, and LGBTQ+ Students. ................................22

CONCLUSION ......................................................................................................27

CERTIFICATE OF COMPLIANCE ....................................................................28

CERTIFICATE OF SERVICE .............................................................................29

# TABLE OF AUTHORITIES

**CASES**

*Andrus v. Glover Constr. Co.*, 446 U.S. 608 (1980)................................................12

*Bostock v. Clayton Cty., Georgia*, No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020).................................................................................................5, 13

*Cohen v. Brown Univ.*, 991 F.2d 888 (1st Cir. 1993) ..............................................7

*Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016) ...................26

*Frank v. United Airlines, Inc.*, 216 F.3d 845 (9th Cir. 2000) ...................................5

*Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602 (9th Cir. 1982) ................................5

*Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444 (E.D. Va. 2019).............26

*Hillman v. Maretta*, 569 U.S. 483 (2013) ................................................................12

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ...............................7, 12

*Mercer v. Duke Univ.*, 401 F.3d 199 (4th Cir. 2005) ...............................................7

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982) ...............................16

*N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ......................................7, 9, 10

*Stanton v. Stanton*, 421 U.S. 7 (1975) ....................................................................16

*United States v. Price*, 383 U.S. 787 (1966)............................................................7

*United States v. Smith*, 499 U.S. 160 (1991) ..........................................................12

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) ...................................................................................26

**STATUTES AND LEGISLATIVE MATERIALS**

20 U.S.C. § 1232(d)(1) (2018)..................................................................................9

20 U.S.C. § 1681(a) (2018)............................................................................4, 7, 12

118 Cong. Rec. S5804–05 (daily ed. Feb. 28, 1972)..............................3, 4, 7, 8, 20

120 Cong. Rec. S39992 (daily ed. Dec. 16, 1974) ...................................................11

General Education Provisions Act, Pub. L. 93–380, 88 Stat. 567............................9

**REGULATIONS**

34 C.F.R. § 106.31(b)(4) (2019) ............................................................13

34 C.F.R. § 106.33 (2019) ...................................................................15

**OTHER AUTHORITIES**

*Archway Classical Acad.–Trivium E.*, OCR Case No. 08-16-1095 (Dep't of
  Educ. Sept. 28, 2017),
  https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/0816
  1095-a.pdf. .........................................................................14

Benjamin Wermund, It's Mostly Been Boys Complaining to Feds About
  Dress Codes, POLITICO (June 4, 2018, 10:00 AM)
  https://www.politico.com/newsletters/morning-education/2018/06/04/its-
  mostly-been-boys-complaining-to-feds-about-dress-codes-240393 .................14

Dress Code, Merriam-Webster's Dictionary, https://www.merriam-
  webster.com/dictionary/dress%20code (last visited June 29, 2020)................13

*Glendale Unified Sch. Dist.*, OCR Case No. 09-16-1960 (Dep't of Educ.
  April 12, 2017),
  https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/0916
  1960-b.pdf ..........................................................................15

*Nondiscrimination on the Basis of Sex in Education Program and Activities
  Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg.
  24,128 (June 4, 1975) ..............................................................9

*Nondiscrimination on the Basis of Sex in Education Programs and Activities
  Receiving or Benefiting from Federal Financial Assistance*, 43 Fed. Reg.
  58,076 (Dec. 11, 1978) .............................................................13

*Nondiscrimination on the Basis of Sex in Education Programs and Activities
  Receiving or Benefitting from Federal Financial Assistance*, 47 Fed. Reg.
  32,526 (July 28, 1982) ...........................................................4, 11

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The National Women's Law Center is a nonprofit legal advocacy organization founded in 1972 and dedicated to the advancement and protection of the legal rights of women, girls, and all who suffer from sex discrimination. The Center focuses on issues of importance to women and their families, including education, economic security, employment, health, and reproductive rights, with a commitment to those who face multiple and intersecting forms of discrimination, including girls of color, girls with disabilities, and LGBTQ+ students. Since 1972, NWLC has worked to secure equal opportunities for women and girls in education, including the right to an educational environment free from discrimination. NWLC has played a leading role in the passage and enforcement of federal civil rights laws and has filed numerous amicus briefs in federal and state courts in matters involving sex discrimination in educational settings. Amici are a coalition of 56 civil rights and public interest organizations committed to preventing and remedying discrimination on the basis of sex, race, and other protected characteristics.

NWLC files this brief with the consent of all parties.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for amici curiae states that no counsel for a party authored the brief in whole or in part, and no person other than amici curiae, their members, or their counsel contributed money to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title IX was designed to correct the "vicious and reinforcing pattern of discrimination" suffered by female students by virtue of society's deep-seated "sex-role expectations" and "myths" about gender roles. 118 Cong. Rec. S5804–05 (daily ed. Feb. 28, 1972) (statement of Sen. Bayh). As one of Title IX's architects explained, "We are all familiar with the stereotype of women as pretty things. . . . But the facts absolutely contradict these myths about the 'weaker sex' and it is time to change our operating assumptions." *Id.* at 5804 (statement of Sen. Bayh).

