**CASE NO. 20-1001 (L)**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

BONNIE PELTIER, as Guardian of A.P., a minor child; ERIKA BOOTH, as Guardian of I.B., a minor child; and KEELY BURKS,

*Plaintiffs-Appellees, Cross-Appellants*

v.

CHARTER DAY SCHOOL, INC.; ROBERT P. SPENCER; CHAD ADAMS; SUZANNE WEST; COLLEEN COMBS; TED BODENSCHATZ; and MELISSA GOTT
in their capacities as members of the Board of Trustees of Charter Day School, Inc.; and THE ROGER BACON ACADEMY, INC.,

*Defendants-Appellants*

and

THE ROGER BACON ACADEMY, INC,

*Defendant-Cross-Appellee*

On Appeal from the United States District Court for the Eastern District of North Carolina, Southern Division Case No. 7:16-cv-00030-H-KS

## REPLY BRIEF OF PLAINTIFFS-APPELLEES

Galen Sherwin
Ria Tabacco Mar
Jennessa Calvo-
  Friedman
Louise Melling
Amy Lynn Katz
American Civil
Liberties Union Fnd.
125 Broad St., 18th Fl.
New York, NY 10004

Irena Como
ACLU of North
Carolina Legal Fnd.
P.O. Box 28004
Raleigh, NC 27611

Jonathan D. Sasser
Ellis & Winters LLP
P.O. Box 33550
Raleigh, NC 27636

*Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

TABLE OF CASES AND AUTHORITIES ................................................. ii

SUMMARY ........................................................................................ 1

ARGUMENT .................................................................................... 4

   I.   The Court Should Reverse the Grant of Summary Judgment to Defendants and Direct Entry of Summary Judgment to Plaintiffs on their Title IX Claims .................................................. 4

      A.   The Skirts Requirement Constitutes Discrimination Under Title IX ....................................................................... 4

      B.   This Court Should Not Adopt the "Unequal Burden" Test ..................................................................................... 9

      C.   This Court Should Reverse the District Court's Holding that USED's Rescission of the Appearance Code Regulation Precludes Plaintiffs' Title IX Claims .................... 13

          1)   The *Chevron* Analysis Is Not Applicable Because the Rescission of the Appearance Regulation Did Not Constitute USED's Interpretation of Title IX ................. 13

          2)   Interpreting Title IX as Exempting Sex-Specific Dress Codes Would Not Merit Deference ......................... 19

   II.   RBA is a "Recipient" of Federal Funds Subject to Title IX ........... 23

   III.   RBA Is a State Actor ................................................................... 27

CONCLUSION ............................................................................... 33

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ......................................................................................... 35

CERTIFICATE OF SERVICE ............................................................. 36

ADDENDUM ........................................................................ Add. 1

i

## <u>TABLE OF CASES AND AUTHORITIES</u>

**Cases**

*ACLU of Minnesota v. Tarek Ibn Ziyad Acad.*,
　　Civil No. 09-138, 2009 WL 2215072 (D. Minn. July 21, 2009) ...... 32

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*,
　　968 F.3d 1286 (11th Cir. 2020) ................................................. 7, 17

*Archway Classical Acad.–Trivium E.*,
　　OCR Case No. 08-16 1095 (Dep't of Educ. Sept. 28, 2017) ........... 19

*Bauer v. Lynch*,
　　812 F.3d 340 (4th Cir. 2016) ........................................................ 11

*Bostock v. Clayton County, Georgia*,
　　140 S. Ct. 1731 (2020) ........................................................ passim

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
　　531 U.S. 288 (2001) ................................................................ 32, 33

*Canady v. Bossier Par. Sch. Bd.*,
　　240 F.3d 437 (5th Cir. 2001) ........................................................ 22

*Cannon v. Univ. of Chicago*,
　　441 U.S. 677 (1979) ....................................................................... 14

*Caviness v. Horizon Community Learning Center, Inc.*,
　　590 F.3d 806 (9th Cir. 2010) ........................................................ 30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
　　467 U.S. 837 (1984) .............................................................. passim

ii

*Christensen v. Harris Cty.*,
    529 U.S. 576 (2000) ......................................................... 14

*Clark v. Universal Builders, Inc.*,
    501 F.2d 324 (7th Cir. 1974) ........................................ 33

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ......................................................... 22

*Disabled in Action v. Mayor & City Council of Baltimore*,
    685 F.2d 881 (4th Cir. 1982) ................................... 24, 25

*Dupre v. Roman Catholic Church of Diocese of Houma-Thibodaux*,
    No. CIV. A. 97-3716, 1999 WL 694081
    (E.D. La. Sept. 2, 1999) .................................................. 25

*Frank v. United Airlines, Inc.*,
    216 F.3d 845 (9th Cir. 2000) ........................................ 12

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ........................................................... 1

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
    218 F.3d 337 (4th Cir. 2000) ...................... 27, 29, 31, 33

*Greater Heights Acad. v. Zelman*,
    522 F.3d 678 (6th Cir. 2008) ........................................ 31

*Grimm v. Gloucester County Sch. Bd.*,
    No. 19-1952, __ F.3d __, 2020 WL 5034430 (4th Cir. 2020) .. passim

*Grove City College v. Bell*,
    465 U.S. 555 (1984) ........................................... 24, 26, 27

*Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*,
    743 F.3d 569 (7th Cir. 2014) .................................................. 10, 11

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ........................................................................ 22

*Hicks v. Ferreyra*,
    965 F.3d 302 (4th Cir. 2020) ........................................................ 18

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ................................................................ 20, 23

*Jespersen v. Harrah's*,
    444 F.3d 1104 (9th Cir. 2006) ................................................ 10, 11

*Knussman v. Maryland¸*
    272 F.3d 625 (4th Cir. 2001) ......................................................... 5

*Leandro v. State of North Carolina*,
    488 S.E.2d 249 (N.C. 1997) ......................................................... 29

*Lebron c. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374, 397 (1995) .............................................................. 32

*Logiodice v. Trustees of Maine Central Institute*,
    296 F.3d 22 (1st Cir. 2002) ........................................................... 30

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ................................................................... 27

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ................................................................ 18, 20

*Matwijko v. Bd. of Trustees of Glob. Concepts Charter Sch.*,
    No. 04-CV-663A, 2006 WL 2466868
    (W.D.N.Y. Aug. 24, 2006) ............................................................ 30

*Mentavlos v. Anderson*,
    249 F.3d 301 (4th Cir. 2001) ........................................................ 33

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ........................................................ 14, 20, 21

*Nat'l Collegiate Athletic Ass'n v. Smith*,
    525 U.S. 459 (1999) ............................................................ 24, 25

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ........................................................ 14

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ................................................................. 10

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*,
    No. 18-107 (U.S. Oct. 8, 2019) ...................................................... 13

*Reed v. Reed*,
    404 U.S. 71 (No. 70-4), 1971 WL 133596 (U.S. 2004) ...................... 1

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ................................................................. 30

*Riester v. Riverside Cmty. Sch.*,
    257 F. Supp. 2d 968 (S.D. Ohio 2002) ....................................... 29, 30

*Sierra Club v. United States Army Corps of Engineers*,
    909 F.3d 635 (4th Cir. 2018) ........................................................ 18

*Silver v. Halifax Cnty. Bd. of Comm'rs,*
    821 S.E.2d 755 (2018).....................................................................29

*Skidmore, Owings & Merrill v. Canada Life Assur. Co.,*
    907 F.2d 1026 (10th Cir. 1990) ................................................19, 32

*State v. Kinston Charter Acad.,*
    836 S.E.2d 330 (N.C. Ct. App. 2019)............................................31

*Sturgis v. Copiah County School Dist.,*
    No. 3:10-CV-455, 2011 WL 4351355
    (S.D. Miss. Sept. 15, 2011) ..............................................................11

*Sugar Creek Charter Sch., Inc. v. State,*
    712 S.E. 2d 730 (N.C. 2011) ...........................................................29

*United States v. Arbaugh,*
    951 F.3d 167 (4th Cir. 2020) ..........................................................18

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ................................................................15, 17

*Wahi v. Charleston Area Med. Ctr., Inc.,*
    562 F.3d 599 (4th Cir. 2009) ..........................................................18

*Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.,*
    922 F.3d 568 (4th Cir. 2019) ..........................................................18

*West v. Atkins,*
    487 U.S. 42 (1988) ...........................................................................30

vi

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) ..............................................24, 26

*Yarbrough v. East Wake First Charter Sch.*,
    108 F. Supp.3d 331 (E.D.N.C. 2015) ...........................................31

## Statutes

5 U.S.C. § 551(5) ..............................................................................17

20 U.S.C. § 1681(a) ..........................................................................23

20 U.S.C. § 1686 ..............................................................................23

N.C. Gen. Stat. § 115C-218.20(a) ....................................................31

Pub. L. 93–380, 88 Stat. 567 (1974) ..........................................20, 21

## Regulations

34 C.F.R. § 106.2(i) ..........................................................................24

34 C.F.R. § 106.8(a) ..........................................................................16

34 C.F.R. § 106.31 ............................................................................19

34 C.F.R. § 106.34 ............................................................................17

39 Fed. Reg. 22,228 (June 20, 1974) ................................................17

40 Fed. Reg. 24,128 (June 4, 1975) ............................................17, 20

45 Fed. Reg. 30,955 (May 9, 1980) ..................................................16

46 Fed. Reg. 23,081 (Apr. 23, 1981) ....................................... 15

47 Fed. Reg. 32,526 (Jul. 28, 1982) ....................................... 16

69 Fed. Reg. 11,276 (Mar. 9, 2004) ....................................... 17

71 Fed. Reg 62,530 (Oct. 25, 2006) ........................................ 17

## Other Authorities

118 Cong. Rec. 5,804 (1972) ............................................. 13, 14

121 Cong. Rec. 20,467 (1975) ................................................ 21

USED OCR, *Case Processing Manual* § 102(b) (Aug. 26, 2020) ............. 19

# SUMMARY

"The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage." Br. for Appellant, *Reed v. Reed*, 404 U.S. 71 (2004) (No. 70-4), 1971 WL 133596, at *21 (U.S., 2004). So wrote Ruth Bader Ginsburg in her first brief before the Supreme Court—a proposition the Court itself would echo soon after. *See Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). In this case, Defendants—operators of a public charter school—have imposed a requirement forcing girls to wear skirts to school ("Skirts Requirement"), with the goal of teaching students that girls are more fragile and in need of protection than boys. They argue that this intentionally different treatment of school children neither violates Title IX nor offends Equal Protection. But Plaintiffs' undisputed testimony demonstrates that the pedestal was, for them, a cage: the Skirts Requirement denied them educational opportunities and subjected them to rank gender stereotypes—the same stereotypes the

1

Supreme Court has repeatedly renounced, and that Congress intended Title IX to stamp out.[1]

Defendants argue that Plaintiffs cannot prove the Skirts Requirement violates Title IX unless they also prove the uniform policy in its entirety is worse for all girls than the policy in its entirety is for all boys—the "unequal burdens" framework. But that analysis has never been applied in the Title IX context, in this Circuit or elsewhere, and stems from a line of cases under Title VII that were wrong when they were decided and have been wholly discredited by the Supreme Court's recent decision in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1741 (2020). This Court should decline to adopt that framework or otherwise depart from the standard it recently reaffirmed in *Grimm v. Gloucester County Sch. Bd.*, No. 19-1952, __ F.3d __, 2020 WL 5034430, at *21 (4th Cir. 2020).

The Court should reverse the district court's holding that sex-differentiated dress codes are categorically exempt from Title IX, and

---

[1] Plaintiffs incorporate herein by reference the arguments in their opening response brief.

recognize that dress codes, like other aspects of educational programs or activities, are covered by the prohibition against sex discrimination. The district court erred by granting *Chevron* deference to the United States Education Department's ("USED") rescission of a 1975 regulation governing dress codes. The rescission was intended to conserve the agency's own resources, not to interpret the statute's scope as to private enforcement under Title IX—a precondition for applying the *Chevron* framework. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). Deference is not warranted even under *Chevron* because categorically exempting dress codes from the general prohibition against sex discrimination is both inconsistent with Congress's clear intent and not a reasonable construction of Title IX, particularly in light of the statute's broad language, remedial purpose, and legislative history.

Defendant Roger Bacon Academy's ("RBA") receipt of federal funds, which RBA uses to manage and operate Charter Day School ("CDS"), subjects it to Title IX. That RBA receives the funds via CDS, Inc., the non-profit that operates CDS, and not directly does not exempt

it from liability. And RBA—like CDS and CDS, Inc.—bears all the
hallmarks of a state actor: it exercises constitutional authority
delegated by the state, and is entwined with entities that North
Carolina has repeatedly treated as arms of the state itself. Adopting
Defendants' position would hand charter schools a free pass to use their
corporate structure as a shield for those most directly responsible for
discriminatory conduct.

## ARGUMENT

### I.   The Court Should Reverse the Grant of Summary Judgment to Defendants and Direct Entry of Summary Judgment to Plaintiffs on their Title IX Claims.

#### A.   The Skirts Requirement Constitutes Discrimination Under Title IX.

The Skirts Requirement impermissibly relies on and perpetuates
the very archaic gender stereotypes about girls' purported fragility that
both the Supreme Court and this Court have repeatedly rejected in the

4

equal protection context.[2] *See Grimm*, 2020 WL 5034430, at *21;

*Knussman v. Maryland¸* 272 F.3d 625, 635-37 (4th Cir. 2001).

Defendants have not disputed the majority of Plaintiffs' testimony

regarding the harms they experienced as a result of the Skirts

Requirement. Rather, having failed to contest that testimony below,

they now try to minimize it and discredit it as "subjective." *See* Defs'

Resp./Reply 61-63. This effort is unavailing. This Court has recently

reaffirmed that to demonstrate discrimination under Title IX a plaintiff

need only show they were "excluded from [or otherwise denied the

benefits of] an education program 'on the basis of sex'; (2) that the

educational institution was receiving federal financial assistance… and

(3) that the improper discrimination caused [them] harm." *Grimm*, 2020

WL 5034430, at *21. Plaintiffs have easily satisfied that test.

---

[2] Despite Defendants' efforts to distance themselves *post hoc* from Mr. Mitchell's justification for the Skirts Requirement, *see* Defs' Resp./Reply at 34-35, the Record shows Mitchell's email expressed the real reasons for the Skirts Requirement. *See* Pls' Br./Resp. 7-11, 32-33. The arguments Defendants now marshal in support of a purported factual dispute on this point, *see id.*, relate to general justifications for any Uniform Policy. Defendants point to no evidence linking these justifications to the Skirts Requirement specifically.

The Record leaves no doubt that Plaintiffs were both excluded from and denied the benefits of CDS as a result of the Skirts Requirement. Plaintiffs avoided activities including climbing, playing on swings, doing cartwheels or flips, and playing soccer during recess, JA 0350, 0353, 0498-99, 0503; they were distracted in class due to discomfort, cold, and fear of exposure, and endured teasing, humiliation, and reprimands when their underwear showed, JA 0348-53, 0497-99, 0503-05, 2414. Def. Resp./Reply 62.[3] Plaintiffs' takeaway was that the school believed "girls should be less active than boys and that they are more delicate than boys," that their "comfort and convenience was less important to [CDS administrators] than the boys'," JA 0504, and ultimately, "that we simply weren't worth as much as boys … [and] that girls are not in fact equal to boys," leading to feelings of inferiority and anger. JA 0507, 0356-57. *See also* JA 0499,

---

[3] The level of emotional distress Plaintiffs' experienced has been subject to extensive litigation. The district court denied Defendants' request to compel mental examination of Plaintiffs, finding their mental states were not at issue. JA 0016, DE 68 (Jan. 6, 2017). The Court ultimately imposed sanctions on Defendants for violating the court's order. *See* JA 0023, 2712-13; DE 136 (Sept. 29, 2017). Those rulings are not before this Court.

0351 (the Skirts requirement conveyed messages "that girls should be less active than boys and that they are more delicate than boys. This translates into boys being put in a position of power over girls").

These harms are strikingly similar to those recognized in *Grimm*. *See Grimm*, 2020 WL 5034430, at *22 (finding plaintiff was harmed by being prohibited from using the boys' restroom, crediting Grimm's testimony that this caused him to delay using the restroom leading to infections that distracted him from class work, and that it invited scrutiny of peers, imposed stigma, and conveyed "he was not welcome"); *see also Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1307 (11th Cir. 2020) (upholding Title IX violation based on student's testimony that he suffered "emotional damage, stigmatization and shame," including feeling that "the school sees me as less of a person, less of a boy, certainly, than my peers").

Defendants have pointed to no evidence that boys experienced any of these effects, and Plaintiffs' testimony shows they did not experience these harms when they were allowed to follow the same rules as the boys, wearing the unisex PE uniform or wearing pants when the

7

uniform policy was waived. JA 0354, 0499, 0504. *See Grimm*, 2020 WL 5034430, at \*23 (discrimination means "treating that individual [plaintiff] worse than others who are similarly situated"). Nor have they disputed Plaintiffs' account that they suffered from the same harmful effects even when wearing "skorts" or "leggings" under their skirts. JA 0344, 0349-52, 2414. And their assertion that boys were harmed by other provisions of the Uniform Policy, such as the requirement to wear belts or short hair, Defs' Resp./Reply 29, is wholly unsubstantiated.