Unfortunately, Defendants-Appellants have not departed from these operating assumptions. Wishing to "create a school environment that embodie[s] traditional values," J.A. at 81, Appellants implemented a uniform policy at Charter Day School ("CDS") in Leland, North Carolina that required girls to wear knee-length jumpers, skirts, or skorts to school on most days and prohibited them from wearing pants or shorts—a privilege reserved only for boy students (hereinafter, the "Skirts Requirement"). When asked to explain the rationale for the Skirts Requirement, Appellants posited that it would "preserve chivalry" as "a code of conduct" in which a woman is "regarded as a fragile vessel that men are supposed to take care of and honor." J.A. at 425 (Baker A. Mitchell Dep. ("Mitchell Dep.") 105:8-14), 345–46 (Pls.' Am. Statement of Material Facts ¶¶ 101–04).

Appellants' own words make plain that the Skirts Requirement perpetuates the very "myths about the 'weaker sex'" that Title IX sought to eradicate. 118 Cong. Rec. at S5804–05. Indeed, the Court need not search for evidence of Appellants' discriminatory intent. Appellants' statements speak for themselves. Perpetuating unlawful sex stereotypes is not an unintended consequence of the Skirts Requirement—it is its core objective. And as the record evidence establishes, those stereotypes deprive female CDS students of equal educational benefits and exclude them from participating in various educational opportunities, in clear violation of Title IX. 20 U.S.C. § 1681(a) (2018).

Holding that the Skirts Requirement does not violate Title IX, the District Court based its erroneous decision on one agency action from 1982, when the United States Department of Education ("USED") promulgated amendments to its Title IX regulations to revoke a provision that had "prohibit[ed] discrimination in the application of codes of personal appearance." *Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance*, 47 Fed. Reg. 32,526 (July 28, 1982) (to be codified at 34 C.F.R. pt. 106). In resting its decision on that revocation, the District Court ignored the statute's legislative history, which illustrates that Congress intended Title IX to provide broad and sweeping protections against harmful sex-based stereotypes and rules.

3

Nor did the District Court consider the myriad ways in which the Skirts Requirement promotes destructive sex stereotypes. Among other messages, the Skirts Requirement communicates that girls are meek; that their comfort matters less than that of boys'; that their looks outweigh their agency; that they should not engage in physical activity; and that they do not belong on the playground. And it causes special harm to particular students, including girls of color, gender non-conforming students, gender non-binary students, transgender students, and girls with disabilities.

The U.S. Supreme Court recently confirmed that discrimination based on sexual orientation and gender identity constitutes illegal sex discrimination under federal law. *Bostock v. Clayton Cty., Georgia*, No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020).[2] As with workplaces, school should be a safe and

---

2   *Bostock* also provides a compelling rebuttal to the rationale in the dress code-related Title VII cases that CDS cited in its merits brief. Apart from the additional reasons for distinguishing those cases as described in Plaintiffs' merits brief, *see* Plaintiffs-Appellees' Opening and Response Br., ECF. No. 35, at 26–27, 45, 67–69, these Title VII cases do not survive the Supreme Court's recent decision in *Bostock*, which overruled a central premise involved in those earlier cases: that a sex-based policy that impacts all genders is not sex discrimination. *See Bostock*, 2020 WL 3146686, at *8 ("[A]n employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability."). Additionally, to the extent that this Court is inclined to look to Title VII code of appearance cases for guidance, it is well-established that sex-based rules of appearance that apply unequally or only to one sex are unlawful. *See, e.g.*, *Frank v. United Airlines, Inc.*, 216 F.3d 845, 855 (9th Cir. 2000) (discriminatory weight

welcoming place where all children are given equal opportunities to succeed.  The

Skirts Requirement robs female CDS students of those equal opportunities.

This Court should reverse the District Court's error on this issue.

---

requirements between male and female flight attendants violated Title
VII); *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 610 (9th Cir. 1982)
(same).  Finally, while this brief otherwise does not address the Equal
Protection Clause issue in this case, amici note that Appellants are incorrect in
arguing that any standard other than heightened scrutiny applies to facial
gender-based distinctions like the Skirts Requirement.  *See* Appellants-
Defendants' Opening Br., ECF. No. 22, at 50.  In light of the blatant sex-
stereotypes that motivated the Skirts Requirement, Appellants cannot satisfy
such scrutiny.

**ARGUMENT**

I.   Title IX Prohibits the Kind of Sex Discrimination Promoted by the Skirts
     Requirement.

   A.   *Congress Intended Title IX to Have a Broad Remedial Reach.*

   Title IX provides that no person may be "excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education

program or activity receiving [f]ederal financial assistance."  20 U.S.C. § 1681(a)

(2018).  The Supreme Court has long recognized that Title IX is a critical tool in

securing equal educational opportunities for women and girls and thus must be

accorded "'a sweep as broad as its language.'"  *N. Haven Bd. of Educ. v. Bell*, 456

U.S. 512, 521 (1982) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)).