Defendants' administrators' and expert testimony regarding the overall success or participation rates of girls at CDS in general, *see* Defs' Resp./Reply 62, is simply irrelevant. Even if such testimony reliably established any link to the Skirts Requirement, which it does not, *see* Pls' Br./Resp. 41-42, it could not create a material factual dispute as to the harms suffered by Plaintiffs themselves. *See Grimm*, 2020 WL 5034430, at \*21-23. As in *Grimm*, the sum of Plaintiffs' experiences amounts to them being deprived of the full promise of their education— to learn, play, and be treated equally—on the same terms as boys. No greater evidence is necessary to establish a Title IX violation, and this

8

USCA4 Appeal: 20-1023      Doc: 47      Filed: 10/02/2020      Pg: 18 of 62

Court should decline the invitation to ratchet up the required showing here.

## B.    This Court Should Not Adopt the "Unequal Burden" Test.

This Court should further reject Defendants' contention that Plaintiffs are required to prove the Skirts Requirement discriminates using the "unequal burden" framework, by showing that the dress code *as a whole* harmed girls *as a whole* more than boys *as a whole*. *See* Defs' Resp./Reply 52-63. Although this notion may have found some favor in Title VII cases dating from the 1970s and early 1980s,[4] it has no basis in modern Fourth Circuit law and conflicts with Supreme Court precedent.

In *Bostock,* the Supreme Court rejected the central theory Defendants advance here: that policies that enforce parallel stereotypes for men and women do not constitute "discrimination." *See Bostock*, 140 S. Ct. at 1741 (imposing a policy against gay or transgender employees

---

[4] *See Br. of Amicus Curiae Prof. Robson supporting Appellees-Cross-Appellants* at 6-13 (describing legal/historical context of these decisions).

on both men and women, "[i]nstead of avoiding Title VII exposure…doubles it."). And it rejected the proposition that Title VII requires an analysis of "how a policy affects one sex as a whole versus the other as a whole," emphasizing that the statute's text required courts to focus "on individuals, not groups." 140 S. Ct. at 1740. In other words, it rejected the very test Defendants, looking to *Jespersen v. Harrah's*, 444 F.3d 1104 (9th Cir. 2006), now urge.

Moreover, cases such as *Jespersen*, which Defendants continue to characterize as settled law, *see* Defs' Resp./Reply 28-29, 55-60, were discredited even before *Bostock*, because they failed to grapple with the harms of sex stereotypes, and therefore cannot be squared with the Supreme Court's recognition in *Price Waterhouse v. Hopkins* that generalized, sex-based expectations regarding behavior and appearance are a form of unlawful discrimination. 490 U.S. 228 (1989); *see Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 578 (7th Cir. 2014) (calling into question "[w]hether and to what extent these cases survive *Price Waterhouse*"). The cases *Jespersen* relied upon all pre-date *Price Waterhouse*. *See* 444 F.3d at 1110 (citing cases). And despite dicta

10

discussing the unequal burden analysis in *Sturgis v. Copiah County School Dist.*, No. 3:10-CV-455, 2011 WL 4351355, at *4 (S.D. Miss. Sept. 15, 2011), and *Hayden*, 743 F.3d at 578; *see* Defs' Resp./Reply 67, neither case actually applied that standard, nor has any other court in a school dress code case.[5] *See* Pls' Br./Resp. 45.

Regardless, even if *Price Waterhouse* and *Bostock* were not controlling, the harms to the individual Plaintiffs here, as well as the harms of gender stereotypes, are sufficient to satisfy even the now-discredited "unequal burden" test—as the District Court found in granting Plaintiffs summary judgment on their equal protection claim. Notably, the appearance code in *Jespersen* was gender neutral as to the clothing required—both men and women wore pants, shirts, and ties. *See Jespersen*, 444 F.3d at 1107. And even *Jespersen* made clear an

---

[5] *Bauer v. Lynch*, also relied on by Defendants, is not a dress code case at all, but concerned different physical fitness standards for men and women. 812 F.3d 340 (4th Cir. 2016). This Court found such policies do not contravene Title VII absent a showing of unequal burden on one sex because men and women are not similarly situated due to "innate physiological differences" in average strength. *Id.* at 343, 348. Defendants have made no such argument in defense of the Skirts Requirement.

appearance code could violate Title VII on a clearer record that it was motivated by gender stereotypes or posed a particular burden on women, as is true here. *Id.* at 1110, 1113. This case is thus more like cases such as *Frank v. United Airlines, Inc.*, 216 F.3d 845, 855 (9th Cir. 2000), which struck down a weight requirement for women flight attendants under the unequal burden standard, than it is like *Jespersen.*

Indeed, a ruling for Plaintiffs would not doom *all* sex-specific dress codes or rules because the touchstone in these cases is (a) more than de minimis harm (b) to particular individuals. *See Grimm*, 2020 WL 5034430, at *23 ("discrimination mean[s] treating *that individual* worse than others who are similarly situated." (emphasis added alteration in original) (quoting *Bostock*, 140 S. Ct. at 1740)). For example, it is difficult to imagine how a requirement that boys, but not girls, wear a belt would have anything other than a trivial effect; belts are devoid of any stereotypically gendered implications. Plaintiffs are in no position to challenge sex-based rules in the CDS Uniform Policy they are not

required to follow because those rules have not caused them harm

personally.[6]

This Court should decline to carve out a new standard under Title

IX unique to sex-specific dress codes, requiring them to prove harms

beyond those they themselves suffered—or disprove harms to others.

Instead, it should adhere to the clear and straightforward test

reaffirmed in *Grimm*, which Plaintiffs have plainly met.

### C. This Court Should Reverse the District Court's Holding that USED's Rescission of the Appearance Code Regulation Precludes Plaintiffs' Title IX Claims.

#### 1) The *Chevron* Analysis Is Not Applicable Because the Rescission of the Appearance Regulation Did Not Constitute USED's Interpretation of Title IX.

Title IX was designed with the purpose of rooting out gender

stereotypes in education "as thoroughly as possible." 118 Cong. Rec. at

---

[6] This is consistent with the position articulated by counsel for Ms. Stephens (also represented by the ACLU) in oral argument. Tr. of Oral Argument at 8:16-9:2, 9:9-25, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, No. 18-107 (U.S. Oct. 8, 2019). Nor does the statement that some dress codes may be permissible as to some people negate Plaintiffs' showing that the *Skirts Requirement* caused *them harm*.

5,804 (1972) (statement of Sen. Bayh).[7] Yet Defendants urge this court to treat the rescission by USED of a subsection of one of the original regulations implementing Title IX, which prohibited discrimination in the application of any rules of appearance ("the Rescission"), as the equivalent of a new regulation exempting dress codes from Title IX, meriting deference. Both propositions are wrong.

Defendants' theory fails to make it past even the threshold inquiry, sometimes referred to as *Chevron* Step Zero: The *Chevron* framework applies only to agency action that involves "construction of a statutory scheme" or interpretations of "the meaning or reach of a statute." *Chevron, U.S.A., Inc.*, 467 U.S. at 844; *see also Christensen v. Harris Cty.*, 529 U.S. 576, 587–88 (2000) (*Chevron* analysis did not apply to agency interpretation that did not create a mandatory rule); *Pashby v. Delia*, 709 F.3d 307, 324 (4th Cir. 2013) (*Chevron* framework

---

[7] The Supreme Court has repeatedly looked to Senator Bayh's statements as "an authoritative guide to the statute's construction." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 527 (1982); *accord Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 (1979). Contrary to Defendants' suggestion that these statements are "generic," *see* Defs' Resp./Reply 46 n. 15, they speak specifically to the core purpose of Title IX.

not applicable because the agency's action did not show it spoke to the

policy in dispute). To be entitled to *Chevron* deference an agency must

not only have the authority to make rules carrying the force of law, "the

agency interpretation claiming deference" must have been

"promulgated in the exercise of that authority." *United States v. Mead

Corp.*, 533 U.S. 218, 226-27 (2001).

Here, the agency did not with the Rescission exercise its authority

to make rules carrying the force of law. The justifications USED offered

do not constitute a new substantive regulation on appearance codes, or

interpret Title IX at all, but rather, merely reflect the agency's

administrative enforcement priorities. As explained in the Notice of

Proposed Rulemaking, "[t]he issue of sex discrimination in codes of

personal appearance, such as rules governing hair length, is more

properly resolved at the local level," as "Federal regulations in this area

are likely to be overly intrusive." 46 Fed. Reg. 23,081 (Apr. 23, 1981).

The Rescission would therefore "free[]" the agency "from devoting its

resources to resolving complaints involving personal appearance codes,

[so] issues that are more clearly related to the prohibition against sex

discrimination under Title IX can be given the additional attention they require." *Id*. The final rule incorporates the same justifications. *See* 47 Fed. Reg. 32,526, 32,527 (Jul. 28, 1982). It nowhere discusses Title IX's scope or states the agency may never seek to remedy sex discriminatory dress codes, let alone opine on whether private plaintiffs may challenge such discrimination.

Nor does USED's statements regarding resolution at the "local level" indicate an opinion that Title IX does not reach sex-specific dress codes, as Defendants assert. Indeed, the agency expressly provides for local coordinators charged with processing Title IX complaints. 34 C.F.R. § 106.8(a); *see* 45 Fed. Reg. 30,955, 30,957-58 (May 9, 1980). Such statements merely signal the agency's position that these local officials were better equipped to assess appearance codes complaints, freeing up agency resources to focus on other priorities.

The Eleventh Circuit recently rejected an argument similar to the one Defendants advance–that the withdrawal of an agency interpretation applying Title IX to sex discrimination based on sexual orientation and gender identity signified the agency's "new position" to

16

the contrary—finding the withdrawal "contained no substantive interpretation of the meaning of 'sex discrimination' in Title IX." *See Adams*, 968 F.3d at 1310.[8]

Had the agency intended to block any application of Title IX to dress codes by either the agency or a private plaintiff, it would have stated that new interpretation unambiguously in the NPRM or the final rule, and provided its reasons.[9] Such an interpretation, which would exclude an entire category of conduct from a generally applicable civil rights law in a substantial departure from prior policy, could not have

---

[8] That the Rescission was implemented by notice and comment merely reflects the procedural requirements for amending or repealing a formal Rule. *See* 5 U.S.C. § 551(5). While "express congressional authorizations to engage in the process of rulemaking" is a "good indicator" Congress delegated authority to an agency to speak with the force of law, *Mead*, 533 U.S. at 229, it is not relevant to the question of whether the agency *used that authority* in taking a specific action, *id.* at 227.

[9] This is one reason Plaintiffs' position does not condemn all other sex-specific regulatory exemptions. Other such exemptions are both unambiguously stated in the regulation and, where they departed from prior policy, contained an adequate explanation—*see, e.g.* 34 C.F.R. § 106.34 (non-discrimination in federally funded classes and activities); 39 Fed. Reg. 22,228, 22,230 (June 20, 1974) (NPRM); 40 Fed. Reg. 24,128, 24,141 (June 4, 1975) (final rule); 69 Fed. Reg. 11,276 (Mar. 9, 2004) (NPRM); 71 Fed. Reg 62,530 (Oct. 25, 2006) (final rule). In any event, the Court need not reach those other regulations, as Plaintiffs do not challenge them here. *See Grimm*, 2020 WL 5034430, at *23.

17

occurred in the absence of a clear statement of intent—and certainly

would not merit deference without a full analysis. *See* Pls' Br./Resp. 73

n. 15.[10] *See Massachusetts v. E.P.A.*, 549 U.S. 497, 534 (2007) (rejecting

agency's interpretation that "offered no reasoned explanation"); *see also*

*Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635,

645 (4th Cir. 2018) (agency interpretation "completely devoid of any

---

[10] Contrary to Defendants' assertion, Defs' Resp./Reply 52 n. 17, Plaintiffs have not waived this argument. This is not a case in which an entirely new argument is raised for the first time on appeal. *See Hicks v. Ferreyra*, 965 F.3d 302, 305, 310 (4th Cir. 2020) (argument that no *Bivens* remedy was available in a *Bivens* action was waived when not asserted below in any form). The argument that the agency did not articulate any view or analysis as to the substantive scope of Title IX was plainly presented below. *See* Pls' Opp. to Defs' Mot. for Summ. J., DE 177 at 45-47 (Dec. 20, 2017); Pls' Reply in Further Supp. of Summ. J., DE 181 at 17-19 (Jan. 17, 2018). Nor did Plaintiffs' argument appear "solely in a footnote." *United States v. Arbaugh*, 951 F.3d 167, 174 n.2 (4th Cir. 2020). Rather, the footnote offered additional support for Plaintiffs' principal argument. *Compare Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009) (finding waiver for argument asserted only in a single statement in a footnote without authority for those assertions). Plaintiffs thus satisfied the requirement "that the lower court be fairly put on notice as to the substance of the issue." *Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 922 F.3d 568, 578 (4th Cir. 2019) (quotation omitted).

18

statutory analysis" "warrants neither *Chevron* nor *Skidmore*
deference").

USED's own actions further contradict Defendants' assertion that
the agency construed Title IX as exempting dress codes because it has
continued to investigate sex specific dress codes as possible violations of
Title IX. *See* Brief of Amici Curie NWLC et al. Supporting Appellees-
Cross Appellants at 13-14; *Archway Classical Acad.–Trivium E.*, OCR
Case No. 08-16 1095 (Dep't of Educ. Sept. 28, 2017),
https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/0816
1095-a.pdf (citing 34 C.F.R. § 106.31 as authority for investigating
complaint regarding sex-based appearance code). Had the agency
intended the Rescission to remove dress codes from the scope of Title
IX, such investigations would be outside of its authority. *See* USED
OCR, *Case Processing Manual* § 102(b) (Aug. 26, 2020).

> **2)    Interpreting Title IX as Exempting Sex-Specific
> Dress Codes Would Not Merit Deference.**

"If the intent of Congress is clear, that is the end of the matter."
*Chevron*, 467 U.S. at 842–43. Here, the statutory text and purpose of
Title IX, as well as the legislative history of the original Title IX

19

regulations, foreclose any reading of the statute as categorically exempting dress codes. *See Massachusetts*, 549 U.S. at 534. In drafting the statute in broad terms, Congress has spoken clearly that dress codes, like other rules adopted by educational programs, fall within the scope of Title IX. *See N. Haven Bd. of Educ.*, 456 U.S. at 521; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a 'broad reach.'"). And "[b]ecause Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered." *Jackson*, 544 U.S. at 175; *Bostock*, 140 S. Ct. at 1747 ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").

Moreover, Congress, pursuant to statute, considered and approved of the original Title IX regulations, including the dress codes provision. *See* 40 Fed. Reg. 24,128 at 24,141; *see* Defs' Resp./Reply 36. Specifically, Section 431(d)(1) of the General Education Provisions Act in effect at

20

the time, Pub. L. 93–380, 88 Stat. 567 (1974), required regulations promulgated under Title IX to be "transmitted" to Congress in order "to afford Congress an opportunity to examine a regulation and, if it found the regulation 'inconsistent with the Act from which it derives its authority ...,' to disapprove it in a concurrent resolution." *N. Haven*, 456 U.S. at 531-32. This process was followed for the original Title IX regulations promulgated by USED's predecessor agency, HEW. After six days of hearings, the regulations—including the appearance regulation—went into effect. *Id.* at 533. This history "indicate[s] that Congress was made aware of the Department's interpretation of the Act . . . [which] lends weight to the argument that coverage" of conduct covered in the original 1975 regulations, "was intended" to come within Title IX's scope. *Id.* at 534; *see also* 121 Cong Rec 20,467 (1975) (comments of Sen. Bayh that the regulations "are consistent with both the spirit and intent of the Congress").

Even if Defendants' proposed interpretation of the Rescission could survive *Chevron* steps zero and one, it would fail at *Chevron* step two because a categorical exemption of sex-based dress codes from Title

21

IX's general prohibition against sex-based discrimination, Defs'
Resp./Reply 39, 47 n. 16, is not reasonable. Under Defendants'
interpretation, any dress code policy, no matter how egregiously sexist
or sexualizing, would be permissible under Title IX.[11] *See* Pls' Br./Resp.
73-74. Nor can Defendants avoid these consequences by attempting to
limit their interpretation to prohibit only those sex-specific rules that
are not part of a "comprehensive" uniform policy—i.e. one that includes
some rules for everyone. Defs' Resp./Reply 47 n. 16. The Rescission
stated no such rule. And that theory conflicts with Defendants'
characterization of the agency's view that "sex-specific dress codes *are*
*not sex discrimination in the first place*," *id.* at 48 (emphasis in

---

[11] Defendants assert that "[s]chool boards, not federal courts, have the
authority to decide what constitutes appropriate behavior and dress in
public schools." Defs' Resp./Reply 47 n.16 (quoting *Canady v. Bossier*
*Par. Sch. Bd.*, 240 F.3d 437, 441 (5th Cir. 2001)). But they rely on First
Amendment cases challenging restrictions on student dress. In that
context, courts give more deference to school boards to determine "what
manner of speech in the classroom or in school assembly is
inappropriate." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267
(1988). In the Title IX context, that discretion ends where
discrimination begins. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S.
629, 649 (1999).

22

original).[12] Such a categorical exemption would plainly be inconsistent with the text and purpose of Title IX. *See* Br. of Amici Curie NWLC et al. in support of Appellees-Cross Appellants, at 6-7 (discussing legislative history). By contrast, Plaintiffs' position—that sex-specific dress codes that harm individual students violate Title IX—is entirely consistent with the statutory text and purpose of Title IX, as well as with this Court's precedent. *See Grimm*, 2020 WL 5034430, at *21.