Indeed, the word "discrimination" here "covers a wide range of intentional unequal

treatment," and Congress's use of that word illustrates that Title IX has "a broad

reach."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

Accordingly, circuit courts—including this Circuit—have interpreted Title IX to

prohibit sex discrimination in "all programmatic aspects of educational

institutions."  *Mercer v. Duke Univ.*, 401 F.3d 199, 207 (4th Cir. 2005) (quoting

*Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993)).

   The statute's legislative history could not be clearer.  "[S]tereotyped

notions" about girls' interests, abilities, or presumed "differences" from boys strike

at the heart of what Title IX was designed to eradicate.  118 Cong. Rec. S5804–05

6

(daily ed. Feb. 28, 1972) (statement of Sen. Bayh).  Senator Birch Bayh, the

legislator who introduced the statutory provision that ultimately became Title IX,

described the statute's language as "far-reaching" and "a strong and

comprehensive measure" intended to provide "solid legal protection" to all women

in education.  *Id.* at 5806–08.

Because sex discrimination in education is often the result of deep-seated

assumptions about gender perpetuated in the name of "tradition," *id.* at 5806, Title

IX's purpose was to root out educational practices that mirrored and enforced these

"sex-role expectations" and society's "operating assumptions" about gender,

including "myths" about "the weaker sex."  *Id.* at 5804–05.  Indeed, Title IX was

intended to correct this "vicious and reinforcing pattern of discrimination."  *Id.*  As

discussed below, *infra* Part II, the Skirts Requirement was founded on and is

intended to perpetuate these very "myths"—serving as a perfect example of what

Title IX sought to eliminate.

The post-enactment history of Title IX illustrates that the agency tasked with

implementing the statute understood that Congress intended it to reach sex-

differentiated dress codes like the Skirts Requirement.  In 1975, the Department of

Health, Education, and Welfare ("HEW"), the predecessor agency to USED,

enacted various Title IX regulations (collectively, the "1975 Post-Enactment

Regulations"), including a regulation prohibiting discrimination in codes of

personal appearance (the "Appearance Regulation"). *Nondiscrimination on the Basis of Sex in Education Program and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed. Reg. 24,128 (June 4, 1975). Before the regulations could take effect, HEW was required under the General Education Provisions Act to submit the proposed rules to both chambers of Congress for their review. *See* General Education Provisions Act, Pub. L. 93–380, 88 Stat. 567, *as amended*, 20 U.S.C. § 1232(d)(1) (2018). Congress then had two options. If it found the proposed rules to be "inconsistent with the Act from which it derive[d] its authority," it could disapprove of them in a concurrent resolution. Otherwise, Congress could do nothing and the rules would take effect. *Id.*

As required by law, HEW submitted to Congress its proposed Appearance Regulation along with the larger package of the 1975 Post-Enactment Regulations. 40 Fed. Reg. at 24,128. After deliberations in the House—which included six days of hearings held by the Subcommittee on Postsecondary Education—neither chamber passed a resolution of disapproval. *See id.*; *see also Bell*, 456 U.S. at 532–33. In other words, when given the opportunity to say that regulating sex-differentiated dress codes fell beyond the scope of Title IX, Congress declined.

In considering how much weight to attribute to that decision, this Court can look to the Supreme Court for guidance, as it has already evaluated the same set of facts in an analogous context. In *Bell*, the Court considered whether HEW

8

exceeded its authority in promulgating rules under Title IX that prohibited sex discrimination in employment under federally funded education programs.  *See generally* 456 U.S. at 514–20.  Although the regulation at issue differed in *Bell*, the Court's fundamental inquiry was the same:  How important was it that Congress did not pass a concurrent resolution of disapproval when presented with a regulation interpreting Title IX?

The Supreme Court ultimately afforded considerable heft to Congress's decision.  It reasoned that, while Congress's failure to pass a resolution of disapproval did not *per se* establish that it considered the 1975 Post-Enactment Regulations "valid and consistent with the legislative intent," it "does indicate that Congress was made aware of [HEW]'s interpretation of the Act and of the controversy surrounding the regulations . . . , and it lends weight to the argument that coverage of [the particular regulation at issue in *Bell*] was intended."  *Id.* at 534.