## II. RBA is a "Recipient" of Federal Funds Subject to Title IX.

Defendants do not dispute that RBA receives and uses federal funding through another recipient, CDS, Inc., to provide education. Recipients, like RBA, who receive federal assistance "through another recipient" are no less "recipients" for purposes of Title IX than those

---

[12] Defendants assert their interpretation of the rescission "does not add a new exception" for dress codes. Defs' Resp./Reply 47-48. But their argument would in effect add a new, implicit exemption for particular conduct—which Congress could have done expressly and actually did for other forms of sex-specific conduct. *See Jackson*, 544 U.S. at 175-76; 20 U.S.C. § 1681(a)(1)-(2), (5), and (6) (exempting admissions or membership practices at certain institutions); (a)(8) and (9) (father-son and mother-daughter events, scholarships for beauty pageants); 20 U.S.C. § 1686 (exempting provision of separate living facilities).

23

who receive such assistance "directly." 34 C.F.R. § 106.2(i); *see also Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX."). Defendants' admission that "CDS, Inc. receives federal funding, which it then uses in part to compensate RBA for services rendered under the Management Agreement," Defs' Resp./Reply 65, should therefore be the beginning and end of the analysis.

Defendants nonetheless attempt to evade liability by recasting RBA as a "beneficiary" rather than a "recipient" of the federal funds. Their approach "elevates form over substance." *See Grove City College v. Bell*, 465 U.S. 555, 564 (1984). "Plainly, a recipient of federal assistance cannot escape its obligations … simply by funneling such assistance through an intermediary." *Disabled in Action v. Mayor & City Council of Baltimore*, 685 F.2d 881, 884 (4th Cir. 1982); *accord Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294 (11th Cir. 2007). Nor does the involvement of Acadia NorthStar, a Financial services institution of the type routinely involved in transactions

between corporate entities (*see* Defs' Resp./Reply 65) scrub the funds of their original source: the U.S. government. *See* JA 0647; *Disabled in Action*, 685 F.2d at 884; *Dupre v. Roman Catholic Church of Diocese of Houma-Thibodaux*, No. CIV. A. 97-3716, 1999 WL 694081, at *4 (E.D. La. Sept. 2, 1999).

RBA's theory that it is not a "recipient" relies principally on a wholly distinguishable case, *NCAA v. Smith*, 525 U.S. at 468. There, the Supreme Court considered the question whether a membership organization that received *dues* from recipients of federal funds "is for that reason a recipient itself." *Id.* at 469 (emphasis added). RBA is not a membership organization, and does not receive "dues payments" from CDS, Inc., to engage in some activity separate and apart from CDS. *See id.* at 468 (distinguishing *Grove City* on those grounds). Nor, as in cases like *Disabled in Action*, is RBA merely using infrastructure created by another entity's expenditure of federal funds. *See Disabled in Action*, 685 F.2d at 884 (holding baseball club that used, but did not own, a stadium was a beneficiary rather an indirect recipient of federal funding provided to the stadium's owner to build elevators). Rather,

RBA receives *fees* from CDS, Inc., derived almost entirely from federal financial assistance, to *operate the school*. Defs' Resp./Reply 64. And CDS, Inc. has ceded to RBA controlling authority to operate practically all aspects of CDS. *See* JA 0230 (RBA is responsible for "the management, operation, administration, accounting and education at CDS"); JA 0401-02. *See also Williams*, 477 F.3d at 1294; Pls' Br./Resp. 77 (citing cases).

Finally, Defendants cite no authority for the novel proposition that federal funds qualify as assistance only if they are "earmarked for" a particular recipient. Defs' Resp./Reply 65-66. Title IX requires only that federal funds be "earmarked for" education, not that the federal government specify the identity of the ultimate recipient. If Defendants' theory were the rule, *Grove City* would have been differently decided: The funding there consisted of grants earmarked for students to pay tuition; students were then free to use the grants at the institution of their choice. Nonetheless, the Supreme Court found the private college the plaintiff had selected was a recipient for purposes of Title IX, even though the government had no way of knowing who the recipient would

26

be when it granted the funds. *See Grove City*, 465 U.S. at 564. Because RBA receives federal funds earmarked to operate a covered education program, and uses them for that purpose, it is subject to Title IX.

## III.   RBA Is a State Actor.

Under North Carolina's charter statute, charter operators such as RBA function as arms of the state to provide the free, public education guaranteed to all under the state constitution. Accordingly, RBA qualifies as a state actor for purposes of Section 1983. RBA's arguments to the contrary rest entirely on cases from other jurisdictions and wholly ignore the relevant features of North Carolina's constitution and charter statute.

Plaintiffs can establish state action either by showing that (1) North Carolina has delegated to RBA a constitutionally mandated duty or (2) there is sufficient entwinement between RBA and the state. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 n.1 (2019); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 345 (4th Cir. 2000). Though Plaintiffs need only meet one of these tests, here they satisfy both.

27

First, North Carolina has delegated to RBA the duty to provide a constitutionally mandated free public education. Defendants do not dispute that CDS is a public school, or that RBA is substantially funded by the state, deriving 90% of its funding from fees paid by CDS, Inc., which in turn receives 95% of its funds from public sources. JA 1676, 2595-97, 2605. Yet they dispute that the school derives its authority from the Constitution. This is belied by the Charter agreed to by CDS, Inc., which states that Charter schools are public schools authorized "[p]ursuant to Article IX, Section 2, of the North Carolina Constitution." JA 0213.

Defendants make much of the fact that RBA was not a party to the Charter. *See* Defs' Resp./Reply 19-20. But RBA's operation of the school was a key term of the Charter Application RBA jointly submitted with CDS, Inc, and the management agreement between CDS, Inc. and RBA was ultimately incorporated into the Charter. Pls' Br./Resp. 62-63; JA 0395. The state thus expressly and knowingly delegated authority to RBA to operate CDS alongside CDS, Inc. and prohibited CDS from

terminating RBA without its explicit approval. JA 0214 (Charter

paragraph 4.4(a))

As both North Carolina state and federal courts have recognized,

the provision of free, public education is a core constitutional function

that the state, and only the state, performs. *See Leandro v. State of*

*North Carolina,* 488 S.E.2d 249, 255 (N.C. 1997); *Sugar Creek Charter*

*Sch., Inc. v. State*, 712 S.E. 2d 730, 741-42 (N.C. 2011); *Silver v. Halifax*

*Cnty. Bd. of Comm'rs*, 821 S.E.2d 755, 756 (2018). That private entities

have been historically involved in providing education is immaterial,

because such entities have never provided *free public education*, or

operated schools defined by state law as *public. See Riester v. Riverside*

*Cmty. Sch.*, 257 F. Supp. 2d 968, 973 (S.D. Ohio 2002) (charter school

was state actor based on statutory designation of charter schools as

public, state approval of their creation, and their obligation to comply

with state regulation); *Goldstein*, 218 F.3d at 345 (fact that private

individuals were sometimes called upon to fight fires did not alter

conclusion that firefighting was an historical and exclusive state

function); *West v. Atkins*, 487 U.S. 42, 55-56 (1988) (private doctor acted

29

as a state actor in providing medical care to inmates in state custody, though provision of medical care is not exclusively a state function). Here, RBA "voluntarily assumed . . . by contract," *see id.*, the state's constitutionally mandated and exclusive responsibility to operate a school offering free, public education. *See* NEA Amicus Brief 3-10.

Far from being controlling here, the cases on which Defendants rely—*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806 (9th Cir. 2010), and *Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22, 26 (1st Cir. 2002)—are inapposite as they were with respect to CDS, Inc.: they do not concern the operation of a school designated by state law as public, providing free general education, and where the "the specific conduct" at issue concerned school policy directly affecting students. *See Matwijko v. Bd. of Trustees of Glob. Concepts Charter Sch.*, No. 04-CV-663A, 2006 WL 2466868, at *5 (W.D.N.Y. Aug. 24, 2006); *Riester*, 257 F. Supp. 2d at 973.

Under North Carolina law, Charter school operators enjoy "protection… including police powers and sovereign immunity,

30

traditionally exclusively reserved to the state." *Goldstein* 218 F.3d at 345; *State v. Kinston Charter Acad.,* 836 S.E.2d 330, 336 (N.C. Ct. App. 2019); *Yarbrough v. East Wake First Charter Sch.*, 108 F. Supp.3d 331, 337 (E.D.N.C. 2015); *cf.* N.C. Gen. Stat. § 115C-218.20(a). Courts including this one have weighed the grant of sovereign immunity heavily in finding state action. *See Goldstein*, 218 F.3d at 345; *Greater Heights Acad. v. Zelman*, 522 F.3d 678, 680 (6th Cir. 2008).

The significant entwinement between RBA and North Carolina further supports state action. Like CDS, Inc., RBA is fully entwined with CDS—a public school and arm of the state under North Carolina law, *see Kinston Charter Acad.,* 836 S.E.2d at 336, subject itself to an extensive network of state regulation. *See* Pls' Br./Resp. 60-61; NEA Amicus Br. 12-14. Under the Management Agreement, RBA is responsible for operating the school in compliance with applicable laws and regulations. JA 0241, 0653. And RBA, via Mitchell, teachers, and school administrators, played a principal role in formulating and enforcing the very policy challenged here. Pls' Br./Resp. 63-64.

31

Because RBA, as manager and operator of CDS, is fully entwined

with both CDS—an arm of the state under North Carolina law—and

with CDS, Inc., it is entwined with the state itself. *See Brentwood Acad.*

*v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296-98

(2001).[13] Indeed, courts have recognized numerous charter school

management organizations as state actors. *See ACLU of Minnesota v.*

*Tarek Ibn Ziyad Acad.*, Civil No. 09-138, 2009 WL 2215072, at *9-10 (D.

Minn. July 21, 2009); Pls' Br./Resp. 54 (citing cases). To permit RBA,

whose President was the architect of the Skirts Requirement, to escape

liability would be to permit it "to evade the most solemn obligations

imposed in the Constitution by simply resorting to the corporate form."

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995).

RBA's status as a private corporation separate from CDS, Inc.,

means that *both* are state actors, not that neither is. *See Clark v.*

---

[13] Contrary to Defendants' assertions, in arguing that RBA is entwined with the state through its entwinement with CDS, Inc., Plaintiffs are not attempting to "pierce the corporate veil," although the two inquiries overlap. *See Skidmore, Owings & Merrill v. Canada Life Assur. Co.*, 907 F.2d 1026, 1027 (10th Cir. 1990) (listing factors). Rather, an assessment of the intertwinement between RBA and CDS, Inc. and between RBA and CDS is essential to the state action inquiry.

*Universal Builders, Inc.*, 501 F.2d 324, 337 (7th Cir. 1974). The state

action inquiry is specific both as to each entity and as to the specific

conduct challenged, taking into account "all the circumstances."

*Brentwood Acad.*, 531 U.S. at 296-98; *Mentavlos v. Anderson*, 249 F.3d

301, 313 (4th Cir. 2001).

The presence of so many factors leaves little doubt of state action.

*See Goldstein*, 218 F.3d at 342.

## CONCLUSION

For the foregoing reasons, the Court should reverse the dismissal

of Plaintiffs' Title IX claims and the dismissal of Defendant RBA. In

addition, for the reasons set forth in Plaintiffs' opening brief, the Court

should affirm the district court's judgment on Plaintiffs' equal

protection claims.

Respectfully submitted this 2nd day of October, 2020.

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

/s/ *Galen Sherwin*
Galen Sherwin
Ria Tabacco Mar
Jennesa Calvo-Friedman
Louise Melling

33

Amy Lynn Katz
Women's Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2615
gsherwin@aclu.org
rmar@aclu.org
jcalvo-friedman@aclu.org
lmelling@aclu.org
wrp_ak@aclu.org

AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA LEGAL
FOUNDATION

/s/ *Irena Como*
Irena Como
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: (919) 834-3466
Facsimile: (866) 511-1344
icomo@acluofnc.org

ELLIS & WINTERS LLP

/s/ *Jonathan D. Sasser*
Jonathan D. Sasser
Post Office Box 33550
Raleigh, NC 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
jon.sasser@elliswinters.com

*Attorneys for Plaintiffs*

34

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 6,468 words, and has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

Dated: October 2, 2020

/s/ *Galen L. Sherwin*

*Counsel for Plaintiffs-Appellees*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2020, I electronically filed the foregoing Reply Brief of Plaintiffs-Appellees with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Galen L. Sherwin* _____

36

# ADDENDUM TO

## REPLY BRIEF OF PLAINTIFFS-APPELLEES

121 Cong. Rec. 20,467 (1975) ........................................................... Add. 2

39 Fed. Reg. 22,228 (June 20, 1974) .............................................. Add. 7

40 Fed. Reg. 24,128 (June 4, 1975) ............................................... Add. 10

45 Fed. Reg. 30,955 (May 9, 1980) ............................................... Add. 13

June 24, 1975          CONGRESSIONAL RECORD — SENATE          20445

# SENATE—*Tuesday, June 24, 1975*

*(Legislative day of Friday, June 6, 1975)*

The Senate met at 8:45 a.m., on the expiration of the recess, and was called to order by the Acting President pro tempore (Mr. METCALF).

### PRAYER

The Chaplain, the Reverend Edward L. R. Elson, D.D., offered the following prayer:

O God, our Father, help us through this day to serve in obedience to Thy law, to do unto others all that we would wish them to do unto us. Bind us together heart to heart, mind to mind, soul to soul that we may be a part of one another.

Help us to forgive others as we would wish them to forgive us; to make the same allowances for others as we would wish them to make for us; to have the same respect for the views and beliefs of others as we would wish them to have for us; to try to understand others as we would wish to be understood. Save us from thinking anything or doing anything which hurts another.

Help us, O Lord, daily to grow stronger, purer, kinder. Help us to shed old faults and to gain new virtues until life becomes altogether new.

Hear our prayer in the Redeemer's name. Amen.

### THE JOURNAL

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the Journal of the proceedings of Monday, June 23, 1975, be approved.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

### CONSIDERATION OF CERTAIN MEASURES ON THE CALENDAR

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the Senate turn to the consideration of Calendar Nos. 209 and 212.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

### EXTENSION OF THE FEDERAL INSECTICIDE, FUNGICIDE, AND RODENTICIDE ACT

The Senate proceeded to consider the bill (H.R. 6387) to extend the Federal Insecticide, Fungicide, and Rodenticide Act, as amended, for 3 months.

#### INTERIM EXTENSION OF FIFRA

Mr. DOLE. Mr. President, I support the passage of H.R. 6387 which would extend the Federal Insecticide, Fungicide, and Rodenticide Act for 3 months until September 30, 1975.

As became apparent in our consideration of this bill in the committee, there are a number of areas that need further consideration by the committee and possible amendment to the original act. This 3-month extension of FIFRA will give the Agriculture Committees in the House and the Senate time to further consider these possible changes.

As many pesticide applicators and farmers from my State of Kansas have indicated, the implementation of FIFRA has caused many problems and potential problems. It is my impression that farmers and pesticide applicators are generally just as concerned about the health and safety of consumers and farmworkers as any Member of Congress. However, the rigid implementation of FIFRA has caused, as I understand, additional costs in the production of food and agricultural commodities. Those costs eventually all add another burden to the budget of every household through higher food expenses. It is my hope that in further committee consideration, we can approach this legislation with the goal in mind of reaching realistic and attainable standards that will not unduly add to the costs of farm production.

In addition, there may be problems with the methods of the Environmental Protection Agency in implementing FIFRA. As indicated in the House Agriculture Committee hearing on this bill, the 3-month extension in this legislation will allow further hearings as appropriate in this area.

Mr. President, I am pleased to support passage of this legislation.

Mr. PHILIP A. HART. Mr. President, the Senate Agriculture Committee has reported a bill calling for a 90-day reauthorization of the Federal Insecticide, Fungicide, and Rodenticide Act. The House passed an identical bill last week. The rationale for this short-term authorization is the committee's desire to study more closely the operation of the present act.

While I would prefer a 2-year reauthorization, I intend to support the committee bill in the hope that both Houses will use the 90-day period to conduct a balanced oversight of EPA's pesticide programs, a task too long neglected.

It is especially important that the committees focus on the benefits as well as the costs of pesticide regulation. As the recent extensive hearings in the House on the Pesticide Act show, it is easy to focus on the costs of regulation—costs which are immediate and can be quantified in dollars and cents—while overlooking benefits, which may be long term in effect and which are not easily measured by a dollar standard.

The debate in the House on the EPA's pesticide hotline program illustrates this point.

The pesticide hotline was created by EPA to provide safety information to pesticide users and to receive complaints—anonymously if the caller desires—about misuse of pesticides. The hotline is one measure EPA has taken to implement the 1972 amendment to FIFRA which for the first time gave EPA authority to prosecute misusers of pesticides. Several House Members attacked this program, alleging that it encouraged harassment of farmers. They demanded that EPA stop the program forthwith.

As chairman of the Environment Subcommittee of the Senate Commerce Committee, I objected to this approach on procedural and substantive grounds. First, the hotline program had been operating only 2½ weeks and, therefore, it was much too soon to judge its effectiveness. Second, while some modifications in the program may be warranted, its goal—to give information on the safe use of chemicals and provide EPA's enforcement branch with data on possible violators of the law—are meritorious and should not be cavalierly abandoned. Farmworkers are among the most defenseless citizens against economic coercion. To deprive them of this means of reporting an illegal use of pesticides which might endanger their health is irresponsible until we have given it a fair trial.

Unfortunately, these potential benefits to farmworkers are difficult to measure and articulate. Farmers and manufacturers, however, have forcefully testified to the real and imagined costs of Federal restrictions on pesticides, and both of these groups are well represented in Washington. I hope that EPA will stand up to these pressures and continue the hotline. If the program is to be canceled, I would hope that the decision would be made on a review of its merits after it has received a fair trial, and not as an exercise in political appeasement.