The same analysis applies here.  The Appearance Regulation was presented to Congress for disapproval in 1975—three years after the passage of Title IX. Critically, when Congress disagreed with HEW's interpretation of Title IX in other instances, it made that disagreement known.  For example, after the 1975 Post-Enactment Regulations had been circulated to the general public for notice and comment but before they were formally submitted to Congress, Congress passed

an amendment to Title IX to exclude social fraternities and sororities. Senator Bayh introduced this amendment on the floor expressing "distress[]" when he realized that HEW's proposed regulations would apply "to a number of organizations which have no legitimate bearing on the original intent of [T]itle IX." 120 Cong. Rec. S39992 (daily ed. Dec. 16, 1974) (Statement of Sen. Bayh). "As the author and prime Senate sponsor of [T]itle IX, I know that it was not my intent, and I do not believe that it was the intent of the Congress[,] that [T]itle IX be extended to organizations such as social fraternities and sororities." *Id.* Senator Bayh's statement demonstrates that, when Congress disagreed with HEW's interpretation of Title IX, it spoke up. Congress's silence in response to the Appearance Regulation speaks volumes.

**B.**     ***Revocation of the Appearance Regulation Does Not Impact the Scope of Title IX.***

The District Court dismissed Appellees' Title IX claim because USED revoked HEW's Appearance Regulation in 1982. *Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance*, 47 Fed. Reg. 32,526 (July 28, 1982) (to be codified at 34 C.F.R. pt. 106). That revocation cannot bear the weight of significance that the District Court placed on it.

*First*, USED cannot narrow the scope of Title IX's protections. Congress intended Title IX to sweep broadly to capture all forms of sex discrimination in

education, with only certain, limited exceptions. The withdrawal of the Appearance Regulation does not change that. In order to effectuate Title IX's broad purpose, the Supreme Court has long read Title IX as reaching conduct not specifically included in the statutory text, including, for example, retaliation. *See Jackson*, 544 U.S. at 175–77. In so finding, the Court declared, "Because Congress did not list *any* specific practices in Title IX, its failure to mention one such practice says nothing about whether it intended that practice to be covered." *Jackson*, 544 U.S. at 175.

To be sure, Title IX does list certain exemptions. *See, e.g.*, 20 U.S.C. § 1681(a)(6)(A) (2018) ("this section shall not apply to membership practices . . . of a social fraternity . . ."); *id.* § 1681(a)(8) (excluding "father-son or mother-daughter" activities or beauty pageants). But dress codes are not among them. "'[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative intent.'" *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)); *accord United States v. Smith*, 499 U.S. 160, 167 (1991). As the Supreme Court recently declared, there is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory

rule creates a tacit exception." *Bostock*, 2020 WL 3146686, at *11.  In reading into Title IX an exemption not explicitly enacted by Congress, the District Court erred.

*Second*, in withdrawing the Appearance Regulation, USED left intact another provision of the same regulation under Title IX that provides for a general prohibition on "[s]ubject[ing] any person to separate or different rules of behavior, sanctions, or other treatment."  34 C.F.R. § 106.31(b)(4) (2019).  A dress code establishes rules of behavior—specifically it creates "formally or socially imposed standards of dress."  Dress Code, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/dress%20code (last visited June 29, 2020).  The withdrawal of the Appearance Regulation does not change the fact that a discriminatory dress code like the Skirts Requirement is already encompassed within USED's long-existing regulation prohibiting a school from imposing sex-based rules of behavior.

*Third*, in withdrawing the Appearance Regulation, USED did not state that sex-differentiated dress codes fell outside the bounds of Title IX.  To the contrary, USED wrote that it rescinded the regulation in order to "more effectively use its resources for enforcing other parts of" Title IX.  *Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 43 Fed. Reg. 58,076, 58,076 (Dec. 11, 1978) (to be codified at 45 C.F.R. pt. 86) (USED's Proposed Revocation).  USED did not articulate a

12

statutory interpretation; its statement simply reflected the agency's enforcement and political priorities at the time.

Indeed, recent enforcement actions by USED illustrate that the agency's own interpretation about the breadth of Title IX differs from Appellants' interpretation (and that of the District Court). Since revoking the Appearance Regulation, USED has investigated discriminatory dress codes under Title IX on at least five occasions. Benjamin Wermund, *It's Mostly Been Boys Complaining to Feds About Dress Codes*, POLITICO (June 4, 2018, 10:00 AM) https://www.politico.com/newsletters/morning-education/2018/06/04/its-mostly-been-boys-complaining-to-feds-about-dress-codes-240393. According to a 2018 *Politico* article, USED's Office for Civil Rights wrote in one such investigation that, "[T]reating a female student differently from a male student in the application of a dress code may raise an inference of discrimination on the basis of sex." *Id.* In another investigation conducted by USED under Title IX, the agency wrote that, "[I]n the context of dress codes and grooming standards, the disparity in the School's hair length rules [between boys and girls] create[s] an inference of discrimination . . ." *Archway Classical Acad.–Trivium E.*, OCR Case No. 08-16-1095 (Dep't of Educ. Sept. 28, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/08161095-a.pdf. And in a third case in 2017 involving an agreement between USED's Office

13

of Civil Rights and a school district resolving an allegation related to the

discriminatory application of a school dress code, the district agreed to implement

harassment training for the staff, which would include "[e]xamples of sex and

gender discrimination, ***including, but not limited to, enforcement of a dress code***

***in accordance with sexual stereotyping***." *Glendale Unified Sch. Dist.*, OCR Case

No. 09-16-1960 (Dep't of Educ. April 12, 2017) (emphasis added),

https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09161960-

b.pdf (resolution agreement).  USED would not have investigated dress codes that

discriminated on the basis of sex if it did not believe it had the authority to do so.