There is now a chorus of voices in the White House and business community calling for deregulation as a quickie solution for the Nation's economic ills. While some lessening of economic regulation may be warranted, as Senator KENNEDY's excellent hearings on the CAB suggest, we should not forget that environmental and safety regulations—such as are authorized by the Pesticide Act—were made necessary by the failures of business to police itself and by the failures of the market to provide incentives for business to internalize the social costs of their products.

If EPA's power to regulate pesticides were ended, the externalities of pesticide manufacture in the form of health risks from inadequately tested or regulated pesticides would fall most heavily on the farmworker who, because of nutritional and educational deficiencies, is least able to avoid them. The consumer would pay these social costs as well. We should not forget that unregulated, the pesticide industry permitted thallium sulphate to be used in a paste which proved as effective in killing children as in killing rats; the deadly paraquat to be used in a syrup form which some children and mothers mistook for coca cola; and DDT to be

June 24, 1975 CONGRESSIONAL RECORD — SENATE 20467

665 (1972) *with Id.* at 725 (Stewart, J., joined by Brennan and Marshall, J.J., dissenting).
[278] Id. at 200 n.45.
[279] *See id.* at 194 n.35. There has since been a rematch, which the Chief Justice's side won on points. In Lehman v. City of Shaker Heights, 94 S. Ct. 2714 (1974), five members of the Court voted to affirm a municipal transit authority ban on political advertising, on captive audience grounds.
[280] *See* 412 U.S. at 187.
[281] *Id.* at 187-88.
[282] *Id.* at 146.
[283] *Id.* at 132.
[284] *Cf. id.* at 130-31.
[285] *Id.* at 147-48.
[286] See especially *id.* at 120-121.
[287] Justice Blackmun wrote the prevailing captive audience opinion in Lehman v. City of Shaker Heights, 94 S. Ct. 2714 (1974), and dissented in Lewis v. City of New Orleans, 94 S. Ct. 970, 974 (1974); Brown v. Oklahoma, 408 U.S. 914 (1972); Lewis v. City of New Orleans, 408 U.S. 913 (1972); Rosenfield v. New Jersey, 408 U.S. 901, 902 (1972). *See also* Cohen v. California, 403 U.S. 15, 27 (1971) (dissenting opinion).
[288] Justice Powell joined Justice Brennan's dissenting opinion in Lehman v. City of Shaker Heights, 94 S. Ct. 2714, 2720 (1974), and concurred in Lewis v. City of New Orleans, 94 S. Ct. 970, 973 (1974); Brown v. Oklahoma, 408 U.S. 914 (1972); and Lewis v. City of New Orleans, 408 U.S. 913 (1972).
[289] Gunther, *In Search of Judicial Quality on a Changing Court: The Case of Justice Powell*, 24 STAN. L. REV. 1001, 1026-29 (1972).
[290] In a wiretapping case Powell declared: "Though the investigative duty of the executive may be stronger in [national security] cases, so also is there greater jeopardy to constitutionally protected speech. . . . History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies. . . . The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.'"
United States v. United States Dist. Court, 407 U.S. 297, 313-4 (1971). Substituting "regulatory" for "investigative," aid "fairness" for "national security" and "domestic security," Powell's argument against warrantless wiretapping could easily be applied to the fairness doctrine.

## COMMITTEE JURISDICTION IN THE ENERGY AREA

Mr. HUGH SCOTT. Mr. President, I ask unanimous consent to have printed in the RECORD a letter and attachments sent to me by H. Hollister Cantus, Director of the Office of Congressional Relations at the Energy Research and Development Administration.

There being no objection, the letter and attachments were ordered to be printed in the RECORD, as follows:

U.S. ENERGY RESEARCH
AND DEVELOPMENT ADMINISTRATION,
*Washington, D.C., June 3, 1975.*
Hon. HUGH SCOTT,
*Minority Leader, U.S. Senate, Washington, D.C.*

DEAR SENATOR SCOTT: I was out of town last week when you intimated your desire to see the Senate reorganize its committee jurisdiction in the energy area. I want to take this opportunity to express my personal support for that recommendation.

For your information, I have attached a list of the Congressional Committees which could make some jurisdictional claims upon the Energy Research and Development Ad-

ministration. According to our estimates, the list presently totals:
33 Committees.
65 Subcommittees and
1 Panel.

As of this date, ERDA witnesses have testified for 109 hours of formal hearings before 6 Full Committees and 27 Subcommittees of 13 different committees. Also of note is the fact that ERDA is only 135 days old, having been activated on January 19, 1975.

I trust this information is of interest to you. If there is anything I can do to be of assistance to you, please do not hesitate to call.

With sincere best wishes, I remain
H. HOLLISTER CANTUS,
*Director, Office of Congressional Relations.*
Enclosure.

COMMITTEES OF CONGRESS HAVING SOME
JURISDICTIONAL CLAIM OVER ERDA
(*Indicates ERDA witnesses appeared this year)

### A. SENATE

1. *Aeronautical and Space Sciencies
2. Agriculture and Forestry
a. Environment, Soil Conservation, and Forestry
3. Appropriations
a. Defense
*b. Interior
c. Public Works
4. Armed Services
a. Arms Control
*b. Research and Development
5. Banking, Housing and Urban Affairs
a. Small Business
b. Housing
6. Budget
7. Commerce
a. Environmental
b. Oceans and Atmosphere
a. Oil and Gas Production and Distribution
*d. Science Technology and Commerce
e. Surface Transportation
8. Finance
9. Energy
b. International Trade
c. International Finance and Resources
9. Foreign Relations
10. Government Operations
*a. Ad Hoc Subcommittee on Export Reorganization
b. Intergovernmental Relations
c. Investigations
*d. Oversight Procedures
11. *Interior and Insular Affairs
*a. Energy Research and Water Resources
b. Environment and Land Resources
c. Minerals, Materials and Fuels
d. Integrated Oil Operations
12. Judiciary
a. Patents, Trademarks and Copyrights
13. Labor and Public Welfare
a. Health
14. Public Works
a. Environmental Pollution
(1) Panel on Environmental Science and Technology
b. Buildings and Grounds
c. Water Resources
15. Select Committee on Intelligence Activities
16. *Select Committee on Small Business
a. Environmental, Rural and Urban Economic Development

### B. JOINT COMMITTEES

17. *Atomic Energy
*a. Agreements for Cooperation
*b. Communities
c. ERDA, Environmental and Safety
d. ERDA, Nuclear Energy
*e. Legislation
f. National Security
*g. Ad Hoc Subcommittee on Breeder Reactors
18. *Economic
19. Printing

### C. HOUSE COMMITTEES

20. Agriculture
a. Conservation and Credit
21. Appropriations
*a. Defense
*b. Interior
*c. Public Works
22. Armed Services
a. Research and Development
*b. Seapower and Strategic & Critical Materials
23. Budget
24. Government Operations
*a. Conservation, Energy and Natural Resources
b. Intergovernmental Relations and Human Resources
c. Legislation and National Security
25. Interior and Insular Affairs
*a. Energy and the Environment
b. Mines and Mining
c. Water and Power Resources
26. International Relations
a. Future Foreign Policy, Research and Development
b. International Organizations
c. International Resources, Food, and Energy
d. International Trade and Commerce
27. Interstate and Foreign Commerce
a. Energy and Power
b. Health and Environment
*c. Transportation and Commerce
28. Judiciary
a. Administrative Law and Governmental Relations
29. Merchant Marine and Fisheries
a. Fisheries and Wildlife Conservation and the Environment
30. Public Works and Transportation
a. Public Buildings and Grounds
*b. Surface Transportation
31. *Science and Technology
*a. ERDD
*b. ERDD (Fossil Fuels)
*c. Environment and the Atmosphere
d. Science, Research and Technology
32. Small Business
a. Energy and Environment
33. Select Committee on Intelligence

## TITLE IX REGULATIONS

Mr. BAYH. Mr. President, yesterday was the third anniversary of the congressional enactment of title IX of the Education Amendments of 1972—landmark legislation banning sex discrimination in all federally assisted education programs. After 3 years of study and evaluation, the Department of Health, Education, and Welfare released final regulations implementing this legislation on June 3, 1975. The release of these regulations has engendered a great deal of attention and potential controversy as to the original congressional intent in enacting title IX.

As the prime sponsor of title IX, I feel the title IX regulations are consistent with both the spirit and intent of the Congress, and therefore I have testified before the House Postsecondary Education Subcommittee's hearings urging that the Congress accept the guidelines and reject any resolutions of disapproval.

Because of the controversy that has arisen over the guidelines, particularly in relation to their coverage of athletics, I ask unanimous consent that my testimony before the House subcommittee be inserted in the RECORD. I also ask unanimous consent that a summary of the guidelines, along with editorials from the New York Times, the Washington

Post, and the Washington Star, endorsing the title IX guidelines, be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

TESTIMONY FOR HOUSE HEARINGS ON TITLE IX REGULATIONS

(By Senator BIRCH BAYH)

Mr. Chairman, as the Senate sponsor of Title IX, I want to take this opportunity to thank you for allowing me this opportunity to testify before your committee on this, the third anniversary of the Congressional enactment of this landmark legislation. While it is indeed unfortunate, Mr. Chairman, that it has taken three long years for the Department of Health, Education and Welfare to promulgate regulations to enforce Title IX, it is my sincere hope that the Congress not add further to this delay by disapproving the regulations and returning them to the Department of HEW as is our statutory option during this 45 day period.

When I first offered Title IX on the floor of the United States Senate, discrimination against women in all levels of education—elementary through graduate—was rampant. This pernicious discrimination took many forms—quota levels in admissions, inequitable scholarship aid, discriminatory course offerings, and biased counseling to name but a few. In order to rectify these clearly discriminatory conditions, the Congress wisely passed Title IX of the Education Amendments on June 23, 1972.

Unfortunately, in the three years since the Congress enacted Title IX, the situation for women in education has improved only minimally. Current statistics on admissions to professional schools show that in 1972 only 12 percent of all students admitted to law school and only 16.8 percent admitted to medical school were women. I might add, Mr. Chairman, for those who would point out that fewer women than men applied to law and medical schools, that it is a persistent pattern of discrimination from the time a youngster enters nursery school that results in men realizing a higher level of education, on the average, than women.

Schools, Mr. Chairman, continue to be the primary vehicles in our society for socialization and career motivation. To the extent that the school system treats women as second-class citizens, inferior to their male classmates, and less worthy of expenditures of educational resources, women will continue to occupy the lower economic strata of the society.

While homemaking may still be the main occupation of American women, it is no longer the only occupation or source of identity for most of them. A majority of young women today will work—and will work in economically disadvantaged jobs. It has been estimated that over half of today's high school girls will work full time for up to 30 years, and 90 percent of those high school girls will be employed for other significant periods of time. Many of these young women will be the primary breadwinners for their families. Statistics released by the Department of Labor indicate that 40 percent of the 1.8 million families with incomes below the poverty level were headed by women. In the job market these women will be facing an earnings gap between similarly employed men or more than 43 percent. Unless major changes are made in the educational options and opportunities for women, a vast majority of these women will find themselves doomed to limited, low paying and marginal employment.

The Title IX regulations released by the Department of Health, Education and Welfare will not provide a change in the dismal picture of educational opportunities for women overnight, but they will mark an important first step.

As the Senate sponsor of Title IX, I had hoped the regulations might be more demanding of our educational institutions in order that we achieve the equality in education mandated by the Congress. Portions of the regulations that were particularly disappointing to me included the Department's modification of the contact sports requirement which shifts the burden of proof for "substantial interest" onto the shoulders of those young women who would like the opportunity to play basketball, hockey, or any other contact sport.

While the regulations are disappointing in some respects, on balance the regulations do make significant strides in mandating equality for women. The heart of these guidelines is the prohibition or the thwarting of equal opportunity for female students and teachers at any educational level. The Title IX guidelines, as the Congress mandated, call for equality in admissions, financial aid, course offerings, career counseling, and in the case of teachers and other educational personnel, employment, pay and promotions. We have waited three full years already for implementing regulations. Therefore I am urging the Congress to adopt the regulations without any further delay.

Negative reactions to the Title IX regulations—those which would urge a Congressional resolution of disapproval—appear to me to be based on a set of assumptions and myths about the regulations which have no basis in reality.

I. DEFINITION OF PROGRAM

One objection to the Title IX regulations questions the scope of the statutory intent of the Congress in passing Title IX. This objection centers on the interpretation of the enforcement of Title IX with regard to the termination of funds to "an education program or activity". Those who voice this objection feel the current regulations go far beyond the Congressional intent by attempting to regulate or enforce Title IX with respect to an entire educational program or activity of an institution as distinct from the more narrow, and according to these critics, proper definition of program as a particular federal grant program found to be in specific non-compliance with Title IX.

In maintaining that the proper Congressional intent was the narrow definition of program, the critics are making the assumption that the scope of Title IX and its enforcement requirements are distinct from those of Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, religion or national origin in all federally assisted programs. This assumption is totally inaccurate, and I would point to my statements on the floor of the Senate on August 9, 1971, and February 28, 1972 (CR S. 13550 and CR S. 5807). If I may quote briefly from my statement on the 28th of February,

"Central to my amendment are Sections 1001 and 1005, which would prohibit discrimination on the basis of sex in federally funded education programs. Discrimination against the beneficiaries of federally assisted programs and activities is already prohibited by Title VI of the Civil Rights Act, but unfortunately the prohibition does not apply to discrimination on the basis of sex. In order to close this loophole, my amendment sets forth prohibition and enforcement provisions which generally parallel the provisions of Title VI."

In addition, the setting up of an identical administrative structure and the use of virtually identical statutory language substantiates the intent of the Congress that the interpretation of Title IX was to provide the same coverage as had been provided under Title VI.

Since the Congress intended the same statutory scope for Title IX as for Title VI, we can understand the concept of program and activity by looking to the Court's interpre-

tation of the term "program" under various decision relating to the proper scope of HEW authority under Title VI. In *Bossier Parish School Board v. Lemon* [370 F. 2nd 847, 5a, 1967], the Fifth Circuit referred to the scope of Title VI as follows:

"Section 601 states a reasonable condition that the United States may attach to any grant of financial assistance and may enforce by refusal or withdraw of Federal assistance. . . . The Bossier Parrish School Board accepted Federal financial assistance in November 1964, and thereby brought its *school system* within the class of programs subject to section 601 prohibition against discrimination".

More importantly, this interpretation was clearly upheld by the Supreme Court in its recent decision in the case of *Lau v. Nichols*, 94 S. Ct. 786 (1974). In its decision the Court held that the San Francisco Unified School District was in violation of section 601 because non-English speaking Chinese students were being denied a "meaningful opportunity to participate in the educational program". The Court held that section 601 was applicable because "that section bans discrimination based 'on the ground of race, color or national origin' in 'any program or activity receiving Federal financial assistance'."

Three Justices concurred, relying not on Title VI itself, but on the scope of HEW's guidelines and regulations promulgated under it. In doing so, they found that the conditioning of federal aid to public schools on circumstances within the education program offered by the school district was within the authority of sections 601 and 602. The guideline used the term "program" in its broadest sense.

"Where inability to speak and understand the English language excludes national origin minority groups children from effective participation in the educational program offered by a school district, the district must take affirmative steps to rectify the language deficiency in order to open its instructional program to these students."

The singularly most important case in establishing the definition of "program" under Title VI has been, *Board of Public Instruction of Taylor County, Florida v. Finch*, 414 F. 2d 1060 (5th Cir. 1969). Under the decision, the 5th Circuit has held that discrimination should be judged on an individual program oriented basis, however, the Court specifically stated that such a requirement does not mean that each program must be considered in isolation. Specifically the Court held:

"To say that a program in a school is free from discrimination because everyone in the school is at liberty to partake of its benefits may or may not be a tenable position. Clearly the racial composition of its faculty may have an effect upon the particular program in question. But this may not always be the case. In deference to that possibility, the administrative agency seeking to cut off federal funds must make findings of fact indicating either that a particular program is itself administered in a discriminatory manner, or is so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory . . . If the funds provided by the grant are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment, the termination of such funds is proper. But there will also be cases from time to time where a particular program within a school (in short, within a political entity, or part thereof) is effectively insulated from otherwise unlawful activities. Congress did not intend that such a program suffer for the sins of others . . . In this way the Act is shielded from a vindictive application."

Title IX, as in the case of Title VI, clearly gives the Department of Health, Education

and Welfare the responsibility to enforce its regulations to prohibit sex discrimination based on sex in all aspects of the school program and to cut off funds where a program is being administered in a discriminatory manner or where it is so affected by discrimination elsewhere in the school program that it becomes discriminatory.

### II. COVERAGE OF ATHLETICS

The second major objection to the proposed regulations concerns the application of Title IX to athletics.

Those maintaining this position argue that 1) the scope of title IX is narrow and defined only to include those education programs that received direct federal financial assistance, and 2) since athletics is not an educational program in direct receipt of federal aid, Title IX cannot and should not apply.

This objection to the coverage of programs which receive indirect benefits from federal support—such as athletics—is directly at odds with the Congressional intent to provide coverage for exactly such types of clear discrimination. For example, although federal money does not go directly to the football program, federal aid to any of the school system's programs frees other money for use in athletics.