*Fourth*, in other circumstances, USED has made clear when it believed that

certain contexts were exempted from Title IX's general prohibition on sex-based

distinctions. *See, e.g.*, 34 C.F.R. § 106.33 (2019) (exempting locker rooms and

bathrooms from the prohibition on separation by sex); *id.* § 106.34(a) (identifying

contact sports and sex education classes as appropriate forums to separate girls and

boys); *id.* § 106.34(b) (allowing educational institutions to, in certain instances,

operate single sex classes in non-vocational elementary and secondary schools).  If

USED intended to interpret Title IX as exempting dress codes, it could have

enacted a similar regulation when it revoked the Appearance Regulation or at any

time subsequent.  It has not.

14

II.  The Skirts Requirement Promotes Sex Stereotypes and Denies Female
     Students Equal Educational Opportunities and Benefits.

**A.** ***The Skirts Requirement Promotes Sex Stereotypes in Violation of
     Title IX.***

The Skirts Requirement promotes sex stereotypes that are prohibited by Title

IX. *Supra* Part I(B).  Most troublingly, Appellants frame the Skirts Requirement in

a way that communicates to all students that girls are meek.[3]  For Appellants, this

is not mere happenstance; it is the objective.  They admit that the Skirts

Requirement reinforces "traditional" gender values, promotes "chivalry," J.A. at 81

(Pls.' Am. Compl. Ex. B (Peltier Mitchell email exchange)), and "convey[s] the

message, starting as early as Kindergarten, that boys and girls are different" and

that "females are to be treated courteously and more gently than boys."  J.A. at 344

(Pls.' Am. Local Civil Rule 56.1 Statement of Material Facts in Supp. of Mot. for

Summ. J. ¶ 96 (citing Mitchell Dep. 104:15-105:7)).  Simply put, this is the tone at

the top set by Appellants' leadership.  The school's founder and board chair

---

[3]  Research indicates that students are conditioned to associate skirts with passive
     play activities.  For instance, in one study, researchers asked preschool boys and
     girls to match line drawings of either a girl in pants or a girl in a skirt with
     specific play activities.  They found that children were significantly more likely
     to match the girl in pants with active play activities and the girl in a skirt with
     passive play activities.  *See* Addendum in Supp. of Br. of Amici Curiae
     ("Addendum"), Vol. I Ex. 1 at 14; *see also* Add. Vol. I Ex. 2 at 24 (study of
     children from preschool to middle school age found that children associated
     skirts with passive and stereotypically feminine activities, such as cooking or
     playing with dolls).

defines "chivalry" as "a code of conduct where women are . . . regarded as a fragile vessel that men are supposed to take care of and honor." J.A. at 425 (Mitchell Dep. 105:11–14). This stereotype that girls are meek—which has been embraced by both the board and faculty as the rationale for the Skirts Requirement—is regularly enforced in the hallways of CDS. J.A. at 345–46 (Pls. Am. Statement of Material Facts ¶¶ 101–105).

These outdated gender notions are damaging to all students, signaling that girls *should* be meeker than their male classmates.[4] Telling girls that they are "fragile" inhibits them from developing qualities that are fundamental to leadership, civic participation, and success in many professions.[5] And by insisting

---

[4]   *See generally* Add. Vol. I Exs. 1–2.

[5]   Boys and gender non-binary individuals are also not served by sex-stereotyped messaging. *See, e.g.*, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725–26, 731 (1982) (holding state-supported university policy limiting enrollment to women violated equal protection clause in case involving male plaintiff denied to university's nursing school program and reasoning "[t]he purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women."); *Stanton v. Stanton*, 421 U.S. 7, 14–15 (1975) ("A child, male or female, is still a child. No longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas. . . . If a specified age of minority is required for the boy in order to assure him parental support while he attains his education and training, so, too, is it for the girl." (internal citation omitted)); *see also* Add. Vol. I Ex. 3 at 46.

on rigid adherence to a policy that discourages assertiveness in girls and passivity in boys, Appellants are engaged in discrimination, in clear violation of Title IX. *Supra* Part I.