Without federal aid a school would have to reduce program offerings or use its resources more efficiently. Title IX refers to federal financial assistance. If federal aid benefits a discriminatory program by freeing funds for that program, the aid assists it. The Court in *Finch* equated "program" with grant stature, but it did not foreclose including within a program all the activities "benefited by the grant statute through the freeing of funds." This position was further elucidated in a recent *Texas Law Review* article, (*Texas Law Review* v. 53, December, 1974). According to James C. Todd:

"Some Title VI cases support this interpretation by analogy. *McGlotten v. Connally* held that granting tax exempt status to private fraternal orders and allowing tax deductions for contributions to them was sufficient to bring those groups within the embrace of Title VI. In *Green v. Kennedy* the Court noted that a tax exemption for segregated private schools might be considered financial support to the extent that it was instrumental in releasing money for discriminatory programs. Those two cases therefore suggest that discrimination should not be tolerated in programs benefiting indirectly—by favorable tax treatment—from federal financial assistance. Other cases have also spoken of tainted programs. In *Finch* the Court warned that even if a program is not itself discriminating, it can still be 'so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory.' If otherwise interested, girls are discouraged from seizing an opportunity open to them, they have been denied the benefits of a program that is not discriminatory on its face. Similarly, a sex-segregated course structure might taint an ostensibly nondiscriminatory program by failing to prepare an interested girl for the activity, so that in effect she is excluded from participation in the program."

Oddly, no one making the argument that athletics should not be covered by Title IX does so on the premise that there is not discrimination. No one denies that there is something fundamentally wrong with a college or university that relegates its female athletes to second-rate facilities or second-rate equipment or second-rate schedules solely because they are female.

There is nothing under the proposed regulations which requires equal aggregate expenditures on the part of colleges and universities for their male athletic programs and for the women. What is required is equality of opportunity. I believe this is guaranteed not only under Title IX, but under the 14th Amendment to the Constitution as well.

A recent Court decision illustrates this guarantee. In *Brenden v. Independent School District 742* (342 F. Supp. 1224, 1972) the Court held that a school district could not foreclose a female's right to participate on an athletic team solely on the basis of sex and sex alone. Even though not basing the case under Title IX, the Court of Appeals cited the statute on an illustration of the congressional policy against "discrimination based on 'stereotyped characterizations of the sexes'." The Court noted Congress's recognition of the importance of all aspects of education for women, it equated discrimination in high school athletics with discrimination in education, and referred in the decision directly to the intent of Title IX. I can substantiate that it was the intent of Congress.

The Title IX regulations are indeed not perfect, but they are far-reaching in many respects, covering admissions policies, course offerings, scholarship aid, counseling services, and athletic opportunity. As in all other forms of statutory regulation, their true impact will be dependent upon their vigorous enforcement.

While the impact of the Title IX regulations may be far-reaching if properly enforced, they are not a panacea. They are a first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the school of their choice, to develop the skills they want, and to apply those skills with knowledge they will have a fair chance to secure jobs of their choice with equal pay for equal work.

### SUMMARY OF THE REGULATION* FOR TITLE IX EDUCATION AMENDMENTS OF 1972

Title IX of the Education Amendments of 1972 says:

"No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance . . ."

With certain exceptions, the law bars sex discrimination in any academic, extracurricular, research, occupational training or other educational program (preschool to postgraduate) operated by an organization or agency which receives or benefits from federal aid. Exempted from the provisions of Title IX are schools whose primary purpose is training for the U.S. military services or the merchant marine and educational institutions controlled by religious organizations whenever compliance with Title IX would be contrary to their religious beliefs. In addition, the "Bayh Amendment" to Title IX exempts the membership policies of the Girl and Boy Scouts, the YMCA and YWCA, Campfire Girls and other single-sex "youth service organizations" whose members are chiefly under age 19. This special exemption does not apply to recreational youth groups such as Little League. Also exempted by the amendments are university-based social fraternities and sororities.

Basically, the regulation for Title IX falls into five categories: general matters related to discrimination on the basis of sex, admissions, treatment of students once they are admitted, employment and procedures.

The following summary was adapted by PEER from a summary prepared by the Resource Center on Sex Roles in Education of the National Foundation for Improvement of Education.

### GENERAL PROVISIONS SECTIONS 86.3–86.9

Each recipient of federal education aid must evaluate its current policies and practices to determine whether they comply with Title IX. Each recipient must then take whatever steps are necessary to end discrim-

ination. Institutions must keep a description of these steps on file for three years, and they must complete the evaluation and steps to overcome the effects of bias within one year of the date the regulation takes effect.

The regulation also requires that recipients adopt and publish grievance procedures to resolve student and employee complaints alleging discrimination prohibited by Title IX.

### ADMISSIONS SECTIONS 86.21–86.23

The regulation bars sex discrimination in admissions to certain kinds of institutions: those of vocational, professional, graduate, and public coeducational undergraduate institutions. Admissions to private undergraduate institutions are exempt, including admissions to private, undergraduate professional and vocational schools. HEW will look at the admissions practices of each "administratively separate unit" separately.

Specifically, the regulation bars limitations (i.e., quotas) on the number or proportion of persons of either sex who may be admitted, preference for one sex, ranking applicants separately by sex, and any other form of differential treatment by sex.

The recipient may not use a test or other criterion for admission which adversely affects any person on the basis of sex unless the test or criterion is shown to predict validly successful completion of the educational program, and unbiased alternatives are not available. Also prohibited are rules concerning parental, family, or marital status of students which make distinctions based on sex; discrimination because of pregnancy or related conditions; and asking an applicant's marital status. Recipients can ask an applicant's sex if the information is not used to discriminate.

The recipient must make comparable efforts to recruit members of each sex, except when special efforts to recruit members of one sex are needed to remedy the effects of past discrimination.

### TREATMENT OF STUDENTS SECTION 86.31–86.42

#### General coverage section 86.31

Although some schools are exempt from coverage with regard to admissions, all schools must treat their admitted students, without discrimination on the basis of sex. Briefly, the treatment of students section covers courses and extracurricular activities (including student organizations and competitive athletics), benefits, financial aid, facilities, housing, rules and regulations (including rules of appearance), and research. A student may not be limited in the enjoyment of any right, privilege, advantage or opportunity based on sex.

The regulation forbids, a recipient to aid or perpetuate sex discrimination by providing "significant assistance" to any agency, organization or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees (with some exceptions, including the membership policies of social fraternities and sororities, Boy and Girl Scouts, YMCA and YWCA). Significant assistance includes the provision of a faculty or faculty sponsor.

#### Housing and facilities sections 86.32 and 86.33

Institutions may provide housing separately for men and women. However, housing for students of both sexes must be as a whole:

proportionate in quantity to the number of students of that sex that apply for housing, and

comparable in quality and cost to the student.

Institutions may not have different housing policies for students at each sex (for example, if a college allows men to live off campus, it must allow women too).

Toilets, locker rooms and shower facilities may be separated on the basis of sex, but these facilities must be comparable for students of both sexes.

---

* 45 CFR Part 86. The text appears in the Federal Register, June 4, 1975, page 24128.

*Courses and other educational activities, sections 86.34 and 86.35*

Courses or other educational activities may not be provided separately on the basis of sex. An institution may not require or refuse participation in any course by any of its students on that basis. This includes physical education, industrial, business, vocational, technical, home economics, music, and adult education courses.

However, sex education is an exception: portions of elementary and secondary school classes dealing with human sexuality may be separated by sex.

In physical education classes, students may be separated by sex within coeducational classes when playing contact sports. Contact sports include wrestling, rugby, ice hockey, football, basketball, and any other sport "the purpose or major activity of which involves bodily contact".

Choruses may be based on vocal range or quality and may result in single-sex or predominantly single-sex choruses.

Local school districts may not, on the basis of sex, exclude any person from:

Any institution of vocational education;

Any other school or educational unit, unless the school district offers the other sex courses, services and facilities which are comparable to those offered in such schools, following the same policies and admission criteria.

*Counseling section 86.36*

A recipient may not discriminate on the basis of sex in counseling or guiding students.

Whenever a school finds that a class has a disproportionate number of students of one sex, it must take whatever action is necessary to assure itself that sex bias in counseling or testing is not responsible.

A recipient may not use tests or other appraisal and counseling materials which use different materials for each sex or which permit or require different treatment for students of each sex. Exceptions can be made if different materials used for each sex cover the same occupations and they are essential to eliminate sex bias.

Schools must set up their own procedures to make certain that counseling and appraisal materials are not sex-biased. If a test does result in a substantially disproportionate number of students of one sex in a course of study or classification, the school must take action to ensure that bias in the test or its application is not causing the disproportion.

*Student financial aid section 86.37*

The regulation covers all forms of financial aid to students. Generally, a recipient may not, on the basis of sex:

provide different amounts or types of assistance, limit eligibility, apply different criteria, or otherwise discriminate;

assist through solicitation, listing, approval, provision of facilities, or other services any agency, organization or person which offers sex-biased student aid;

employ students in a way that discriminates against one sex, or provide services to any other organization which does so.

There are exceptions for athletic scholarships and single-sex scholarships established by will or trust.

ATHLETIC SCHOLARSHIPS

An institution which awards athletic scholarships must provide "reasonable opportunities" for both sexes, in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics. Separate athletic scholarships for each sex may be offered in connection with separate male/female teams to the extent consistent with both the section on scholarships and the section on athletics (86.41).

SCHOLARSHIPS FOR STUDY ABROAD

The regulation exempts discriminatory student assistance for study abroad (such as Rhodes Scholarships), provided that a recipient which administers or helps to administer the scholarship awards makes available reasonable opportunities for similar studies for the other sex.

SINGLE SEX SCHOLARSHIPS

An institution may administer or assist in the administration of scholarships and other forms of student financial aid whenever a will, trust, or bequest specifies that the aid can only go to one sex, as long as the overall effect of making sex-restricted awards is not discriminatory.

To ensure this, institutions must:

Select financial aid recipients on the basis of nondiscriminatory criteria, not the availability of sex-restricted scholarships;

Allocate sex-restricted awards to students already selected in such a fashion; and

Ensure that no student is denied an award because of the lack of a sex-restricted scholarship.

*Student health and insurance benefits Section 86.39*

Student medical, hospital, accident or life insurance benefits, services, or plans may not discriminate on the basis of sex. This would not bar benefits or services which may be used by a different proportion of students of one sex than of the other, including family planning services.

Any school which provides full coverage health services must provide gynecological care.

*Marital or Parental Status Section 86.40*

The regulation bars any rule concerning a student's actual or potential parental, family, or marital status which makes distinctions based on sex.

A school may not discriminate against any student in its educational program, including any class or extracurricular activity, because of the student's pregnancy, childbirth, false pregnancy, miscarriage, or termination of pregnancy, unless the student requests voluntarily to participate in a different program or activity.

If a school does offer a voluntary, separate education program for pregnant students, the instructional program must be comparable to the regular instructional program.

A school may ask a pregnant student to have her physician certify her ability to stay in the regular education program only if it requires physician's certification for students with other physical or emotional conditions.

Recipients must treat disabilities related to pregnancy the same way as any other temporary disability in any medical or hospital benefit, service, plan or policy which they offer to students. Pregnancy must be treated as justification for a leave of absence for as long as the student's physician considers medically necessary. Following this leave, the student must be reinstated to her original status.

*Athletics section 86.41*

GENERAL COVERAGE

The regulation says that no person may be subjected to discrimination based on sex in any scholastic, intercollegiate, club or intramural athletics offered by a recipient of federal education aid.

SEPARATE TEAMS AND CONTACT SPORTS

Separate teams for each sex are permissible in contact sports or where selection for teams is based on competitive skill. Contact sports include boxing, wrestling, rugby, ice hockey, football, basketball, and any other sport "the purpose or major activity of which involves bodily contact."

In *noncontact* sports, whenever a school

has a team in a given sport for one sex only, and athletic opportunities for the other sex have been limited, members of the other sex must be allowed to try out for the team.

EQUAL OPPORTUNITY

A school must provide equal athletic opportunity for both sexes. In determining whether athletic opportunities are equal, HEW will consider whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes. The Department will also consider (among other factors): facilities, equipment, supplies, game and practice schedules, travel and per diem allowances, coaching (including assignment and compensation of coaches), academic tutoring, housing, dining facilities, and publicity.

Equal expenditures are not required, but HEW "may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex."

ADJUSTMENT PERIOD

Elementary schools must comply fully with the section covering athletics "as expeditiously as possible" but no more than one year from the effective date of the regulation. Secondary and post-secondary institutions have three years from the regulation's effective date to comply fully.

*Textbooks section 86.42*

The regulation does not require or abridge the use of particular textbooks or curriculum materials.

EMPLOYMENT SECTIONS 86.51–86.61

*General provisions 86.51–86.55*

All employees in all institutions are covered, both full-time and part-time, except those in military schools, and those in religious schools to the extent compliance would be inconsistent with the controlling religious tenets.

In general, the regulation prohibits: discrimination based on sex in employment, recruitment, and hiring, whether full-time or part-time, under any education program or activity which receives or benefits from federal financial aid. It also bars an institution from entering into union, employment agency, or fringe benefit agreements which subject individuals to discrimination.

An institution may not limit, segregate, or classify applicants or employees in any way which could adversely affect any applicant's or employee's employment opportunities or status because of sex.

The regulation prohibits sex discrimination in all aspects of employment, including employment criteria, advertising and recruitment, hiring and firing, promotion, tenure, pay, job assignments, training, leave, and fringe benefits.

*Fringe benefits section 86.56*

Fringe benefit plans must provide either for equal periodic benefits for male employees or equal contributions for both sexes. Retirement plans may not establish different retirement ages for employees of each sex.

*Marital status and pregnancy section 86.57*

An institution may not apply any employment policy concerning the potential marital, parental or family status of an employee or employment applicant which makes distinctions based on sex.

An institution may not discriminate in employment on the basis of pregnancy or related conditions. A temporary disability resulting from these conditions must be treated as any other temporary disability for all job-related purposes, including leave, seniority, reinstatement and fringe benefits. If the employer has no temporary disability policy, pregnancy and related conditions must be considered a justification for leave without

pay and the employee reinstated to her original or comparable status when she returns from leave.

*Effect of state and local laws section 86.58*

The obligation to comply with this regulation is not precluded by any state or local laws.

[From the Washington Post, June 10, 1975]
HEW's RULES ON WOMEN AND EDUCATION

With all the hullabaloo over the impact on college sports of the new federal sex bias rules, it is easy to overlook the real importance of those rules which is that they should open the country's educational institutions to women in a way they have never been open before. That will mean, in the long run, more female doctors and other professionals, more female scholars and college teachers, more females in technical jobs, and, to some extent, more female athletes. The rules mean, simply, that the nation is taking another significant step toward a time when intellect and talent and competence in general will be recognized as such in all endeavors—whether academic or athletic—regardless of the sex of the person concerned.

In that sense, the fight over what these rules will do to sports and athletic programs is a side issue. The real impact of them will be on things that matter much more in life—things like admission to vocational and professional schools and public colleges, access to courses and scholarship funds, and employment practices. In these areas, as well as in athletics, educational institutions at all levels have consistently discriminated against women down through the years. The new rules, if they are properly enforced by HEW, will do much to eliminate that discrimination.

There is also a matter of basic fairness involved in the athletic programs and if it takes a complete change in the nature of intercollegiate sports to produce that fairness, so be it. There is something fundamentally wrong with a college or university or, for that matter, a lower level school, that relegates its female athletes to secondrate facilities or second-rate equipment or second-rate travel arrangements solely because they are female. There is nothing in the Constitution or in the nature of the world that says only males can be athletes or that male athletes are entitled, if they are good enough, to free education, free food and free medical care.

Indeed, we suspect that there are a good many university presidents who, way down deep inside, are cheering that part of the HEW rules having to do directly with sports. The emphasis on all too many campuses has reached the point where it appears the purpose of the university is not to educate young people but to produce winning football or basketball teams. The presidents know this—and despair at what it is doing to their institutions—but many of them have felt unable to tackle the problem because of the power their athletic departments have with alumni. These new rules may provide the impetus they need to begin to bring the right perspective back to the campuses. If so, HEW's efforts will serve not only to give to women what is rightfully theirs but to restore some balance between what is meaningful in higher education and what is fun and games.

[From the New York Times, June 4, 1975]
AGAINST SEXIST SCHOOLS—AND SPORTS FOR PAY

The new Federal guidelines against sex discrimination in the nation's schools and colleges combine a much-needed emphasis on equal opportunity for women with enough flexibility to prevent a dispiriting homogenization of educational institutions. Such a sensible approach to what is still an irra-

tionally controversial area of social reform—and nowhere more explosively irrational than in sports—can be expected to draw fire from both ideological extremes.

Although some of the more esoteric aspects of sex discrimination are likely to attract most public attention, the crux of the matter is the prohibition of any bias blocking equal opportunity for female students and teachers at any educational level. Absolute equality is crucial in school and college admissions, financial aid, counseling and, in the case of teachers and other educational personnel, employment, pay and promotions.

The new rules quite properly prohibit the kind of sex stereotyping in education that barred girls from shop classes and boys from home economics. The justifications for such "male" or "female" subjects once put forth have long since been rendered obsolete.

The Department of Health, Education and Welfare has wisely resisted pressures to include the content of textbooks in the guidelines. Expert studies have provided ample illustrations that many of these teaching materials are indeed infected with male chauvinism, but Federal censorship is not the remedy. Local school boards and educators can better re-educate authors and publishers through care in selecting teaching materials.