The Skirts Requirement also conveys a number of other harmful messages to girls. It says that boys' comfort outweighs girls'. J.A. at 515 (Decl. of Keely Burks in Supp. of Pls.' Mot. for Summ. J., dated Nov. 29, 2017 ("Keely Decl.") ¶ 8). It emphasizes the need for girls (but not boys) to be modest.[6] It "puts girls' bodies under the control of another and calls girls' attention to their appearances and bodily adornments."[7] It places the responsibility (and fault) on girls for "distracting" their male classmates, rather than holding boys responsible for their behavior toward girls.[8] And it signifies that appearance, not functionality, is the most important value served by a girl's clothing, elevating appearance over agency—at the expense of a girl's ability to learn most effectively.[9]

---

[6] *See, e.g.*, Add. Vol. I Ex. 4 at 65 (noting that in one study "boys were allowed and encouraged to pursue relaxed behaviors in a variety of ways that girls were not" and "[t]eachers were more likely to reprimand girls for relaxed bodily movements and comportment").

[7] *Id.* at 63.

[8] Add. Vol. I Ex. 5.

[9] Wearing skirts made Appellees uncomfortable, especially in the winter months. *See, e.g.*, J.A. at 508 (I.B. Decl. ¶ 5 ("In the winter, I wear two layers of leggings under my skirt to stay warm when I'm at school, but this is not as warm as when I'm able to wearing pants with long underwear. . . . I used to

17

These are not hypothetical contentions. The record is replete with evidence of the Skirts Requirement's actual effects, including that girls at CDS are instructed to sit modestly during class, which distracts them from concentrating. Plaintiff I.B. testified, for example, that, "In kindergarten and first grade, [she] remember[s] she was told to 'sit like a girl' and 'sit like a princess," which made her "feel uncomfortable and singled out." J.A. at 508 (Decl. of I.B. in Supp. of Pls.' Mot. for Summ. J., dated Nov. 29, 2017 ("I.B. Decl.") ¶ 7). Plaintiff Keely gave a similar account, saying, "I always had to be conscious of how I was sitting, and that took focus that distracted me from my academic work. I thought the teachers didn't care if the girls were as comfortable in class as the boys were, and this would upset me." J.A. at 515 (Keely Decl. ¶ 6); *see also* J.A. at 986–88 (Rosina Walton Dep. 43:19-45:19); J.A. at 531–33 (Patricia Brown Dep. 29:10-31:3).

The Skirts Requirement likewise impedes girls' physical activity. Plaintiff I.B. stated that "[t]here are certain things I do not do during recess" like "climbing or doing gymnastics," and that other girls do not play "certain games." J.A. at 509-510 (I.B. Decl. ¶¶ 14–15). After a teacher reprimanded Keely for doing a

---

sometimes cry in the mornings before school because I would be cold wearing only a skirt with leggings")); J.A. at 515 (Keely Decl. ¶ 9 ("In the cold weather, wearing a skirt is simply not warm enough")).

cartwheel when her skirt flew up over her head, Keely refrained from doing cartwheels or flips when she was in her uniform, but observed that "the boys were free to do cartwheels and flips without feeling embarrassed."  J.A. at 514 (Keely Decl. ¶ 5).

> I gave up trying to play soccer on any day except days when I was in my P.E. uniform because it was simply too embarrassing. But I was angry that the boys could play however they wanted in their regular school clothes while I had to avoid the activities I enjoyed because I had to be worried about being "ladylike."

J.A. at 516–17 (Keely Decl. ¶ 13); *see also* J.A. at 517 (Keely Decl. ¶ 14 (Keely refrained from participating in physical education on days she was in "show choir," which required her to wear her uniform even on some P.E. days, and would instead "have to sit and watch while the other kids in the class played sports . . . even though I loved sports.  If I had been wearing pants or shorts as part of my school uniform, I could have participated in Show Choir and participated in gym.")).  Far from theoretical, the Skirts Requirement's harms were felt everyday, from the classroom to the playground.  J.A. at 515 (Keely Decl. ¶ 8 (describing the policy as "unfair" because it restricted only the girls' movement)).  But the Skirts Requirement traffics in the very sex stereotyping that Title IX seeks to eradicate.  *See* 118 Cong. Rec. S5805 (daily ed. Feb. 28, 1972) (statement of Sen. Bayh).

The Skirts Requirement also violates Title IX because it denies girls equal educational benefits.  As described above, the Skirts Requirement prevented girls

from participating in recess to the same extent as boys, *supra* at 17—a predictable outcome of this type of clothing restriction.[10]  To make matters worse, research shows that girls who wear skirts are *perceived* to be less active and athletic than girls who wear gender-neutral clothing, thereby increasing the risk that girls will be excluded from physical activities because teachers, coaches, parents, and peers will mistakenly conclude that girls are not interested in participating in athletics and other physical play.[11]

The harmful effects extend to the classroom as well.  As Appellees have attested, boys have teased female classmates and looked up their skirts, *see, e.g.*, J.A. at 517 (Keely Decl. ¶ 16 (Keely stating that boys looked up her skirt during fire and tornado drills)), demonstrating that the Skirts Requirement itself has subjected girls to teasing, ridicule, and harassment.  At best, those moments were uncomfortable; at worst, traumatizing.  Forcing girls to wear skirts can also shape the subjects and career interests that they ultimately pursue.[12]  To take one example, studies show that promoting gender stereotypes—as the Skirts

---

[10]  *See* Add. Vol. I Exs. 6–11.