In another constructive limitation of the general rules, the department sanctioned the continued existence of single-sex schools and colleges. Far from being an example of sexism, that exemption is an essential recognition of the importance of diversity in American education.

Far more vulnerable than any of the guidelines themselves, however, is the announcement that H.E.W. will no longer investigate individual complaints of discrimination. While some discretion is clearly in order to distinguish esoteric or crank complaints from legitimate grievances, any policy that ignores individual calls for justice can scarcely be considered law-enforcement. Secretary Weinberger cannot be faulted for appealing to the educational institutions' "good faith"; it would be naive to expect a total melting away of deeply ingrained habits of prejudice and exclusion in the absence of an effective mechanism for assessing well-documented individual complaints.

Taken by themselves, the inevitable confusion of the guidelines against sex discrimination in school and college sports and the equally inevitable anger of the response by the college athletics lobby might be mildly amusing. Unfortunately, however, the controversy stems from a distortion of values in the commercialized world of college sports that is far more serious than the question of women's role in that particular arena.

The everyday issues of adequate support for girls' and women's teams in schools and colleges should be relatively easy to resolve. Women's physical education activities have been chronically shortchanged at many schools and campuses, and there is need for a fairer distribution of funds. Such details as requiring that physical education classes be coeducational in elementary and secondary schools may well merit some expert reassessment, but questions of that kind are readily adjusted to educational realities.

Far more serious issues are involved, however, in the dark hints by spokesmen for big-time college athletics that the guidelines will torpedo their multimillion-dollar enterprises. Collegiate impresarios appear terrified that their trading in high-priced athletic talent might be scuttled by demands for equal pay in athletic "scholarships" for women. The answer to such fears is that the time has come, not for counting women in, but for getting the campuses out of their commercialism thinly disguised as college sports.

[From the Washington Star, June 5, 1975]
EQUAL EDUCATION FOR WOMEN

Why all the fuss over HEW's rules barring sex discrimination in schools and colleges? If equality under the law means anything, it surely entitles females to an equal break in public-supported educational institutions.

The major complaints seem to be coming from spokesmen for male-oriented college sports who think the regulations promulgated by the Department of Health, Education, and Welfare will end their high-powered, big-business programs. The fact is, sports are involved in only one part of the regulations. Other provisions require equal treatment for males and females in faculty hiring, financial aid, vocational training, housing, gym classes and other educational activities.

Women are only beginning to overcome the bias that has kept them out of the highest jobs in public school systems and colleges. Everyone knows that the big male bruiser who can play football, even though he may not have a brain in his head, has an infinitely better chance of winning a college scholarship than the female high school student who is good in the classroom but wouldn't pull the paying fans through the college sports arena turnstiles. Vocational schools traditionally have been oriented toward training males for the higher-paying trades while shunting females off toward secretarial and hairdresser jobs. It's time these kinds of discrimination, as well as many others in the educational system, are ended.

So far as rules requiring integration of physical education programs are concerned, there doesn't seem to be much reason for a big hullabaloo. They don't mean that boys and girls are going to be taking showers together or using the same wash rooms. Nor do they mean that boys and girls are going to be wrestling one another in high school and college gyms across the country, for bodily contact sports are specifically exempted from the integration orders.

What it does mean is that schools and colleges are going to have to start spending more on female sports programs and allowing girls to participate in non-bodily contact sports that now are largely reserved for males.

We doubt that big-time college sports are going to suffer seriously from rules that require the scholarship and financial aid pot to be split more evenly between the sexes, or from an increase in financial outlay for female sports programs. Colleges no doubt will find ways to subsidize all the superstar jocks they think they need, and the fans will continue coming up with the ever-increasing price of tickets to finance the expensive stadia and trappings that go with college sports. Even if the regulations were to put a crimp in inter-collegiate athletic programs, it might be a good thing. Sports programs should be aimed at getting the maximum participation possible among students, not as building teams for maximum box-office draw. Professional sports should be left to the professional leagues.

Legislation against sex discrimination in educational institutions was enacted three years ago by Congress. It took HEW all this time to get the specific regulations drafted to carry out that law, and these rules still are subject to rejection by Congress within 45 days. If Congress believes in the law it has passed, it ought to let the regulations become effective.

Equal educational opportunity for women is, as HEW Secretary Caspar Weinberger said the other day when he announced the regulations, "the law of the land." So let's get on with enforcing it.

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

## Office of the Secretary

### [ 45 CFR Part 86 ]

### EDUCATION PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE

#### Nondiscrimination on the Basis of Sex

The Office of Civil Rights of the Department of Health, Education, and Welfare proposes to add Part 86 to the Departmental Regulation to effectuate Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 et seq.), except sections 904 and 906 thereof (20 U.S.C. 1684 and 1686), with regard to Federal financial assistance administered by the Department. Title IX provides that "no person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," with certain exceptions. Title IX is similar to Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) except that Title IX applies to discrimination based on sex, is limited to educational programs and activities, and includes employment.

Subpart A of these proposed regulations (§§ 86.1 through 86.9) includes definitions and provisions concerning: remedial and affirmative actions, required assurances, dissemination of information policies, and other general matters related to discrimination on the basis of sex. The Subpart also explains the effect of state or local laws and other requirements.

Subpart B (§§ 86.11 through 81.16) describes the educational institutions and other entities, whether public or private, which are covered in whole or in part by the proposed regulations. It also includes exemptions as to admissions for certain educational institutions, as set forth in the statute, but it should be noted that these exemptions are limited to admissions. This Subpart defines "admissions," and describes certain educational institutions which are eligible to submit transition plans designed to convert their single-sex admissions processes to nondiscriminatory processes over a stated period of time not to exceed seven years from the date of enactment of Title IX (i.e. by June 24, 1979).

Subpart C (§§ 86.21 through 86.23) sets forth the general and particular prohibitions with respect to nondiscrimination based on sex in admissions policies and admission preferences, including requirements concerning recruitment of students. The regulatory requirements regarding treatment of students and employment (Subparts D and E) are applicable to all educational institutions receiving Federal financial assistance, including those whose admissions are exempt under Subpart C.

Subpart D (§§ 86.31 through 86.38) sets forth the general rules with respect to prohibited discrimination in educational programs and activities. The specific subject matter covered in Subpart

D includes discrimination on the basis of sex in academic research, extracurricular and other offerings, housing, facilities, access to programs and activities, financial and employment assistance to students, health and insurance benefits for students, physical education and instruction, athletics, and discrimination based on the marital or parental status of students.

Subpart E (§§ 86.41 through 86.51) sets forth the general rules with respect to employment in educational programs and activities. The specific subject matters covered are discrimination on the basis of sex in hiring and employment criteria, recruitment, compensation, job classification and structure, promotions and termination, fringe benefits and leave, advertising, pre-employment inquiries, and discrimination with respect to marital or parental status. It also includes provisions for exemptions where sex is a bona fide occupational qualification.

Subpart F (§§ 86.61 through 86.66) sets forth the procedures which would govern the implementation of the proposed regulations, including procedures for effecting compliance, conducting hearings, rendering decisions and issuing notices. It also includes provisions concerning the applicability of administrative and judicial review. Section 86.11, in Subpart A, provides that the regulations apply "to each education program or activity which receives or benefits from Federal financial assistance" administered by the Department. Under analogous cases involving constitutional prohibitions against racial discrimination, the courts have held that a school district's or college's education functions include any service, facility, activity or program which it operates as sponsors, including athletics and other extracurricular activities. These precedents have been followed with regard to sex discrimination; see Brenden v. Independent School District 742, 477 F. 2d 1292 (8th Cir. 1973).

Section 86.63(c), in Subpart F, provides, as Title IX requires in 20 U.S.C. 1682, that termination or refusal to grant or continue such assistance "shall be limited in its effect to the particular education program or activity" in which noncompliance has been found. The Secretary proposes to interpret section 86.63 (c) consistently with the interpretation of similar language contained in Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d–1). He proposes, therefore, that an education program or activity or part thereof operated by a recipient of Federal financial assistance administered by the Department will be subject to the requirements of this regulation if it receives or benefits from such assistance. This interpretation is consistent with the leading case interpreting the language contained in Title VI, which holds that Federal funds may be terminated under Title VI only upon a finding they "are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment * * *" Board of Public

Instruction of Taylor County, Florida, v. Finch, 414 F. 2d 1068, 1078–79 (5th Cir. 1969).

A more detailed discussion of various sections in each of the Subparts of the proposed Title IX regulations is set forth in the following paragraphs. In certain cases, major issues and the reasons for the proposed decision are discussed.

Subpart A. Section 86.2 generally provides definitions. Of particular note is § 86.2(o) which provides that where an educational institution is composed of more than one school, department or college, admission to any other component, each such school, department or college is considered as a separate unit for the purposes of determining whether its admissions are covered by the regulation. Thus, if a private institution is composed of an undergraduate and a graduate college, admissions to the undergraduate college are exempt (see discussion under Subpart B below) but admissions to the graduate school are not.

Section 86.3(a) requires remedial action to overcome the effects of previous discrimination based on sex in a Federally assisted educational program or activity. Remedial action pursuant to § 86.3(a) is restricted to areas of a recipient's educational program or activity which are not exempt from coverage. Section 86.3(b) permits, but does not require, affirmative action to overcome the effects of conditions which have resulted in limited participation by members of either sex. The Department will not require imposition of quotas under either of these sections.

Section 86.4 requires each recipient of Federal financial assistance to submit to the Director an assurance that each of its educational programs and activities receiving or benefiting from such assistance will be conducted in compliance with the regulations.

Subpart B. Section 86.13 of the regulation provides that all public and private military schools that are recipients of Federal financial assistance, whether secondary or post-secondary, are exempt from coverage. Neither the statute nor the regulation applies to U.S. military and merchant marine academies since these schools are Federal entities rather than recipients of Federal assistance.

Section 86.12 provides that the regulation does not apply to religiously controlled institutions to the extent that such application would be inconsistent with the religious tenets of the controlling organization. An educational institution wishing to claim an exemption on the ground of religion must do so in writing to the Director when it files its assurance of compliance pursuant to § 86.4. The institution would be required to set forth the manner and extent to which application of the regulation would not be consistent with the religious tenets of its controlling organization.

The statute covers admissions only in certain institutions: vocational, professional, graduate, and public undergraduate institutions, except such of the latter as from their founding have been

Add. 8

PROPOSED RULES

traditionally and continually single-sex. The admissions policies of private undergraduate institutions are exempt. Under the statute and § 86.14, the admissions requirements do not apply, in general, to admissions to public or private preschool, elementary and second schools. Because the statute mandates such coverage as to vocational schools, however, admission to public or private vocational schools, whether at the junior high school, high school or post-secondary level, are covered by § 86.14(c) and must be nondiscriminatory. With respect to coverage of admissions to institutions of professional and vocational education, the Secretary has interpreted the statute as excluding admissions coverage of professional and vocational programs offered at private undergraduate schools. Thus, admission to programs leading to first degrees in fields such as teaching, engineering, and architecture at such private colleges will be exempt under § 86.14(d). While the admissions section of the statute might be read as including professional degrees wherever they are offered, the statute can also be read as stating, and the legislative history indicates, that admissions to private undergraduate schools were to be totally exempt.

The exemption in § 86.14(d) for admissions to public traditionally and continually single-sex undergraduate institutions will affect only a few institutions. Likewise, section 86.15 of the regulation, concerning transition by single sex institutions whose admissions are covered by the statute into institutions with nondiscriminatory admissions practices, will affect relatively few institutions.

*Subpart C.* Subpart C prescribes (subject to the appropriate admissions exemptions) requirements for nondiscrimination in recruitment and admission of students to educational programs and activities. In addition to a general prohibition of discrimination in § 86.21(a), the regulations delineate, in § 86.21(b), specific prohibitions based on sex relating to such practices as ranking of applicants, application of quotas, and administration of tests or selection criteria. Use of tests for admission which are shown to have an adverse impact on members of one sex must be shown to predict validly the successful completion of the educational program or activity in question (§ 86.21(b)(2)). Further, in connection with this prohibition, § 86.22 of the regulation forbids a recipient from giving preference to applicants on the basis of their attendance at particular institutions if the preference results in discrimination on the basis of sex. Such preferences may be permissible under that section, however, if the granting institution can show that the pool of applicants eligible for such a preference includes roughly equivalent numbers of males and females, or if it can show that the total number of applicants eligible to receive the preference is insignificant in comparison to its total applicant pool.

Specific prohibitions in Subpart C also forbid applying rules concerning such matters as marital or parental status in a manner which discriminates in admissions on the basis of sex (§ 86.21(c)(1)). Section 86.21(c)(2) prohibits discrimination on the basis of pregnancy and related conditions, and § 86.21(c)(3) provides that recipients shall treat disabilities related to such conditions in the same manner and under the same policies as any other temporary disability or physical condition is treated.

The last section of Subpart C, § 86.23, requires generally that comparable efforts be made by educational institutions to recruit members of each sex. Additional recruitment efforts directed primarily toward members of one sex must be undertaken to remedy past discrimination (pursuant to § 86.3(a) in Subpart A), and such additional efforts may also be taken absent past discrimination in order to correct the effects of conditions which have had the effect of limiting the admissions of members of one sex, to the recipient's educational program or activity (pursuant to § 86.3(b)). Finally, a recipient may not, under § 86.23(b), recruit primarily or exclusively at institutions whose student bodies are exclusively or predominantly single-sex if the effect of such recruitment efforts is to discriminate on the basis of sex.

*Subpart D.* Subpart D concerns the prohibition of discrimination in treatment of students in educational programs and activities. Generally, § 86.31 (a) states that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other educational program or activity operated by a recipient and which receives or benefits from Federal financial assistance. This provision is followed by specific prohibitions in § 86.31(b) which include: discriminating on the basis of sex in the application of any rules of appearance, or in the application of rules of domicile and residency (as discussed below), and aiding or perpetuating sex discrimination by assisting any agency, organization or person which discriminates on the basis of sex in providing any aid, benefits, or services to students or employees. Section 86.31(a) does permit an institution to assist its students in seeking admission to an education program which discriminates, if that admissions discrimination would be permissible under Subpart C. For example, a public undergraduate institution may administer an exchange program with a private undergraduate institution which admits only students of one sex because Subpart C permits the private institution to have such an admissions policy.

Section 86.31(b)(6) forbids application by recipients of residency and domicile rules in a manner which discriminates on the basis of sex. For example, many educational institutions base their determinations of eligibility for in-state tuition on domicile; applicable state law may require a married woman to take the domicile of her husband as of the date of marriage, or further require a

year of residency to demonstrate domicile. If a male student domiciled in State A marries a female student domiciled in State B, and they then move to State B where the woman continues in school and the man begins school, he may not be entitled to in-state tuition in State B until he has lived there for a year. Additionally, as the wife must take her husband's domicile, she will lose her in-state tuition eligibility. If, instead, the woman were from State A and the man from State B, both would have been entitled immediately to in-state tuition in State B. Application of such rules would be prohibited under § 86.31(b)(6). See Samuel v. University of Pittsburgh, et al., F. Supp. (W.D. Pa., No. 71-1202, April 10, 1974).

Section 86.31(b)(7) prohibits a recipient from assisting another party which discriminates on the basis of sex in serving students or employees of that recipient. This section might apply, for example, to financial support by the recipient to a community recreational group or to official institutional sanction of a professional or social organization. Among the criteria to be considered in each case are the substantiality of the relationship between the recipient subject to the regulation and the other party involved, including the financial support by the recipient, and whether the other party's activities relate so closely to the recipient's educational program or activity, or to students or employees in that program, that they fairly should be considered as activities of the recipient itself. (Under § 86.6(c), a recipient's obligations are not changed by membership in any league or other organization whose rules require or permit discrimination on the basis of sex.)

A recipient is required to develop and implement a procedure to ensure that the operator or sponsor of an educational program or activity not operated wholly by such recipient, in which the recipient assists participation by its students and employees, takes no action which the regulation would prohibit the recipient from taking. This requirement would apply, for example, to a college's responsibility to ensure nondiscrimination in teaching assignments of student teachers from its education school in schools not operated by the college. If the recipient finds that such discrimination is taking place and is unable to secure its prompt correction, it is required to end its connection with the operating or sponsoring entity (§ 86.31(c)).

With respect to housing, § 86.32 provides that a recipient may not discriminate in any aspect of the provision of housing except that, as provided in the statute, housing may be separate on the basis of sex. Thus, all rules, fees, and other requirements must not discriminate on the basis of sex, and the housing provided or otherwise made available (*e.g.* through listing) must be proportionate in quantity to the number of applicants for housing of each sex and comparable in quality and cost to the student. Moreover, a recipient must administer rules concerning off-campus housing (*e.g.* rules concerning which students

Add. 9

22230                                    PROPOSED RULES

may live off campus) without discrimination. To the extent that it approves, or assists students in obtaining, off-campus housing, it must take whatever steps it believes necessary to assure that the off-campus housing available to members of one sex, when compared to that available to members of the other sex, is proportionate in quantity to the numbers of applicants of each sex as well as comparable in quality and cost.

Separate toilet, locker room and shower facilities on the basis of sex may be provided, but such facilities as are provided must be comparable in quality and number for men and women (§ 86.33).

Section 86.34(a) covers access to course offerings and other aspects of a recipient's educational program or activity. No course offerings may be conducted separately on the basis of sex including health, physical education, industrial arts, business, vocational, technical, home economics, music, and adult education, and no student may be required to participate or be refused participation in any course offering on the basis of sex. Section 86.34(b) provides that local educational agencies, in which admission to individual schools are exempt, nevertheless may not discriminate in admissions to the vocational institutions (see Subpart B). In addition, they may not discriminate in admissions to any other school or educational unit which they operate (e.g. a special high school operated for boys) unless they otherwise make available to students of the sex excluded, pursuant to the same policies and criteria of admission, comparable courses, services and facilities. Section 86.34(d) requires use of nondiscriminatory appraisal and counseling materials.