[11]  Add. Vol. I Ex. 12 at 466; Add. Vol. I Ex. 13 at 489.

[12]  *See, e.g.*, Add. Vol. II Ex. 16 at 543 (finding "implicit gender–science stereotyping was related to nations' sex differences in science and math achievement").

Requirement does and is designed to do—contributes to the well-documented achievement gap between boys and girls in STEM fields.[13]

The problems do not end there. Forcing girls to wear skirts also makes them more susceptible to missing classroom time and learning. If girls are penalized for violating the Skirts Requirement—a rule that is not imposed on boys, and thus one they cannot violate—girls are robbed of valuable class time, whether through a stern lecture from an administrator, waiting to have a skirt measured to see if it reaches the knee (as is required by the Skirts Requirement) or, in the most extreme cases, suspension. See *e.g.*, J.A. at 97–98 (2015-2016 Parent and Student Handbook (providing for possible suspension or expulsion for violating school rules)); J.A. at 514 (Keely Decl. ¶ 4 (explaining that Keely was forced to sit in the principal's office all day and miss class because she was wearing shorts)). For students who are struggling academically, missed class time puts them at risk of falling even further behind, and repeatedly being reprimanded for one's clothing is embarrassing and discouraging, which further detracts from learning.[14] J.A. at 472 (Decl. of Bonnie Peltier in Supp. of Pls.' Mot. for Summ. J., dated Nov. 29, 2017

---

[13] *Id.*

[14] Add. Vol. II Ex. 17 at 556–57 (*citing* Susan Frazier-Kouassi, *Race and Gender at the Crossroads: African American Females in Schools*, 8 PERSPECTIVES 151 (2002)); Add. Vol. II Ex. 18 at 574; Add. Vol. II Ex. 19 at 580, 597–98; Add. Vol II. Ex. 20 at 628, 630–31.

(Peltier Decl.) ¶ 15 (noting receipt of repeated notices from CDS teachers that A.P.'s skirt was too short)).

**B.**  ***The Skirts Requirement and Related Sex Stereotypes Create More Pronounced Harms for Girls of Color, Girls with Disabilities, and LGBTQ+ Students.***

The harms detailed herein are particularly pronounced for girls of color, girls with disabilities, and LGBTQ+[15] students.[16]  As noted, the very reasons that Appellants offer as support for the Skirts Requirement—promoting their version of "chivalry," which imagines girls as a "fragile vessel"—further a stereotypical notion of femininity that contributes to the disproportionate disciplining of Black girls for dress code violations.[17]  Those in authority often perceive Black girls as more assertive and outspoken than white girls and, due to race- and gender-based stereotypes, take these traits as negatives.[18]  These views on acceptable behavior

---

[15]  LGBTQ+ refers to lesbian, gay, bi-sexual, transgender, and queer individuals. The "plus" symbol indicates that individuals in these and related communities may self-identify with additional terms that are culturally based or otherwise specific to their communities.

[16]  The disproportionate enforcement of dress codes against girls of different backgrounds extends beyond dress codes that require girls to wear skirts. However, the Court need not reach the broader issues posed by gender-differentiated dress codes *writ large* in addressing Plaintiffs-Appellees' Title IX claim.

[17]  Add. Vol. II Ex. 20 at 620; Add. Vol. II Ex. 22 at 677.

[18]  Add. Vol. II Ex. 21 at 648.

are often informed by biases that view white middle-class notions of femininity, like "passivity" and "modesty,"[19] as the norm to which all girls must aspire,[20] to the detriment of Black,[21] Native American/Indigenous,[22] and Latina girls.[23]

Girls with disabilities are also disproportionately affected by a Skirts Requirement, as they may experience additional difficulty sitting "like a lady" or coordinating their movements in order to meet the "modesty" expectations that come with wearing a skirt. Among other things, these students sometimes exhibit less postural control, weaker core and back muscles, and other differences with their body awareness that may make it more difficult for them to sit still or upright.[24] As the record in this case establishes, "modesty" is a key value

---

[19]  Add. Vol. II Ex. 22 at 674.

[20]  Add. Vol. II Ex. 23 at 690.

[21]  Add. Vol. II Ex. 21 at 659 (stating "Black girls are at greater risk than other girls of receiving citations . . . for dress code violations") (citing sources).

[22]  Native American girls suffer disproportionately high discipline rates in schools, a possible holdover from when students were forced to assimilate in Native American boarding schools, which required them to adhere to Eurocentric appearance and grooming standards. Add. Vol. II Ex. 21 at 651 (citing sources).

[23]  An overemphasis on dress code enforcement can also detract from the learning environment for Latina students. Add. Vol. II Ex. 24 at 781, 787.