The Department recognizes that sex stereotyping in curricula and educational materials is a serious problem to which Title IX could well apply, but the Department has concluded that specific regulatory provisions in this area would raise grave constitutional problems concerning the right of free speech under the First Amendment to the Constitution, and for that reason the Secretary has not covered this subject matter in the proposed regulation. The Department assumes that recipients will deal with this problem in the exercise of their general authority and control over curricula and course content. For its part, the Department will increase its efforts, through the Office of Education, to provide research, assistance and guidance to local education agencies in eliminating sex bias from curricula and educational materials.

Section 86.35 requires that provision of financial aid, assistance in making outside employment available to students, and employment of students by a recipient must be undertaken in a nondiscriminatory manner.

Section 86.35(a) prohibits different amounts and types of all forms of student financial aid to members of one sex. Section 86.35(a) prohibits a college or university subject to Title IX from assisting private fellowship or scholarship programs which are limited to members of one sex or for which members of each sex are selected separately. There may be appropriate remedial action in this area, including temporarily considering a student's sex in awarding financial aid. This section does not apply to a recipient's assisting in the administration of a scholarship or fellowship program established under a foreign will, trust or similar legal instrument, or by a foreign government, which differentiates between the sexes. The Secretary believes that the statute was not intended to cover such programs. The Secretary is aware of the problems raised by financial aid limited to members of one sex by a domestic bequest, deed of trust, or other instruments and invites comment in this area.

Under § 86.36, recipients may not discriminate in the provision of medical, hospital, accident, or life insurance benefits, services, policies or plans to any of their students, and recipients may not provide such benefits, service, policies or plans or otherwise discriminate, in any manner which would violate the employment sections of the regulation (Subpart E) if the action were to be taken with respect to employees. The section does not, however, prohibit recipients from providing any benefits or services which may be used by a different proportion of students of one sex than of the other, including but not limited to family planning services.

Section 86.37 provides generally that recipients may not apply rules concerning a student's actual or potential parental, family, or marital status in a discriminatory manner, and it provides specific prohibitions regarding discrimination against students on account of pregnancy, childbirth, or pregnancy-related disabilities. A student may not be excluded from regular classes because of pregnancy or related conditions unless she so requests or unless her physician certifies that a different arrangement is necessary. The regulation reflects the principle that disabilities related to pregnancy should be treated like any other disability.

Section 86.38 imposes requirements concerning physical education and athletic programs, which are integral parts of the educational processes of schools and colleges and are fully subject to the requirements of Title IX. See Brenden v. Independent School District 742, 477 F. 2d 1292, 1299–96 (8th Cir. 1973); compare Bucha v. Illinois High School Association, 351 F. Supp. 69 (N.D. Ill. 1972).

Section 86.38(a) provides that physical education classes and athletic programs must be operated without discrimination on the basis of sex. Such activities for which participation or selection is premised on factors other than skill may not be conducted separately on the basis of sex. Athletics for which selection is based on competitive skill may be provided through separate teams for males and females to the extent such teams comply with the requirements of §§ 86.38 (b) through (e), which are summarized below. (The award of scholarships for participation on a single sex team will not be interpreted as a single sex scholarship prohibited by § 86.35(a) so long as the recipient complies with the requirements of § 86.38, providing for equal opportunity in athletics.)

Recipients must determine in what sports students of both sexes desire to participate (§ 86.38(b)). Where athletic opportunities for students of one sex have previously been limited, a recipient must make affirmative efforts to inform students of that sex of the availability of equal opportunities for them, and to provide support and training to enable them to participate in those opportunities (§ 86.38(c)).

Section 86.38(d) requires that a recipient make affirmative efforts to provide athletic opportunities in such sports and through such teams as will most effectively equalize opportunities for members of both sexes, and in so doing consider the determinations of student interest made pursuant to § 86.38(b). The regulation does not require equal aggregate expenditures for athletics for members of each sex nor equal expenditures for each team (§ 86.38(e)).

Subpart E. Subpart E proposes requirements concerning employment which generally follow those of the Equal Employment Opportunity Commission (29 CFR Part 1604), and the Department of Labor's Office of Federal Contract Compliance (41 CFR Part 60). The EEOC administers Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination, and the OFCC is responsible for the coordination of implementation of Executive Order 11246, as amended, which prohibits employment discrimination by Federal contractors. This Department is responsible for administration, pursuant to the OFCC regulations, of the Executive Order as to Federal contractors which are educational institutions. Virtually all recipients subject to Part 86 are also subject to Title VII, and many are also subject to the Executive Order. Where Subpart E of Title IX differs from either the Title VII regulations or those under Executive Order 11246, an employer who complies with this proposed regulation would also be complying with both Title VII and Executive Order, even where the latter provisions differ from each other, with the exception of fringe benefits as discussed in the following paragraph.

Section 86.46(b) (2) of Subpart E follows the Executive Order regulations in requiring that fringe benefit plans provide for either equal periodic benefits to members of each sex, or equal contributions by the employer for members of each sex (§ 86.36 imposes identical requirements for student benefit plans).

The Title VII regulation differs in that it prohibits payment of unequal periodic benefits on the basis of sex, and precludes employers from justifying unequal periodic benefits on the basis of differences in cost for males and for females. Assuming different life spans at particular ages between the sexes, and assuming equal contributions by all employees, Title VII implicitly requires payment of higher employer contributions for, and

Add. 10

WEDNESDAY, JUNE 4, 1975

WASHINGTON, D.C.

Volume 40 ■ Number 108

PART II





# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

## Office of the Secretary

■

## NONDISCRIMINATION ON BASIS OF SEX

### Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance

§ 86.16  Educational institutions eligible to submit transition plans.

(a) *Application.* This section applies to each educational institution to which Subpart C applies which:

(1) Admitted only students of one sex as regular students as of June 23, 1972; or

(2) Admitted only students of one sex as regular students as of June 23, 1965, but thereafter admitted as regular students, students of the sex not admitted prior to June 23, 1965.

(b) *Provision for transition plans.* An educational institution to which this section applies shall not discriminate on the basis of sex in admission or recruitment in violation of Subpart C unless it is carrying out a transition plan approved by the United States Commissioner of Education as described in § 86.17, which plan provides for the elimination of such discrimination by the earliest practicable date but in no event later than June 23, 1979.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 86.17  Transition plans.

(a) *Submission of plans.* An institution to which § 86.15 applies and which is composed of more than one administratively separate unit may submit either a single transition plan applicable to all such units, or a separate transition plan applicable to each such unit.

(b) *Content of plans.* In order to be approved by the United States Commissioner of Education, a transition plan shall:

(1) State the name, address, and Federal Interagency Committee on Education (FICE) Code of the educational institution submitting such plan, the administratively separate units to which the plan is applicable, and the name, address, and telephone number of the person to whom questions concerning the plan may be addressed. The person who submits the plan shall be the chief administrator or president of the institution, or another individual legally authorized to bind the institution to all actions set forth in the plan.

(2) State whether the educational institution or administratively separate unit admits students of both sexes, as regular students and, if so, when it began to do so.

(3) Identify and describe with respect to the educational institution or administratively separate unit any obstacles to admitting students without discrimination on the basis of sex.

(4) Describe in detail the steps necessary to eliminate as soon as practicable each obstacle so identified and indicate the schedule for taking these steps and the individual directly responsible for their implementation.

(5) Include estimates of the number of students, by sex, expected to apply for, be admitted to, and enter each class during the period covered by the plan.

(c) *Nondiscrimination.* No policy or practice of a recipient to which § 86.16 applies shall result in treatment of applicants to or students of such recipient in violation of Subpart C unless such treatment is necessitated by an obstacle identified in paragraph (b)(3) of this section and a schedule for eliminating that obstacle has been provided as required by paragraph (b)(4) of this section.

(d) *Effects of past exclusion.* To overcome the effects of past exclusion of students on the basis of sex, each educational institution to which § 86.16 applies shall include in its transition plan, and shall implement, specific steps designed to encourage individuals of the previously excluded sex to apply for admission to such institution. Such steps shall include instituting recruitment programs which emphasize the institution's commitment to enrolling students of the sex previously excluded.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§§ 86.18–86.20  [Reserved]

Subpart C—Discrimination on the Basis of Sex in Admission and Recruitment Prohibited

§ 86.21  Admission.

(a) *General.* No person shall, on the basis of sex, be denied admission, or be subjected to discrimination in admission, by any recipient to which this subpart applies, except as provided in §§ 86.16 and 86.17.

(b) *Specific prohibitions.* (1) In determining whether a person satisfies any policy or criterion for admission, or in making any offer of admission, a recipient to which this Subpart applies shall not:

(i) Give preference to one person over another on the basis of sex, by ranking applicants separately on such basis, or otherwise;

(ii) Apply numerical limitations upon the number or proportion of persons of either sex who may be admitted; or

(iii) Otherwise treat one individual differently from another on the basis of sex.

(2) A recipient shall not administer or operate any test or other criterion for admission which has a disproportionately adverse effect on persons on the basis of sex unless the use of such test or criterion is shown to predict validly success in the education program or activity in question and alternative tests or criteria which do not have such a disproportionately adverse effect are shown to be unavailable.

(c) *Prohibitions relating to marital or parental status.* In determining whether a person satisfies any policy or criterion for admission, or in making any offer of admission, a recipient to which this subpart applies:

(1) Shall not apply any rule concerning the actual or potential parental, family, or marital status of a student or applicant which treats persons differently on the basis of sex;

(2) Shall not discriminate against or exclude any person on the basis of pregnancy, childbirth, termination of pregnancy, or recovery therefrom, or establish or follow any rule or practice which so discriminates or excludes;

(3) Shall treat disabilities related to pregnancy, childbirth, termination of pregnancy, or recovery therefrom in the same manner and under the same policies as any other temporary disability or physical condition; and

(4) Shall not make pre-admission inquiry as to the marital status of an applicant for admission, including whether such applicant is "Miss" or "Mrs." A recipient may make pre-admission inquiry as to the sex of an applicant for admission, but only if such inquiry is made equally of such applicants of both sexes and if the results of such inquiry are not used in connection with discrimination prohibited by this part.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 86.22  Preference in admission.

A recipient to which this subpart applies shall not give preference to applicants for admission, on the basis of attendance at any educational institution or other school or entity which admits as students or predominantly members of one sex, if the giving of such preference has the effect of discriminating on the basis of sex in violation of this subpart.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 86.23  Recruitment.

(a) *Nondiscriminatory recruitment.* A recipient to which this subpart applies shall not discriminate on the basis of sex in the recruitment and admission of students. A recipient may be required to undertake additional recruitment efforts for one sex as remedial action pursuant to § 86.3(a), and may choose to undertake such efforts as affirmative action pursuant to § 86.3(b).

(b) *Recruitment at certain institutions.* A recipient to which this subpart applies shall not recruit primarily or exclusively at educational institutions, schools or entities which admit as students only or predominantly members of one sex, if such actions have the effect of discriminating on the basis of sex in violation of this subpart.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§§ 86.24–86.30  [Reserved]

Subpart D—Discrimination on the Basis of Sex in Education Programs and Activities Prohibited

§ 86.31  Education programs and activities.

(a) *General.* Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives or benefits from Federal financial assistance. This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of (1) a recipient to which Subpart C does not apply, or (2) an entity, not a

recipient, to which Subpart C would not apply if the entity were a recipient.

(b) *Specific prohibitions.* Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

(5) Discriminate against any person in the application of any rules of appearance;

(6) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;

(7) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(8) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

(c) *Assistance administered by a recipient educational institution to study at a foreign institution.* A recipient educational institution may administer or assist in the administration of scholarships, fellowships, or other awards established by foreign or domestic wills, trusts, or similar legal instruments, or by acts of foreign governments and restricted to members of one sex, which are designed to provide opportunities to study abroad, and which are awarded to students who are already matriculating at or who are graduates of the recipient institution; *Provided,* a recipient educational institution which administers or assists in the administration of such scholarships, fellowship, or other awards which are restricted to members of one sex provides, or otherwise makes available reasonable opportunities for similar studies for members of the other sex. Such opportunities may be derived from either domestic or foreign sources.

(d) *Programs not operated by recipient.* (1) This paragraph applies to any recipient which requires participation by any applicant, student, or employee in any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient, including participation in educational con-sortia and cooperative employment and student-teaching assignments.

(2) Such recipient:

(i) Shall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any applicant, student, or employee of such recipient which this part would prohibit such recipient from taking; and

(ii) Shall not facilitate, require, permit, or consider such participation if such action occurs.

§ 86.32 Housing.

(a) *Generally.* A recipient shall not, on the basis of sex, apply different rules or regulations, impose different fees or requirements, or offer different services or benefits related to housing, except as provided in this section (including housing provided only to married students).

(b) *Housing provided by recipient.* (1) A recipient may provide separate housing on the basis of sex.

(2) Housing provided by a recipient to students of one sex, when compared to that provided to students of the other sex, shall be as a whole:

(i) Proportionate in quantity to the number of students of that sex applying for such housing; and

(ii) Comparable in quality and cost to the student.

(c) *Other housing.* (1) A recipient shall not, on the basis of sex, administer different policies or practices concerning occupancy by its students of housing other than provided by such recipient.

(2) A recipient which, through solicitation, listing, approval of housing, or otherwise, assists any agency, organization, or person in making housing available to any of its students, shall take such reasonable action as may be necessary to assure itself that such housing as is provided to students of one sex, when compared to that provided to students of the other sex, is as a whole: (i) Proportionate in quantity and (ii) comparable in quality and cost to the student. A recipient may render such assistance to any agency, organization, or person which provides all or part of such housing to students only of one sex.

(Secs. 901, 902, 907, Education Amendments of 1972, 86 Stat. 373, 374, 375; 20 U.S.C. 1681, 1682, 1686)

§ 86.33 Comparable facilities.

A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374)

§ 86.34 Access to course offerings.

A recipient shall not provide any course or otherwise carry out any of its education program or activity separately on the basis of sex, or require or refuse participation therein by any of its students on such basis, including health, physical education, industrial, business, vocational, technical, home economics, music, and adult education courses.

(a) With respect to classes and activities in physical education at the elementary school level, the recipient shall comply fully with this section as expeditiously as possible but in no event later than one year from the effective date of this regulation. With respect to physical education classes and activities at the secondary and post-secondary levels, the recipient shall comply fully with this section as expeditiously as possible but in no event later than three years from the effective date of this regulation.

(b) This section does not prohibit grouping of students in physical education classes and activities by ability as assessed by objective standards of individual performance developed and applied without regard to sex.

(c) This section does not prohibit separation of students by sex within physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(d) Where use of a single standard of measuring skill or progress in a physical education class has an adverse effect on members of one sex, the recipient shall use appropriate standards which do not have such effect.

(e) Portions of classes in elementary and secondary schools which deal exclusively with human sexuality may be conducted in separate sessions for boys and girls.

(f) Recipients may make requirements based on vocal range or quality which may result in a chorus or choruses of one or predominantly one sex.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 86.35 Access to schools operated by L.E.A.s.

A recipient which is a local educational agency shall not, on the basis of sex, exclude any person from admission to:

(a) Any institution of vocational education operated by such recipient; or

(b) Any other school or educational unit operated by such recipient, unless such recipient otherwise makes available to such person, pursuant to the same policies and criteria of admission, courses, services, and facilities comparable to each course, service, and facility offered in or through such schools.

(Sections 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 86.36 Counseling and use of appraisal and counseling materials.

(a) *Counseling.* A recipient shall not discriminate against any person on the basis of sex in the counseling or guidance of students or applicants for admission.

(b) *Use of appraisal and counseling materials.* A recipient which uses testing or other materials for appraising or counseling students shall not use different materials for students on the basis of their sex or use materials which permit or require different treatment of students on such basis unless such different materials cover the same occupations and interest areas and the use of such different materials is shown to be essential to eliminate sex bias. Recipients shall develop and use internal procedures for ensuring that such materials do not discriminate on the basis of sex. Where the

for the institution in which they reside. The Department of Labor has recently issued a proposed regulation under the Fair Labor Standards Act (FLSA) that covers the question of compensation for institutionalized persons. 42 FR 15224 (March 18, 1977). This Department will seek information and comment from the Department of Labor concerning that agency's experience administering the FLSA regulation.

36. *Health, welfare, and other social service providers.* Section 104.52(a) has been expanded in several respects. The addition of new paragraph (a)(2) is intended to make clear the basic requirement of equal opportunity to receive benefits or services in the health, welfare, and social service areas. The paragraph parallels §§ 104.4(b)(ii) and 104.43(b). New paragaph (a)(3) requires the provision of effective benefits or services, as defined in § 104.4(b)(2) (i.e., benefits or services which "afford handicapped persons equal opportunity to obtain the same result [or] to gain the same benefit * * *").

Section 104.52(a) also includes provisions concerning the limitation of benefits or services to handicapped persons and the subjection of handicapped persons to different eligibility standards. One common misconception about the regulation is that it would require specialized hospitals and other health care providers to treat all handicapped persons. The regulation makes no such requirement. Thus, a burn treatment center need not provide other types of medical treatment to handicapped persons unless it provides such medical services to nonhandicapped persons. It could not, however, refuse to treat the burns of a deaf person because of his or her deafness.