[24]  *See, e.g.*, Add. Vol. II Ex. 25 (describing the adaptive clothing industry and mentioning that individuals with some disabilities have particular difficulty wearing dresses); Add. Vol. II Ex. 26 at 799–800 (explaining that many autistic

underlying the Skirts Requirement, leaving girls with disabilities particularly at risk of non-compliance—and the harms that come with it.

LGBTQ+ students are particularly harmed by a Skirts Requirement, as they are disciplined for dress code violations more frequently.[25] The Skirts Requirement (which forces students to identify as male or female) does not recognize the existence of gender non-binary[26] or gender non-conforming[27] students. Gender non-conforming and non-binary students are already more likely to be depressed, anxious, possess a lower sense of self-worth, and be at a greater risk of suicide.[28] Notably, being gender non-conforming or non-binary does not

---

individuals find sitting uncomfortable and that "sensory factors that might cause minor discomfort for a neurotypical person . . . can be overwhelming for an autistic person," and that, at times, "sitting 'properly' in a chair is truly stressful, physically painful, and/or a major distraction"); Add. Vol. II Ex. 27 at 802 (medical study noting that many children with autism suffer from "postural control deficits" rendering them "significantly more unstable than children with neurotypical development"); Add. Vol. II Ex. 28 at 814, 818 (finding that one of the benefits of special education programs is increased flexibility related to wearing uniforms).

[25] Add. Vol. II Ex. 29 at 901, 990.

[26] A non-binary gender identity is one that does not fit into existing gender schemas.

[27] "Gender non-conforming" refers to an individual with a gender expression or presentation that differs from the cultural or social stereotypes associated with the person's assigned gender or sex.

[28] Add. Vol. I Exs. 14–15; Add. Vol. II Exs. 30–31.

*itself* drive this psychological distress.  Distress comes when children are pressured to conform to gender norms—and particularly when children assigned female at birth who do not identify as girls are pressured to conform to feminine gender norms.  As psychologists have noted, "Feeling strong pressure to conform to gender stereotypes . . . undermines rather than promotes adjustment [to stress]," thereby acting as a "straightjacketing of the self."[29]  The Skirts Requirement is therefore particularly harmful for non-binary students, because it forces them to conform to gender norms to which they do not subscribe.  J.A. at 357 (Pls.' Am. Compl. ¶ 178 (citing sealed exhibit)).

Likewise, by not allowing for attire consistent with their gender identities or expression, the Skirts Requirement poses additional harms to transgender boys and girls.  In fact, courts around the country have held that Title IX requires schools to allow transgender students to access educational facilities and opportunities that match their gender identity.  *See Grimm v. Gloucester Cty. Sch. Bd.*, 400 F. Supp. 3d 444, 459 (E.D. Va. 2019); *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017), *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 220–22 (6th Cir. 2016).  These decisions carry special force in the wake of *Bostock*'s decision that discrimination

---

[29]  Add. Vol. I Ex. 15 at 529.

against LGBTQ+ individuals is illegal under federal law as a form of prohibited sex discrimination.

In sum, a forced skirts requirement reinforces negative sex stereotypes about girls and causes particular harm to certain students, including girls of color, girls with disabilities, and LGBTQ+ students.  Title IX proscribes these very sex-based distinctions.

## CONCLUSION

For the foregoing reasons, amici curiae join Plaintiffs-Appellees in urging

the Court to reverse the District Court's grant of summary judgment dismissing

Appellees' Title IX claim.

Dated:    July 13, 2020
          New York, N.Y.

                              Respectfully submitted,


                              /s/ Courtney M. Dankworth


Emily Martin                    Courtney M. Dankworth
Neena Chaudhry                    *Counsel of Record*
Sunu Chandy                     DEBEVOISE & PLIMPTON LLP
Adaku Onyeka-Crawford           919 THIRD AVENUE
NATIONAL WOMEN'S LAW CENTER      NEW YORK, NEW YORK 10003
11 DUPONT CIRCLE, NW            (212) 909-6000
WASHINGTON, D.C. 20036
(202) 588-5180
                                *Counsel for the National Women's Law
                                Center, et al., as Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify the following in accordance with Fed. R. App. 32(g)(1):

1. This brief complies with the type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (*i.e.*, cover page, disclosure statement, table of contents, table of authorities, certificate of counsel, signature blocks, proof of service, addendum), this brief contains 6,107 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Federal R. App. 32(a)(6), because it was prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font size and Times New Roman type style.

Dated: July 13, 2020

/s/ Courtney M. Dankworth
COURTNEY M. DANKWORTH

*Counsel for the National Women's Law
Center, et al., as Amici Curiae*

## CERTIFICATE OF SERVICE

Counsel for *amici curiae* certifies that on July 13, 2020, I electronically filed the foregoing with the Clerk of Court of the United States Court of Appeals for the Fourth Circuit by using the EM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated:        July 13, 2020


/s/ Courtney M. Dankworth
COURTNEY M. DANKWORTH

*Counsel for the National Women's Law Center, et al., as Amici Curiae*

29