Commenters had raised the question of whether the prohibition against different standards of eligibility might preclude recipients from providing special services to handicapped persons or classes of handicapped persons. The regulation will not be so interpreted, and the specific section in question has been eliminated. Section 104.4(c) makes clear that special programs for handicapped persons are permitted.

A new paragraph (a)(5) concerning the provision of different or separate services or benefits has been added. This provision prohibits such treatment unless necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others.

Section 104.52(b) has been amended to cover written material concerning waivers of rights or consent to treatment as well as general notices concerning health benefits or services. The section requires the recipient to ensure that qualified handicapped persons are not denied effective notice because of their handicap. For example, recipients could use several different types of notice in order to reach persons with impaired vision or hearing, such as brailled messages, radio spots, and tacticle devices on cards or envelopes to inform blind persons of the need to call the recipient for further information.

Section 104.52(c) is a new section requiring recipient hospitals to establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care. Although it

would be appropriate for a hospital to fulfill its responsibilities under this section by having a full-time interpreter for the deaf on staff, there may be other means of accomplishing the desired result of assuring that some means of communication is immediately available for deaf persons needing emergency treatment.

Section 104.52(c), also a new provision, requires recipients with fifteen or more employees to provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills. Further, the Assistant Secretary may require a small provider to furnish auxiliary aids where the provision of aids would not adversely affect the ability of the recipient to provide its health benefits or service.

37. *Treatment of Drug Addicts and Alcoholics.* Section 104.53 is a new section that prohibits discrimination in the treatment and admission of drug and alcohol addicts to hospitals and outpatient facilities. Section 104.53 prohibits discrimination against drug abusers by operators of outpatient facilities, despite the fact that section 407 pertains only to hospitals, because of the broader application of section 504. This provision does not mean that all hospitals and outpatient facilities must treat drug addiction and alcoholism. It simply means, for example, that a cancer clinic may not refuse to treat cancer patients simply because they are also alcoholics.

38. *Education of institutionalized persons.* The regulation retains § 104.54 of the proposed regulation that requires that an appropriate education be provided to qualified handicapped persons who are confined to residential institutions or day care centers.

### Subpart G—Procedures

In § 104.61, the Secretary has adopted the title VI complaint and enforcement procedures for use in implementing section 504 until such time as they are superseded by the issuance of a consolidated procedureal regulation applicable to all of the civil rights statutes and executive orders administered by the Department.

### Appendix B—Guidelines for Eliminating Discrimination and Denial Of Services on the Basis of Race, Color, National Origin, Sex, and Handicap in Vocational Education Programs

Note.—For the text of these guidelines, see 34 CFR Part 100, Appendix B

## PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE

### Subpart A—Introduction

Sec.
106.1  Purpose and effective date.
106.2  Definitions.
106.3  Remedial and affirmative action and self-evaluation.
106.4  Assurance required.
106.5  Transfers of property.
106.6  Effect of other requirements.
106.7  Effect of employment opportunities.

Sec.
106.8  Designation of responsible employee and adoption of grievance procedures.
106.9  Dissemination of policy.

### Subpart B—Coverage

106.11  Application.
106.12  Educational institutions controlled by religious organizations.
106.13  Military and merchant marine educational institutions.
106.14  Membership practices of certain organizations.
106.15  Admissions.
106.16  Educational institutions eligible to submit transition plans.
106.17  Transition plans.
106.18–106.20  [Reserved].

### Subpart C—Discrimination on the Basis of Sex In Admission and Recruitment Prohibited

106.21  Admission.
106.22  Preference in admission.
106.23  Recruitment.
106.24–106.30  [Reserved].

### Subpart D—Discrimination on the Basis of Sex In Education Programs and Activities Prohibited

106.31  Education programs and activities.
106.32  Housing.
106.33  Comparable facilities.
106.34  Access to course offerings.
106.35  Access to schools operated by L.E.A.s.
106.36  Counseling and use of appraisal and counseling materials.
106.37  Financial assistance.
106.38  Employment assistance to students.
106.39  Health and insurance benefits and services.
106.40  Marital or parental status.
106.41  Athletics.
106.42  Textbooks and curricular material.
106.43–106.50  [Reserved].

### Subpart E—Discrimination on the Basis of Sex In Employment In Education Programs and Activities Prohibited

106.51  Employment.
106.52  Employment criteria.
106.53  Recruitment.
106.54  Compensation.
106.55  Job classification and structure.
106.56  Fringe benefits.
106.57  Marital or parental status.
106.58  Effect of State or local law or other requirements.
106.59  Advertising.
106.60  Pre-employment inquiries.
106.61  Sex as bona-fide occupational qualification.
106.62–106.70  [Reserved].

### Subpart F—Procedures (Interim)

106.71  Interim procedures.

Subject Index to Title IX Preamble and Regulation

**Appendix A—Guidelines for Eliminating Discrimination and Denial of Services on the Basis of Race, Color, National Origin, Sex, and Handicap in Vocational Education Programs.**

**Subpart A—Introduction**

**§ 106.1  Purpose and effective date.**

The purpose of this part is to effectuate title IX of the Education Amendments of 1972, as amended by Pub. L. 93–568, 88 Stat. 1855 (except sections 904 and 906 of those Amendments) which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part. This part is also intended to effectuate section 844 of the Education Amendments of 1974, Pub. L. 93–380, 88 Stat. 484. The effective date of this part shall be July 21, 1975.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682, as amended by Pub. L. 93–568, 88 Stat. 1855, and Sec. 844, Education Amendments of 1974, 86 Stat. 484, Pub. L. 93–380)

**§ 106.2  Definitions.**

As used in this part, the term—

(a) *"Title IX"* means title IX of the Education Amendments of 1972, as amended by section 3 of Pub. L. 93–568, 88 Stat. 1855, except sections 904 and 906 thereof; 20 U.S.C. 1681, 1682, 1683, 1685, 1686.

(b) *"Department"* means the Department of Health, Education, and Welfare.

(c) *"Secretary"* means the Secretary of Education.

(d) *"Assistant Secretary"* means the Assistant Secretary for Civil Rights of the Department.

(e) *"Reviewing Authority"* means that component of the Department delegated authority by the Secretary to appoint, and to review the decisions of, administrative law judges in cases arising under this part.

(f) *"Administrative law judge"* means a person appointed by the reviewing authority to preside over a hearing held under this part.

(g) *"Federal financial assistance"* means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

(h) *"Recipient"* means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.

(i) *"Applicant"* means one who submits an application, request, or plan required to be approved by a Department official, or by a recipient, as a condition to becoming a recipient.

(j) *"Educational institution"* means a local educational agency (L.E.A.) as defined by section 801(f) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 881), a preschool, a private elementary or secondary school, or an applicant or recipient of the type defined by paragraph (k), (l), (m), or (n) of this section.

(k) *"Institution of graduate higher education"* means an institution which:

(1) Offers academic study beyond the bachelor of arts or bachelor of science degree, whether or not leading to a certificate of any higher degree in the liberal arts and sciences; or

(2) Awards any degree in a professional field beyond the first professional degree (regardless of whether the first professional degree in such field is awarded by an institution of undergraduate higher education or professional education); or

(3) Awards no degree and offers no further academic study, but operates ordinarily for the purpose of facilitating research by persons who have received the highest graduate degree in any field of study.

(l) *"Institution of undergraduate higher education"* means:

(1) An institution offering at least two but less than four years of college level study beyond the high school level, leading to a diploma or an associate degree, or wholly or principally creditable toward a baccalaureate degree; or

(2) An institution offering academic study leading to a baccalaureate degree; or

(3) An agency or body which certifies credentials or offers degrees, but which may or may not offer academic study.

(m) *"Institution of professional education"* means an institution (except any institution of undergraduate higher education) which offers a program of academic study that leads to a first professional degree in a field for which there is a national specialized accrediting agency recognized by the Secretary.

(n) *"Institution of vocational education"* means a school or institution (except an institution of professional or graduate or undergraduate higher education) which has as its primary purpose preparation of students to pursue a technical, skilled, or semiskilled occupation or trade, or to pursue study in a technical field, whether or not the school or institution offers certificates, diplomas, or degrees and whether or not it offers fulltime study.

(o) *"Administratively separate unit"* means a school, department or college of an educational institution (other than a local educational agency) admission to which is independent of admission to any other component of such institution.

(p) *"Admission"* means selection for part-time, full-time, special, associate, transfer, exchange, or any other enrollment, membership, or matriculation in or at an education program or activity operated by a recipient.

(q) *"Student"* means a person who has gained admission.

(r) *"Transition plan"* means a plan subject to the approval of the Secretary pursuant to section 901(a)(2) of the Education Amendments of 1972, under

which an educational institution operates in making the transition from being an educational institution which admits only students of one sex to being one which admits students of both sexes without discrimination.

[Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682]

§ 106.3  Remedial and affirmative action and self-evaluation.

(a) *Remedial action.* If the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex in an education program or activity, such recipient shall take such remedial action as the Assistant Secretary deems necessary to overcome the effects of such discrimination.

(b) *Affirmative action.* In the absence of a finding of discrimination on the basis of sex in an education program or activity, a recipient may take affirmative action to overcome the effects of conditions which resulted in limited participation therein by persons of a particular sex. Nothing herein shall be interpreted to alter any affirmative action obligations which a recipient may have under Executive Order 11246.

(c) *Self-evaluation.* Each recipient education institution shall, within one year of the effective date of this part:

(1) Evaluate, in terms of the requirements of this part, its current policies and practices and the effects thereof concerning admission of students, treatment of students, and employment of both academic and non-academic personnel working in connection with the recipient's education program or activity;

(2) Modify any of these policies and practices which do not or may not meet the requirements of this part; and

(3) Take appropriate remedial steps to eliminate the effects of any discrimination which resulted or may have resulted from adherence to these policies and practices.

(d) *Availability of self-evaluation and related materials.* Recipients shall maintain on file for at least three years following completion of the evaluation required under paragraph (c) of this section, and shall provide to the Assistant Secretary upon request, a description of any modifications made pursuant to paragraph (c) (ii) of this section and of any remedial steps taken pursuant to paragraph (c) (iii) of this section.

[Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682]

[40 FR 21428, June 4, 1975; 40 FR 39506, Aug. 28, 1975]

§ 106.4  Assurance required.

(a) *General.* Every application for Federal financial assistance for any education program or activity shall as condition of its approval contain or be accompanied by an assurance from the applicant or recipient, satisfactory to the Assistant Secretary, that each education program or activity operated by the applicant or recipient and to which this part applies will be operated in compliance with this part. An assurance of compliance with this part shall not be satisfactory to the Assistant Secretary if the applicant or recipient to whom such assurance applies fails to commit itself to take whatever remedial action is necessary in accordance with § 86.3(a) to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination whether occurring prior or subsequent to the submission to the Assistant Secretary of such assurance.

(b) *Duration of obligation.* (1) In the case of Federal financial assistance extended to provide real property or structures thereon, such assurance shall obligate the recipient or, in the case of a subsequent transfer, the transferee, for the period during which the real property or structures are used to provide an education program or activity.

(2) In the case of Federal financial assistance extended to provide personal property, such assurance shall obligate the recipient for the period during which it retains ownership or possession of the property.

(3) In all other cases such assurance shall obligate the recipient for the period during which Federal financial assistance is extended.

(c) *Form.* The Director will specify the form of the assurances required by paragraph (a) of this section and the extent to which such assurances will be required of the applicant's or recipient's subgrantees, contractors, subcontractors, transferees, or successors in interest.

[Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682]

§ 106.5  Transfers of property.

If a recipient sells or otherwise transfers property financed in whole or in part with Federal financial assistance to a transferee which operates any education program or activity, and the Federal share of the fair market value of the property is not upon such sale or transfer properly accounted for to the Federal Government both the transferor and the transferee shall be deemed to be recipients, subject to the provisions of Subpart B of this part.

[Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682]

§ 106.6  Effect of other requirements.

(a) *Effect of other Federal provisions.* The obligations imposed by this part are independent of, and do not alter, obligations not to discriminate on the basis of sex imposed by Executive Order 11246, as amended; sections 799A and 845 of the Public Health Service Act (42 U.S.C. 295h–9 and 298b–2); Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); the Equal Pay Act (29 U.S.C. 206 and 206(d)); and any other Act of Congress or Federal regulation.

[Secs. 901, 902, 905, Education Amendments of 1972, 86 Stat. 373, 374, 375; 20 U.S.C. 1681, 1682, 1685]

(b) *Effect of State or local law or other requirements.* The obligation to comply with this part is not obviated or alleviated by any State or local law or other requirement which would render any applicant or student ineligible, or limit the eligibility of any applicant or student, on the basis of sex, to practice any occupation or profession.

(c) *Effect of rules or regulations of private organizations.* The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization, club, athletic or other league, or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives or benefits from Federal financial assistance.

[Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682]

§ 106.7  Effect of employment opportunities.

The obligation to comply with this part is not obviated or alleviated because employment opportunities in any occupation or profession are or may be more limited for members of one sex than for members of the other sex.

[Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682]

§ 106.8  Designation of responsible employee and adoption of grievance procedures.

(a) *Designation of responsible employee.* Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part.

The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph.

(b) *Complaint procedure of recipient.* A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 106.9  Dissemination of policy.

(a) *Notification of policy.* (1) Each recipient shall implement specific and continuing steps to notify applicants for admission and employment, students and parents of elementary and secondary school students, employees, sources of referral of applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient, that it does not discriminate on the basis of sex in the educational programs or activities which it operates, and that is required by title IX and this part not to discriminate in such a manner. Such notification shall contain such information, and be made in such manner, as the Assistant Secretary finds necessary to a prise such persons of the protections assured them by title IX and this part, but shall state at least that the requirement not to discriminate in education programs and activities extends to employment therein, and to admission thereto unless Subpart C does not apply to the recipient, and that inquiries concerning the application of title IX and this part to such recipient may be referred to the employee designated pursuant to § 106.8, or to the Assistant Secretary.

(2) Each recipient shall make the initial notification required by paragraph (a) (1) of this section within 90 days of the effective date of this part or of the date this part first applies to such recipient, whichever comes later, which notification shall include publication in: (i) Local newspapers; (ii) newspapers and magazines operated by such recipient or by student, alumnae, or alumni groups for or in connection with such recipient; and (iii) memoranda or other written communications distributed to every student and employee of such recipient.

(b) *Publications.* (1) Each recipient shall prominently include a statement of the policy described in paragraph (a) of this section in each announcement, bulletin, catalog, or application form

which it makes available to any person of a type, described in paragraph (a) of this section, or which is otherwise used in connection with the recruitment of students or employees.

(2) A recipient shall not use or distribute a publication of the type described in this paragraph which suggests, by text or illustration, that such recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part.

(c) *Distribution.* Each recipient shall distribute without discrimination on the basis of sex each publication described in paragraph (b) of this section, and shall apprise each of its admission and employment recruitment representatives of the policy of nondiscrimination described in paragraph (a) of this section, and require such representatives to adhere to such policy.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

Subpart B—Coverage

§ 106.11  Application.

Except as provided in this subpart, this Part 86 applies to every recipient and to each education program or activity operated by such recipient which receives or benefits from Federal financial assistance.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 86.12  Educational institutions controlled by religious organizations.

(a) *Application.* This part does not apply to an educational institution which is controlled by a religious organization to the extent application of this part would not be consistent with the religious tenets of such organization.

(b) *Exemption.* An educational institution which wishes to claim the exemption set forth in paragraph (a) of this section, shall do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 106.13  Military and merchant marine educational institutions.

This part does not apply to an educational institution whose primary purpose is the training of individuals for a military service of the United States or for the merchant marine.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)

§ 106.14  Membership practices of certain organizations.

(a) *Social fraternities and sororities.* This part does not apply to the membership practices of social fraternities and sororities which are exempt from taxation under section 501(a) of the Internal Revenue Code of 1954, the active membership of which consists primarily of students in attendance at institutions of higher education.

(b) *YMCA, YWCA, Girl Scouts, Boy Scouts and Camp Fire Girls.* This part does not apply to the membership practices of the Young Men's Christian Association, the Young Women's Christian Association, the Girl Scouts, the Boy Scouts and Camp Fire Girls.

(c) *Voluntary youth service organizations.* This part does not apply to the membership practices of voluntary youth service organizations which are exempt from taxation under section 501(a) of the Internal Revenue Code of 1954 and the membership of . which has been traditionally limited to members of one sex and principally to persons of less than nineteen years of age.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682; Sec. 3(a) of P.L. 93–568, 88 Stat. 1862 amending Sec. 901)

§ 106.15  Admissions.

(a) Admissions to educational institutions prior to June 24, 1973, are not covered by this part.

(b) *Administratively separate units.* For the purposes only of this section, §§ 86.16 and 86.17, and Subpart C, each administratively separate unit shall be deemed to be an educational institution.

(c) *Application of Subpart C.* Except as provided in paragraphs (d) and (e) of this section, Subpart C applies to each recipient. A recipient to which Subpart C applies shall not discriminate on the basis of sex in admission or recruitment in violation of that subpart.

(d) *Educational institutions.* Except as provided in paragraph (e) of this section as to recipients which are educational institutions, Subpart C applies only to institutions of vocational education, professional education, graduate higher education, and public institutions of undergraduate higher education.

(e) *Public institutions of undergraduate higher education.* Subpart C does not apply to any public institution of undergraduate higher education which traditionally and continually from its establishment has had a policy of admitting only students of one sex.

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374; 20 U.S.C. 1681, 1682)